ADAM R.F. GUSTAFSON
Principal Deputy Associate Attorney General

ERIC GRANT
United States Attorney
Eastern District of California

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General

DUSTIN J. WEISMAN (CO Bar #44818)
JOHN K. HEISE (CA Bar #331615)
Trial Attorneys
Natural Resources Section
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (303) 844-1369
Facsimile: (303) 844-1350
Email: dustin.weisman@usdoj.gov
Email: john.heise@usdoj.gov

*Attorneys for the United States*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>Defendants. | Case No. 2:26-cv-00107-DC-SCR<br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: February 20, 2026<br>Time: 1:30 pm<br>Judge: Hon. Dena M. Coggins<br>Magistrate Judge: Hon. Sean C. Riordan |

# Table of Contents

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 2

    I.      California's Regulatory Framework .......................................................... 2

           A.      Pre-SB 1137 Framework.............................................................. 2

           B.      SB 1137............................................................................................ 3

    II.     Federal Regulatory Framework .................................................................. 5

           A.      Mineral Leasing Act ..................................................................... 5

           B.      Federal Land Policy and Management Act............................... 6

           C.      The Federal Oil and Gas Leasing Process ................................ 7

    III.    SB 1137's Effects on Federal Lands and Leases ................................. 7

APPLICABLE LAW ........................................................................................................ 11

    I.      Federal Preemption ....................................................................................... 11

STANDARD OF REVIEW ............................................................................................. 13

ARGUMENT .................................................................................................................... 14

    I.      The United States is likely to succeed on the merits ........................... 14

           A.      SB 1137 obstructs federal policy under MLA and FLPMA .................... 14

           B.      SB 1137 is an impermissible land-use regulation, not a reasonable environmental regulation ................................................... 18

    II.     The United States has suffered, and will continue to suffer, irreparable harm..... 20

    III.    The balance of the equities and the public interest favor injunctive relief ........... 22

CONCLUSION.................................................................................................................. 24

# Table of Authorities

Page(s)

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982) ........................................................................................... 21

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) .......................................................................... 14

*Am. Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003) ........................................................................................... 12

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
  559 F.3d 1046 (9th Cir. 2009) .......................................................................... 22

*Arizona v. United States,*
  567 U.S. 387, at  (2012) .............................................................. 12, 17, 18, 21

*Barahona-Gomez v. Reno,*
  167 F.3d 1228 (9th Cir. 1999) .......................................................................... 13

*Barahona-Gomez v. Reno,*
  236 F.3d 1115 (9th Cir. 1999) .......................................................................... 13

*Bohmker v. Oregon,*
  903 F.3d 1029 (9th Cir. 2018) ............................................................ 16, 17, 18

*Boyle v. United Techs. Corp.,*
  487 U.S. 500 (1988) ........................................................................................... 12

*Brubaker v. Bd. of Cnty. Comm'rs, El Paso Cnty.,*
  652 P.2d 1050 (Colo. 1982) .................................................................... 13, 19

*Butte City Water Co. v. Baker,*
  196 U.S. 119 (1905) ........................................................................ 12, 17, 18, 20

*California Coastal Comm'n v. Granite Rock Co.,*
  480 U.S. 572 (1987) ........................................................................ 12, 13, 18, 19

*Chamber of Com. of U.S. v. Edmonson,*
  594 F.3d 742 (10th Cir. 2010) .......................................................................... 24

*Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,*
  450 U.S. 311 (1981) ........................................................................................... 12

*City of Milwaukee v. Illinois,*
  451 U.S. 304 (1981) ........................................................................................... 12

*CSX Transp., Inc. v. Easterwood,*
  507 U.S. 658 (1993) ................................................................................... 12, 18

*Daimler Truck N. A., LLC v. Cal. Air Cres. Bd.,*
  No. 2:25-cv-02255, 2025 U.S. Dist. LEXIS 215580 (E.D. Cal. Oct. 31, 2025) ...................... 21

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC,*
  915 F. Supp. 2d 1138 (C.D. Cal. 2012) ................................................................. 14

*Gibbons v. Ogden,*
  22 U.S. 1 (1824) .......................................................................................... 12

*Kleppe v. New Mexico,*
  426 U.S. 529 (1976) ......................................................................... 5, 13, 15, 19

*Louisiana v. Biden,*
  543 F. Supp. 3d 388 (W.D. La. 2021) ...................................................................... 23

*M'Culloch v. Maryland,*
  17 U.S. 316 (1819) ....................................................................................... 13

*Nash v. Fla. Indus. Comm'n,*
  389 U.S. 235 (1967) ................................................................................... 12, 18

*Nat'l City of Indiana v. Boutris,*
  No. Civ. S-03-0655, 2003 WL 21536818 (E.D. Cal. July 2, 2003) ........................................ 24

*New Orleans Pub. Serv., Inc. v. Council of New Orleans (NOPSI),*
  491 U.S. 350 (1989) ...................................................................................... 21

*Nken v. Holder,*
  556 U.S. 418 (2009) ...................................................................................... 22

*North Dakota v. United States,*
  495 U.S. 423 (1990) ...................................................................................... 13

*Pueblo Entero (LUPE) v. Abbott,*
  604 F. Supp.3d 512 (W.D. Tex. 2022) .................................................................... 21

*South S. Dakota Mining Ass'n v. Lawrence Cnty.,*
  155 F.3d 1005 (8th Cir. 1998) ..................................................... 12, 13, 15, 16, 19

*Texas v. Becerra,*
  577 F. Supp. 3d 527 (N.D. Tex. 2021) .................................................................... 21

*Texas v. Yellen,*
  105 F.4th 755 (5th Cir. 2024) ............................................................................ 21

*U.S. Philips Corps. v. KBC Bank,*
  590 F.3d 1091 (9th Cir. 2010) ........................................................................... 24

*United States v. Arizona,*
  641 F.3d 339 (9th Cir. 2011) ......................................................................... 1, 21

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) ............................................................................ 22

*United States v. California,*
   No. 2:18-cv-721-WBS-DB, 2018 WL 5780003 (E.D. Cal. Nov. 1, 2018) ...................... 13, 20

*United States v. City & Cnty. of S.F.San Francisco,*
   310 U.S. 16 (1940) ................................................................................................................. 5

*United States v. Oakland Cannabis Buyers' Coop.,*
   532 U.S. 483 (2001) ............................................................................................................. 22

*United States v. Texas,*
   144 S. Ct. 797 (2024) .......................................................................................................... 21

*United States v. Texas,*
   719 F. Supp. 3d 640 (W.D. Tex. 2024) ............................................................................... 21

*Ventura Cnty. v. Gulf Oil Corp.,*
   601 F.2d 1080 (9th Cir. 1979) .................................................................................. 13, 18, 19

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
   529 U.S. 765 (2000) ............................................................................................................. 21

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008) ................................................................................................... 13, 14, 20

**Statutes**

30 U.S.C. § 181 ............................................................................................................................. 5

30 U.S.C. § 209 ............................................................................................................................. 6

30 U.S.C. § 21a ....................................................................................................................... 6, 15

30 U.S.C. § 226 ............................................................................................................................. 6

30 U.S.C. § 226(b)(1)(A) .......................................................................................................... 6, 7

30 U.S.C. § 226(b)(1)(B) .............................................................................................................. 6

30 U.S.C. § 226(g) ........................................................................................................................ 7

30 U.S.C. § 351 ............................................................................................................................. 6

42 U.S.C. § 15910 ....................................................................................................................... 15

43 U.S.C. § 1332(3) ..................................................................................................................... 15

43 U.S.C. § 1701 ........................................................................................................................... 7

43 U.S.C. § 1701(a)(12) ......................................................................................................... 6, 15

43 U.S.C. § 1712(a) ...................................................................................................................... 7

43 U.S.C. § 1732(a) ...................................................................................................................... 7

Cal. Pub. Res. Code § 3010 .................................................................................................... 4, 17

CAL. PUB. RES. CODE § 3106 ................................................................................ 2

CAL. PUB. RES. CODE §§ 3236–3236.6 ............................................................... 5

CAL. PUB. RES. CODE §§ 3281(a)-(b) ............................................... 1, 3, 5, 9, 16

**Regulations**

43 C.F.R. § 1601.0-5(n) (2017) ........................................................................... 7

43 C.F.R. § 1610.5-3(a) (2017) ........................................................................... 7

43 C.F.R. § 3120.12 (2024) ................................................................................. 7

43 C.F.R. § 3162.3-1(e)-(f) (2024) ................................................................... 7, 8

43 C.F.R. §§ 3120.11 .......................................................................................... 7

**Other Authorities**

SB 1137,
   2021–2022 Leg. Reg. Sess. (Cal. Aug. 30, 2022) ...................................... 1

**List of Attachments**

1.  Declaration of Jeremiah Karuzas, BLM California State Office

2.  Declaration of Matthew Warren, BLM Oil and Gas Program

3.  Declaration of David Budy, Sentinel Peak Resources California LLC

4.  Declaration of Gary Richardson, E&B Natural Resources Management Corporation

5.  Declaration of Joseph Eller, Holmes Western Oil Corporation

6.  Declaration of Ralph Combs, Termo Company

7.  Declaration of Megan Schwartz, Catalyst Environmental Solutions Corporation

8.  Declaration of Rock Zierman, Native Oil Producers and Employees of California

# INTRODUCTION

That states may not dictate how the federal government manages federal lands is beyond cavil. Yet that is precisely what California Senate Bill 1137 ("SB 1137") seeks to do: it prohibits the development of fossil fuels within so-called "health protection zones," which cover substantial areas of federal land leased by the United States for fossil fuel production. This brazen overreach obstructs the United States' exclusive authority under the Property Clause to manage its own lands, and it unlawfully interferes with and frustrates federal leasing programs authorized and directed by Congress under the Mineral Leasing Act ("MLA"), the Federal Land Policy and Management Act ("FLPMA"), and other federal statutes. The United States is likely to succeed on the merits because federal law preempts the challenged provisions of SB 1137.[1]

SB 1137 irreparably injures the United States' sovereign interest in managing federal lands. *See United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds*, 567 U.S. 387 (2012) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm."). The balance of equities and the public interest strongly favor injunctive relief. California may share the United States' interest in protecting public health and safety, but it cannot obstruct or override Congress's policy choices and the government's land-use planning. SB 1137 deters prospective bidders from participating in lease sales, diminishes competition, and reduces the long-term value of federal fossil fuel resources. It also purports to override BLM's land use planning decisions on public lands in California. The operators that the federal government depends on to develop those resources are struggling to remain viable, jeopardizing the United States' ability to foster future fossil fuel development and eroding the financial return owed to the American public. The public has a compelling interest in ensuring that the federal government can manage its lands free from unlawful state interference and that national policy decisions made by the people's representatives in Congress are respected and carried out.

---

[1] *See* Compl., Dkt. No. 1, Prayer for Relief, ¶¶ a-b (citing CAL. PUB. RES. CODE §§ 3281(a)-(b) (challenged provisions); CAL. CODE REGS. tit. 14, §§ 1765-1765.10 (challenged associated regulations). For clarity, when this brief refers to "SB 1137" it is referring to both the challenged statutory provisions and the challenged associated regulations.

1    Because the United States is likely to prevail on the merits of its federal preemption claim,

2    and because SB 1137 causes ongoing, irreparable harm to the United States, this Court should

3    preliminarily enjoin the challenged provisions of SB 1137.

4    **FACTUAL BACKGROUND**

5    **I.    California's Regulatory Framework**

6    **A.  Pre-SB 1137 Framework**

7    To drill and produce oil or gas on a federal lease in California, an operator must get two

8    approvals: (1) a federal Application for Permit to Drill ("APD") from the Bureau of Land Man-

9    agement ("BLM"), and (2) a state Notice of Intention ("NOI") from the California Geologic En-

10   ergy Management Division ("CalGEM").

11   The federal APD process is a federal requirement and begins when the operator submits an

12   APD to BLM. BLM then conducts an on-site inspection that typically includes the operator, sur-

13   face and mineral estate representatives (if BLM does not manage the surface), BLM resource spe-

14   cialists, and, where applicable, other Surface Management Agencies (*e.g.*, U.S. Forest Service or

15   tribal authorities). Following the inspection, BLM—often in coordination with those agencies—

16   completes environmental review under the National Environmental Policy Act ("NEPA") and may

17   approve the APD, approve it with conditions, deny it, or defer decision.

18   Separately, California law requires operators to obtain CalGEM approval by filing a NOI

19   to drill or rework a well. CalGEM reviews the proposal for compliance with state health, safety,

20   and environmental requirements, including the California Environmental Quality Act ("CEQA").

21   CalGEM may approve the NOI, approve it with conditions, or deny it. Under state law, no drilling

22   or production activity may commence on federal lands in California without CalGEM's NOI ap-

23   proval. *See* Cal. Pub. Res. Code § 3106; Cal. Code Regs. tit. 14, §§ 1712-1724.4.

24   SB 1137 introduced a critical change to these parallel approval processes: CalGEM is now

25   statutorily required to deny any NOI for a well whose surface location falls within 3,200 feet of a

26   sensitive receptor (defined below). As a result, even when BLM has issued an APD authorizing

27   drilling and all federal requirements are met, California law prohibits operations in those zones,

28   rendering all or portions of existing federal leases undevelopable.

Prior to SB 1137, operators could develop the full extent of their federal leases, subject to any conditions in their lease/APD and applicable federal and state regulations governing environmental protection, public health, and safety. State regulators such as CalGEM could exercise their authority to impose conditions on *how* development occurred—for example, by requiring emissions controls, modifying drilling plans, or implementing mitigation measures—but they could not impose blanket prohibitions that rendered the entirety or large portions of federal leases off-limits. *See* Decl. of Jeremiah Karuzas ("Karuzas Decl.") ¶¶ 6, 20. As a result, the United States and operators reasonably expected to access and develop all or most of the resource, while adjusting their operations to meet regulatory requirements. SB 1137's setback requirement marks a fundamental departure from this regulatory framework by categorically excluding large swaths of federal land from any surface development and preventing operators from accessing all or substantial portions of the underlying resources.

**B.  SB 1137**

In September 2022, Defendant Governor Gavin Newsom signed SB 1137 into law. *See* Understanding California's Oil and Gas Safety Zones: Senate Bill 1137, https://www.conservation.ca.gov/calgem/Pages/SB1137.aspx (last visited Jan. 16, 2026). SB 1137 establishes expansive "health protection zones" ("HPZs") in which almost all new fossil fuel development and modifications to existing operations are prohibited, including development on federal lands.

Initial implementation began on January 1, 2023, when Defendant CalGEM stopped approving new well permits within HPZs. *Id*. On February 3, 2023, implementation was suspended after an industry-led referendum qualified for the ballot, but resumed on June 28, 2024, after the referendum was withdrawn. *Id*. On August 1, 2025, CalGEM published the "SB 1137 First Implementation Regulations" in the *OAL Notice Register*, starting a 45-day public comment period ending September 18, 2025. *Id*.

SB 1137 added Sections 3280 through 3291 to the California Public Resources Code. The United States challenges two core provisions. First, Section 3281(a) directs that CalGEM "shall not approve any notice of intention under Section 3203 within a health protection zone," with rare exceptions—such as to address an imminent threat to health, safety, or the environment; to comply

1    with a court order finding that denial would constitute a taking or otherwise require approval; or

2    to plug and abandon a well. Second, Section 3281(b) prohibits construction or operation of "new

3    production facilities" in HPZs unless associated with an approved notice of intention under subdi-

4    vision (a) or deemed necessary by CalGEM to protect health and safety.

5         The statute defines "production facility" to include not only wells, but also virtually any

6    equipment attendant to oil and gas production, such as tanks, flowlines, gathering lines, wellheads,

7    pumps, compressors, and pipelines not regulated by the State Fire Marshal. CAL. PUB. RES. CODE

8    § 3010. Section 3280(b) defines an HPZ as "the area within 3,200 feet of a sensitive receptor,"

9    while Section 3280(c) defines "sensitive receptor" to include residences, schools, community cen-

10   ters, healthcare facilities, live-in housing, and businesses open to the public.

11        SB 1137's legislative history makes clear that its drafters intended the law to operate as a

12   "ban" on new drilling within the HPZ, explaining that "no new wells" would be permitted there

13   that Notices of Intention would be "categorically denied" barring certain narrowly defined excep-

14   tions. *See* Bill Analysis, S.B. 1137, 2021–2022 Leg. Reg. Sess. (Cal. Aug. 30, 2022) (Assembly

15   Floor); S. Floor Analysis, S.B. 1137, 2021–2022 Leg. Reg. Sess. (Cal. Aug. 30, 2022). Even

16   though the legislature repeatedly described the "health protection zone" as a "setback," SB 1137

17   was clearly drafted as a zoning ordinance to keep oil and gas operations at a defined distance from

18   certain areas "depending on land use." *Id*. These analyses underscore that the legislature intended

19   SB 1137 to operate as a land-use prohibition rather than an environmental standard.

20        CalGEM issued guidance explaining that noncompliance with SB 1137 or its implementing

21   regulations may result in civil and criminal enforcement. *See* FAQ for Local Government and

22   Planning Bodies on SB 1137, https://www.conservation.ca.gov/calgem/Pages/SB1137-FAQ.aspx

23   (last visited Jan. 16, 2026). And CalGEM has told federal lessees and operators that it will take

24   enforcement action against them for violating SB 1137's setback provisions. *See* Decl. of Megan

25   Schwartz ("Schwartz Decl.") ¶¶4-7 (recounting statements by State officials—including the Cali-

26   fornia Department of Conservation's Chief Counsel and the State Oil and Gas Supervisor—that

27   SB 1137's challenged provisions apply to federal leases and that the State would pursue civil and

28   potentially criminal action against suspected violators); Decl. of Joseph Eller ("Eller Decl.") ¶ 4

1 (recounting meeting where CalGEM said it intended to bring enforcement actions against opera-

2 tors who drill within an HPZ without an NOI); Decl. of Ralph Combs ("Combs Decl.") ¶¶ 4-7

3 (similar). Violations constitute misdemeanors and are punishable under existing law. CAL. PUB.

4 RES. CODE §§ 3236–3236.6. SB 1137 contains no exemption for operations on federal lands or

5 under federal leases and CalGEM has relied on SB 1137's setback provisions to deny or withhold

6 approval of federal lessees' NOIs. *Id.* § 3281(a).[2]

7 ## II.    Federal Regulatory Framework

8 Congress has the exclusive "Power to dispose of and make all needful Rules and Regula-

9 tions respecting the Territory or other Property belonging to the United States." U.S. CONST.

10 art. IV, § 3, cl. 2; *United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 29 (1940) (Con-

11 gress' power over federal lands is "without limitation[]."). While a state, "[a]bsent consent or ces-

12 sion[,] . . . undoubtedly retains jurisdiction over federal lands within its territory," Congress "re-

13 tains the power to enact legislation respecting those lands pursuant to the Property Clause," and

14 when it acts, "the federal legislation necessarily overrides conflicting state laws under the Suprem-

15 acy Clause." *Kleppe v. New Mexico*, 426 U.S. 529, 543-44 (1976) (citation modified). Two key

16 federal statutes, enacted under Congress's Property Clause authority, reflect congressional intent

17 for the development of fossil fuels on federal lands: the MLA and FLPMA.

18 ### A.  Mineral Leasing Act

19 The MLA, 30 U.S.C. § 181 *et seq.*, established a type of mineral category called "leasable"

20 minerals. Under the MLA, deposits of oil and gas are made subject to disposition through a leasing

---

23 [2] What SB 1137's text makes clear on its face—that NOIs will be categorically denied for all
operations within HPZs, even for operations on federal lands and leases—operators have seen in
practice. *See* Combs Decl. ¶¶ 10-11 (CalGEM placed Termo's NOI application in abeyance—a
practice used to delay action—and, after a "sensitive receptor" appeared and CalGEM determined
that the well was within an HPZ where it said it will not issue NOIs, CalGEM has yet to issue a
decision; given CalGEM's stated policy of denying NOIs in HPZs, Termo has not submitted other
NOIs for similarly situated federal wells); Eller Decl. ¶ 4 (CalGEM said it would not approve NOIs
for wells on federal lands due to location within HPZs); Decl. of David Budy ("Budy Decl.") ¶¶ 5-
10 (because of SB 1137, CalGEM has not acted on NOI applications for federal wells submitted
in early 2022).

process. This leasing process allows the Secretary of the Interior, through BLM, to retain title to the land and establish, in accordance with law, the type of lease, duration of the lease, acreage limitations, royalty and rental terms, and other terms and conditions. The Mineral Leasing Act for Acquired Lands of 1947, 30 U.S.C. § 351 *et seq.*, extended the mineral leasing laws to all lands acquired by the United States. The Act allows the United States to retain title to the land and to establish lease terms for all minerals found on acquired land.

As amended, the MLA reflects a national policy "to foster and encourage private enterprise in . . . the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security[,] and environmental needs." 30 U.S.C. § 21a. Leases issued under the MLA confer the right to explore for, drill, and produce oil and gas on public lands, subject to applicable federal regulations and lease stipulations. 30 U.S.C. § 226.

Congress set a national minimum bid of $10 per acre for onshore federal oil and gas leases. 30 U.S.C. § 226(b)(1)(B). The royalty rate for oil and gas produced from federal onshore leases is based on the production amounts, the lease royalty rate, and the value of the product. *See* 30 U.S.C. § 226(b)(1)(A). The royalty rate is a percentage of the value of the production removed or sold from the leased lands and there is a statutory minimum of 12.5 percent for oil and gas. *Id.* In general, all production is subject to royalty payments, except in limited cases where royalty payments are statutorily or administratively reduced or waived for policy reasons, for unavoidably lost production, or for production used on or for the benefit of the lease. *See* 30 U.S.C. § 209.

### B. Federal Land Policy and Management Act

FLPMA, 43 U.S.C. § 1701 *et seq.*, establishes a framework for the multiple-use management of public lands, including the orderly and efficient development of mineral resources. In FLPMA, Congress declared "that it is the policy of the United States that . . . the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals." 43 U.S.C. § 1701(a)(12). The term "mineral" includes oil and gas. *See* 30 U.S.C. § 21a.

### C.  The Federal Oil and Gas Leasing Process

Consistent with the MLA and the FLPMA, BLM follows a three-step process for leasing and extraction on public lands. First, BLM adopts a Resource Management Plan ("RMP") assessing the oil and gas resources in a broad geographic area and identifying areas of land open to development. 43 C.F.R. § 1601.0-5(n) (2017). The Plan establishes, among other things, "[l]and areas for limited, restricted or exclusive use," "[a]llowable resource uses . . . and related levels of production or use to be maintained," "[r]esource condition goals and objectives to be attained," and "[p]rogram constraints and general management practices." *Id.*; *see also* 43 U.S.C. § 1712(a). FLPMA requires that BLM manage public lands "in accordance with the land use plans developed." 43 U.S.C. § 1732(a); *see also* 43 C.F.R. § 1610.5-3(a) (2017) ("All future resource management authorizations and actions . . . shall conform to the approved plan.").

Second, once an RMP is adopted, if BLM has identified land available for oil and gas extraction, it is required to hold competitive lease sales "at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b)(1)(A) (2025); *see* 43 C.F.R. § 3120.12 (2024). BLM identifies parcels for sale, sometimes responding to expressions of interest from potential lessees, and sometimes selecting parcels on its own. 43 C.F.R. §§ 3120.11, 3120.31 (2024).

Third, after the land has been auctioned off, oil and gas operators submit drilling proposals to BLM. 30 U.S.C. § 226(g). To obtain a permit to drill, operators must submit a drilling plan and a surface use plan describing the anticipated drill-site construction, identifying potential hazards, and specifying mitigation or reclamation measures. 43 C.F.R. § 3162.3-1(e)-(f) (2024). No drilling operations or surface disturbance may occur until BLM approves a drilling permit. *Id.* § 3162.3-1(c). In approving drilling applications, the agency may impose modifications or conditions on the permit. *Id.* § 3162.3-1(h)(1).

### III.    SB 1137's Effects on Federal Lands and Leases

Congress, through statutes such as the MLA and FLPMA, entrusted BLM with the authority and responsibility to manage federal lands, including the development of the Nation's oil and gas resources. Through resource management plans, environmental reviews, lease sales, and other

actions, BLM conducts detailed assessments to identify lands best suited for responsible fossil fuel development and then carefully permits and monitors such activities in alignment with national policy objectives. *See* Warren Decl. ¶¶ 5-19. California's SB 1137, however, attempts to usurp federal land-use planning and override these federal determinations by imposing state restrictions that preclude the use of federal lands designated for fossil fuel development. As a result, federal lands that have been thoughtfully selected and authorized for fossil fuel production are now barred from development, disrupting the federal government's management and policy priorities. *See* Karuzas Decl. ¶¶ 16, 19-21 (BLM expects SB 1137 to foreclose new development and routine workovers on approximately 33% of existing federal leases and believes the share of affected federal leases will continue to increase as additional HPZs are designated); Warren Decl. ¶ 30 (SB 1137 undermines BLM's ability to lease and manage federal mineral resources as it sees fit and disrupts federal land management and policy priorities.).

SB 1137's impact on the federal government's management of its land use is not trivial. The United States possesses title to approximately forty-seven million acres in California. Karuzas Decl. ¶ 4. In fiscal year 2024, oil and gas development on federal lands in California generated over $78M in revenue, which BLM expects will decline because of SB 1137.[3] Warren Decl. ¶¶ 24-25. Through BLM, the United States currently administers an estimated 616 oil and gas leases on federal lands and mineral estate in the state. Karuzas Decl. ¶ 4. About 202 of those leases are impacted by Verified HPZs (33%), with roughly sixteen additional leases impacted by Potential HPZs. *Id*. ¶ 17. In total, about 218 leases—over a third of all federal leases in California—encompassing over 19,000 acres that overlap with a Verified or Potential HPZs. *Id*. About seventy-nine of these leases lie entirely within HPZs. *Id*. But SB 1137's reach is not static. Any lease—even one currently untouched—can be swept into an HPZ if a "sensitive receptor" is later established nearby, and partial HPZ coverage can quickly become total. Because the United States may hold additional lease sales, and because HPZ boundaries will expand with every newly identified

---

[3] In fiscal year 2023 (October 1, 2022–September 30, 2023), before California fully implemented SB 1137 on June 28, 2024, federal oil and gas revenues from California exceeded $90 million. Warren Decl. ¶ 24 n.3.

"sensitive receptor," the statute's impact on federal land use and oil and gas leasing is expected to grow and intensify over time. *Id.* ¶¶ 15, 21.

Even where an operator holds a valid federal lease and necessary federal permit, SB 1137 can bar them from developing oil and gas resources on federal lands both within and outside an HPZ setback zone. *See* Decl. of Gary Richardson ("Richardson Decl.") ¶¶ 7, 10-11, 17-18 (development of 189 new wells precluded); Eller Decl. ¶¶ 2, 4 (development of fourteen wells precluded); Budy Decl. ¶¶ 4, 10 (development of twenty-four wells precluded); Combs Decl. ¶¶ 8-12 (development of one well precluded). This is because SB 1137's challenged provisions act as a categorical ban, without any meaningful exceptions, on the development of oil and gas resources within HPZs. For leases that fall entirely within an HPZ, SB 1137 renders the lease inaccessible to development. *See* Eller Decl. ¶ 4; Budy Decl. ¶ 4; Combs Decl. ¶ 9.

For some leases that fall partially within an HPZ, operators cannot access oil and gas resources. *See* Richardson Decl. ¶¶ 10-18 (E&B Resources to abandon development of project, including portions outside of HPZs, because 183 of 189 proposed wells and 97% of the federally leased land are within HPZs). Alternative drilling methods—such as attempting to reach HPZ-restricted minerals from outside the zone through horizontal or directional drilling—often provide no relief because they are physically impossible, economically infeasible, or both, due to the physical characteristics of the land and oil. *See* Richardson Decl. ¶¶ 11-17 (discussing the infeasibility or impossibility of alternative drilling methods); Combs Decl. ¶ 9 (describing how geologic formations and economic considerations make alternative drilling methods not viable).

The impact of HPZs extends still more broadly. Even some fossil fuel resources outside of HPZs are undevelopable because operators must place infrastructure within an HPZ to support production outside of HPZs, and Sections 3281(a)–(b) categorically bar such infrastructure where an NOI is required—which is true for almost all infrastructure. *See* Richardson Decl. ¶¶ 25-26 (describing how SB 1137 has frustrated development on federal leases outside HPZs because existing facilities on leases within HPZs would need to be expanded); Decl. of Rock Zierman ("Zierman Decl.") ¶ 3.

SB 1137 has and will continue to have an impact on oil production and federal revenue. The immediate financial impact of SB 1137 on existing leases includes reduced or halted production, which reduces the royalty payments owed to the United States. *See* Karuzas Decl. ¶¶ 18-21 (BLM estimates that 16.5% of the 2,047 active wells on federal lands are within HPZs, and SB 1137 prohibits routine workovers.); Richardson Decl. ¶¶ 23-24 ($67M loss in royalty revenue to the United States over an eleven-year period due to the inability to develop a 189-well project); Eller Decl. ¶¶ 5-6 ($5,835,375 loss in royalty revenue to the United States due to the inability to develop fourteen wells). Revenue to the United States will be reduced when lessees with affected leases request suspensions from BLM. *See* Warren Decl. ¶ 28.

Moreover, as the number of sensitive receptors increases, expanding HPZ boundaries, SB 1137's negative effects on production and royalties will grow. *See* Richardson Decl. ¶ 16 (discussing how new "sensitive receptors" would widen SB 1137's negative impacts and affect additional federal leases); Combs Decl. ¶ 10 (illustrating how a well initially outside an HPZ can become subject to HPZ restrictions mid-NOI review due to the sudden appearance of a new sensitive receptor); Karuzas Decl. ¶¶ 15, 21 (noting that any lease can be covered by an HPZ if a "sensitive receptor" is later established by CalGEM nearby) . The uncertainty surrounding potential future HPZ designations discourages current operators with federal leases from making the investments necessary to develop federal fossil fuel resources. *See* Richardson Decl. ¶¶ 20-21 (E&B Resources is unable to invest in existing wells and production facilities within HPZs because it cannot obtain NOIs due to SB 1137.); Combs Decl. ¶¶ 11-12 (Termo halted development on federal leases within HPZs because CalGEM will not issue NOIs and because new sensitive receptors could render investments worthless); Zierman Decl ¶ 4 (operators have not pursued otherwise-viable projects due to SB 1137-cause uncertainty, particularly the possibility of HPZ expansion).

SB 1137's harmful effects extend beyond current lessees, eroding the value of any future federal leases in both bonus bids and royalties. *See* Zierman Decl. ¶¶ 5-7 (deters small operators from bidding on federal leases); Warren Decl. ¶¶ 25-29 (noting potential for diminished federal revenue). At the lease-sale stage, SB 1137 deters operators from bidding on federal lands within HPZs because it creates uncertainty over whether the lands can be developed, and when operators

do bid, they necessarily offer less—reflecting the fear of losing of developable acreage and the substantial risk that future HPZ designations will further undercut their investment. Indeed, several operators have opted to forgo bidding on federal leases given these risks. *See* Richardson Decl. ¶ 27; Eller Decl. ¶ 7; Combs Decl. ¶ 10; Zierman Decl. ¶¶ 5-7. Even when leases are issued, projected royalty revenues drop sharply when portions of the leased lands are rendered undevelopable by existing or future HPZ restrictions. *See* Richardson Decl. ¶¶ 23-24; Eller Decl. ¶¶ 5-6; Budy Decl. ¶ 10; Karuzas Decl. ¶ 21. SB 1137 thus devalues federal mineral resources at every stage.

Through the MLA and FLPMA, Congress has directed BLM to identify, lease as appropriate, and regulate federal lands suitable for oil and gas development. This process balances environmental stewardship, economic benefit, and national energy needs. SB 1137 upends this framework by imposing state setbacks that bar development within HPZs, even where BLM has determined such lands are open and appropriate for energy production. As a result, federal leases—awarded through bidding and governed by detailed federal regulations—are rendered inoperable, depriving the United States of the use of its lands for the very purposes Congress intended.

SB 1137 also threatens the viability of smaller, independent operators—companies that are critical to developing federal leases but often lack the capital reserves to survive prolonged production delays or costly compliance burdens. *See* Richardson Decl. ¶ 28; Zierman Decl. ¶¶ 6-7. As these operators leave the California market because of SB 1137, the United States will face diminished competition in its future lease sales, lower lease bids, and the risk of undeveloped resources remaining idle. *See* Richardson Decl. ¶ 27; Eller Decl. ¶ 7; Warren Decl. ¶¶ 25-29; Combs Decl. ¶ 10; Zierman Decl. ¶¶ 5-7. The ripple effects extend to the loss of high-paying jobs in the energy sector and associated industries, further eroding the economic benefits that federal energy development provides to local communities and the Nation.

**APPLICABLE LAW**

## I.     Federal Preemption

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the

Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. States laws that "interfere with, or are contrary to the laws of Congress, made in pursuance of the [C]onstitution, or some other treaty made under the authority of the United States . . . must yield to it." *Gibbons v. Ogden,* 22 U.S. 1, 82 (1824); *see also Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317 (1981).

Federal law preempts conflicting state law. *Arizona v. United States*, 567 U.S. at 399 ; *see also Butte City Water Co. v. Baker*, 196 U.S. 119, 125 (1905) (state law "must be entirely consistent with the Federal laws, otherwise it is of no effect").[4] "Evidence of pre-emptive purpose" must be "sought in the [relevant statute's] text and structure." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); *see also Nash v. Fla. Indus. Comm'n*, 389 U.S. 235, 239 (1967) ("States [are] devoid of power to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." (citation modified)). Because federal land-use regulations are not in a field traditionally subject to state regulations, *see* U.S. Const. art VI, cl. 2, "[t]he conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988).

When addressing conflict preemption, the Supreme Court has distinguished between land use and environmental regulations. *See California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572 (1987). States may not apply land-use regulations that conflict with federal law, but they may apply environmental regulations that do not "mandate particular uses of [federal] land," but only require that "however the land is used, damage to the environment is kept within prescribed limits." *Id.* at 587. To put a finer point on it, states may not "prohibit a lawful use of the sovereign's land that the superior sovereign itself permits and encourages." *S. Dakota Mining Ass'n v. Lawrence Cnty.*, 155 F.3d 1005, 1011 (8th Cir. 1998) ("To do so offends both the Property Clause and the Supremacy Clause of the federal Constitution."). Allowing states to implement these prohibitions

---

[4] Federal preemption can occur in other ways. Federal law can expressly preempt state law, *see Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 417 (2003), and it preempts state law that intrudes into a field occupied exclusively by federal law, *see City of Milwaukee v. Illinois*, 451 U.S. 304, 316-17 (1981).

1  "would place the public domain of the United States completely at the mercy of state legislation,"

2  *Kleppe*, 426 U.S. at 543.

3       Even though states may enact generally applicable public health and environmental laws,

4  such laws are preempted if they conflict with federal statutes, frustrate federal objectives, or inter-

5  fere with federal mineral leases. *See Granite Rock*, 480 U.S. at 587; *Ventura Cnty. v. Gulf Oil*

6  *Corp.*, 601 F.2d 1080 (9th Cir. 1979), *aff'd sub nom. Ventura Cnty. v. Gulf Oil Corp.*, 445 U.S.

7  947 (1980); *S. Dakota Mining Ass'n*, 155 F.3d at 1011; *Brubaker v. Bd. of Cnty. Comm'rs, El Paso*

8  *Cnty.*, 652 P.2d 1050 (Colo. 1982).

9       Rooted in the Supremacy Clause and closely linked to federal preemption, the intergovern-

10  mental immunity doctrine also prohibits states from regulating or interfering with the operations

11  of the federal government or those with whom it engages. *M'Culloch v. Maryland*, 17 U.S. 316,

12  317 (1819) ("[S]tates have no power, by taxation or otherwise, to retard, impede, burden, or in any

13  manner control, the operations of the constitutional laws enacted by [C]ongress."). A state law

14  violates the intergovernmental immunity doctrine if it directly regulates the federal government or

15  discriminates against it or its contractors, *North Dakota v. United States*, 495 U.S. 423, 435 (1990),

16  even if the law does not target the federal government, *United States v. California*, No. 2:18-cv-

17  721-WBS-DB, 2018 WL 5780003, at *4 (E.D. Cal. Nov. 1, 2018).

18                          **STANDARD OF REVIEW**

19       The purpose of a preliminary injunction is to preserve the status quo of the parties and

20  prevent irreparable loss before judgment can issue. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1234

21  (9th Cir. 1999), *supplemented*, 236 F.3d 1115 (9th Cir. 1999). A plaintiff seeking a preliminary

22  injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer

23  irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

24

25

26

27

28

1  and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20

2  (2008).[5]

3                                              **ARGUMENT**

4  **I.    The United States is likely to succeed on the merits.**

5          The United States is likely to succeed on the merits because SB 1137 violates the Suprem-

6  acy Clause—that is, it directly conflicts with Congress's policy decisions and is preempted by the

7  MLA and FLPMA. Enacted under Congress's Property Clause authority, MLA and FLPMA col-

8  lectively entrust BLM with the responsibility to determine which federal lands are open and suit-

9  able for fossil fuel development, to lease those lands, and to regulate drilling operations. California

10  may not—through SB 1137 or any other state law or land-use regulation—obstruct or override

11  those determinations. Nor can California attempt to sidestep the preemptive effect of the MLA and

12  FLPMA by recasting SB 1137, which operates as a land-use planning law, as a reasonable envi-

13  ronmental regulation under *Granite Rock* or as a law that regulates only lessees and not the federal

14  government. California thus lacks authority to enforce the challenged provisions of SB 1137

15  against federal lands and lessees.

16          **A.  SB 1137 obstructs federal policy under MLA and FLPMA.**

17          SB 1137 obstructs federally enacted policies governing oil and gas development on federal

18  lands. Acting under the MLA and FLPMA, BLM has determined through its land-use planning

19  process that certain federal lands in California are open and suitable for fossil fuel development.

20  But through SB 1137, California seeks to override those land-use determinations—and foreclose

21  any future federal decisions—by making land-use decisions to categorically prohibit such

22

23

24  ───────────────────

   [5] The Ninth Circuit has articulated an alternate formulation of the *Winter* test, suggesting that in-
25  junctive relief is appropriate where the plaintiff can show "serious questions" going to the merits
   and a balance of hardships that "tips sharply" towards the plaintiff. *All. for the Wild Rockies v.*
26  *Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation omitted). To the extent that the
   "serious questions" formulation is different that the "likelihood" standard, *see, e.g.*, *Fox Television*
27  *Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1141 n.6 (C.D. Cal. 2012)
   (declining to apply "serious questions" standard), the United States satisfies both standards.
28

1  development within state-designated HPZs. This creates a direct conflict between federal and state

2  law, and under the Supremacy Clause, SB 1137's challenged prohibitions must yield.

3        Congress passed the MLA and FLPMA to plan for, promote, authorize, and regulate min-

4  eral development on federal lands. SB 1137 obstructs this federal policy by prohibiting develop-

5  ment that BLM, through the MLA and FLPMA, has planned for and authorized. As the Supreme

6  Court explained in *Kleppe* that "[a]bsent consent or cession a State undoubtedly retains jurisdiction

7  over federal lands within its territory, but Congress equally surely retains the power to enact leg-

8  islation respecting those lands pursuant to the Property Clause . . . . And when Congress so acts,

9  the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause."

10  426 U.S. at 543-44.

11        To be sure, Congress has not explicitly barred California from regulating federal lands for

12  environmental purposes, but that does not resolve SB 1137's constitutional infirmity. Consider

13  *South Dakota Mining Ass'n*, which explained that "[a] local government cannot prohibit a lawful

14  use of the sovereign's land that the superior sovereign itself permits and encourages." 155 F.3d at

15  1011. A prohibition of that nature "offends both the Property Clause and the Supremacy Clause,"

16  *id.*, and allowing it "would place the public domain of the United States completely at the mercy

17  of state legislation," *Kleppe*, 426 U.S. at 543. SB 1137 offends these same principles.

18        In both the MLA and FLPMA, Congress made unmistakably clear its intent to promote

19  fossil fuel development on federal lands. To start, the MLA reflects Congress's "continuing pol-

20  icy … to foster and encourage … the orderly and economic development of domestic mineral re-

21  sources" in order "to help assure satisfaction of industrial, security, and environmental needs." 30

22  U.S.C. § 21a. Turning to FLPMA, Congress reaffirmed that same commitment, directing that

23  "public lands be managed in a manner which recognizes the Nation's need for domestic sources

24  of minerals." 43 U.S.C. § 1701(a)(12). Congress has implemented this same policy across multiple

25  statutes. *See*, *e.g.*, 42 U.S.C. § 15910 (promoting oil and gas production on federal lands through

26  incentives); 43 U.S.C. § 1332(3) (declaring the Outer Continental Shelf "a vital national resource

27  reserve" to be made available for "expeditious and orderly development"). Not only has Congress

28

1   encouraged development, but it also established a statutory framework to ensure that such devel-

2   opment proceeds in a planned and balanced way with environmental and other public interests.

3       SB 1137 contravenes this federal law and policy supporting planned and responsible de-

4   velopment on federal lands. A state may not "prohibit a lawful use of the sovereign's land that the

5   superior sovereign itself permits and encourages." *S. Dakota Mining Ass'n*, 155 F.3d at 1011. Yet

6   that is what California has done in SB 1137, which effectively arrogates land use planning on

7   federal lands to itself and bars the development of fossil fuel resources whenever they lie within

8   one kilometer (about 3,200 feet) of state-defined "sensitive receptors." Cal. Pub. Res. Code

9   §§ 3281(a)-(b). Operators must file a NOI with CalGEM before undertaking new development—

10  or even performing most work on existing facilities—and SB 1137 directs CalGEM to deny those

11  applications except in narrowly defined circumstances tied to health and safety. *Id*. The result is a

12  de facto ban on lands that BLM has determined through its land-use planning are open to oil and

13  gas leasing and without asking the Secretary to withdraw the lands from oil and gas leasing under

14  FLPMA. No new fossil fuel development is permitted within the setback zone, and existing oper-

15  ations are steadily phased out because operators are prohibited from modifying, upgrading, or re-

16  pairing their facilities. *Id*. The impact is substantial: over 200 federal leases in California—roughly

17  one-third of all federal leases—and millions of acres of federal land are effectively rendered off-

18  limits to development, and that number is expected to rise as additional HPZs are designated. *See*

19  Karuzas Decl. ¶¶ 15-21.

20      The Ninth Circuit's decision in *Bohmker v. Oregon*, 903 F.3d 1029 (9th Cir. 2018) does

21  not require a different result. There, the court held that Oregon's ban on "the use of motorized

22  mining equipment in rivers and streams containing essential salmon habitat" was "a reasonable

23  environmental regulation, not a state land use planning law." *Id.* at 1031. Notably, the United

24  States filed an amicus brief in *Bohmker* arguing that Oregon's statute did not conflict with federal

25  law and was thus not preempted. *Id*. at 1050. Unlike SB 1137, Oregon's statute did "not choose or

26  mandate land uses," and it was "reasonably tailored to achieve its environmental purpose without

27  unduly interfering with mining operations." *Id.* at 1040. Rather, Oregon's law prohibited a specific

28  mining method (mining with motorized equipment) to protect a specific environmental interest

(essential habitat for threatened salmon). *Id.* The same is not true here. SB 1137 does not ban certain drilling methods. Instead, it is a de facto ban on *all* new development activities (as well as current and future maintenance necessary to continue development activities) in HPZs. Nor is it reasonably tailored to address an "environmental purpose without unduly interfering with mining operations." *Id.* Indeed, SB 1137's HPZs affect nearly one-third of all federal leases in California—roughly 218 of 616 leases. Compl. ¶ 47. At bottom, SB 1137 functions as a state land-use regulation, not a reasonable environmental regulation.

SB 1137 also restricts fossil fuel development *outside* HPZs. Fossil fuel production operations routinely require the installation of attendant equipment—such as tanks, flowlines, gathering lines, wellheads, pumps, compressors, and pipelines—on adjacent lands to service drilling activities and resource collection outside HPZ boundaries. *See* Eller Decl. ¶ 3 (these equipment installations are "standard maintenance practices that are routinely used in the industry to maintain the productive and safe life of wells"); Zierman Decl. ¶ 3 (oil and gas production often requires supporting infrastructure be placed within an HPZ). But under Sections 3281(a)–(b), operators must submit a Notice of Intention to install such "production facilities," and CalGEM is directed to deny those applications if the proposed equipment is sited within an HPZ, absent narrow health or environmental exceptions. *See id.*; Cal. Pub. Res. Code § 3010. As a result, SB 1137 prevents operators from siting necessary infrastructure on HPZ lands, rendering undevelopable some federal oil and gas resources outside HPZs. *See* Richardson Decl. ¶¶ 5-26 (SB 1137's challenged provisions frustrate development activities on federal leases outside HPZs given the need to expand existing facilities within HPZs); Zierman Decl. ¶ 3 (SB 1137's categorical prohibition on permitting infrastructure in HPZs renders developable federal resources outside HPZs unrecoverable).

From top to bottom, SB 1137 operates as a land-use prohibition on federally authorized fossil fuel development within (and sometimes *outside*) HPZs. State legislation "must be entirely consistent with the Federal laws, otherwise it is of no effect." *Butte City Water Co.*, 196 U.S. at 125. Even if SB 1137 were not a categorical ban, it is still preempted because it conflicts with federal law—it directly impedes and obstructs federal decisions to lease and develop mineral resources on public lands. A state may not enact laws that conflict with federal law, *Arizona*,

567 U.S. at 399, nor may it enact laws that "retard, impede, burden, or in any manner control" the implementation of federal law. *Nash*, 389 U.S. at 239 (citation modified). Yet that is what SB 1137 does.

**B. SB 1137 is an impermissible land-use regulation, not a reasonable environmental regulation.**

*Granite Rock* distinguishes between permissible state environmental regulations and impermissible state land-use controls on federal land. 480 U.S. at 587. Environmental regulations address *how* activities may occur on the land, requiring that "damage to the environment is kept within prescribed limits." *Id.*; *see*, *e.g.*, *Bohmker*, 903 F.3d at 1040-51 (holding that Oregon's SB 3, which restricted the use of motorized in-stream mining equipment to protect fish habitat, did not prohibit mining, select land uses, or otherwise dictate land-use planning, and was a permissible environmental regulation not preempted by federal law). But land-use planning "chooses particular uses for the land" and "mandates" or excludes entire classes of activity. *Id.* When Congress allows specific uses for federal land—such as oil and gas leasing under the MLA—states may not enact land-use regulations that bar or frustrate those uses. *Ventura Cnty.*, 601 F.2d at 1084.

California cannot defend SB 1137 as a reasonable environmental regulation. Its text, operation, and legislative history make plain that it functions as a direct land-use control that obstructs federal management goals and decisions. Under the Supremacy Clause, state laws that conflict with federal statutes governing the use of federal lands are of "no effect." *Butte City Water Co.*, 196 U.S. at 125. Because SB 1137 categorically prohibits federally authorized uses of federal lands—oil and gas development within HPZs that encompass federal lands—it conflicts with the federal policies expressed in the MLA's and FLPMA's "text and structure." *See CSX Transp.*, 507 U.S. at 664. SB 1137 therefore cannot survive preemption analysis.

SB 1137 categorically prohibits new fossil fuel development within one kilometer of state-defined "sensitive receptors." For this reason, SB 1137 operates as a blanket land-use ban (like a zoning ordinance), not a conditional environmental safeguard. Indeed, SB 1137's legislative history makes this clear: the legislature repeatedly referred to the HPZ as a "setback" akin to "zoning and local ordinances" in other jurisdictions. *See* Bill Analysis, S.B. 1137, 2021–2022 Leg. Reg.

1   Sess. (Cal. Aug. 30, 2022); S. Floor Analysis, S.B. 1137, 2021–2022 Leg. Reg. Sess. (Cal. Aug.

2   30, 2022). The same analyses characterize SB 1137's restrictions as a "ban" on new drilling, with

3   NOIs to drill "categorically denied" except in narrow circumstances. *Id*. By design and in practice,

4   SB 1137 operates as a zoning control that bans federally authorized mineral development in large

5   swaths of federal land.

6       Even if SB 1137 were not a land-use regulation (it is), it still could not be justified as an

7   environmental regulation. SB 1137's challenged provisions do not impose standards designed to

8   minimize emissions, mitigate surface impacts, or protect groundwater. Instead, those challenged

9   provisions prohibit development within HPZs *regardless of whether a proposed well poses any*

10  *environmental risk*. Indeed, a facility sited in an HPZ would be subject to SB 1137's prohibitions

11  even if it produced no emissions. This lack of connection to any substantive environmental bench-

12  mark underscores that SB 1137 regulates land use, not environmental effects.

13      Courts routinely invalidate similar prohibitions. In *Ventura County*, the Ninth Circuit held

14  that a county could not require separate zoning permits for oil drilling on federal leases because

15  the scheme allowed the county to "prohibit that use, either temporarily or permanently, in an at-

16  tempt to substitute its judgment for that of Congress." 601 F.2d at 1084. In *Brubaker*, the Colorado

17  Supreme Court struck down a local prohibition on federally authorized drilling, holding that while

18  states may impose reasonable environmental conditions, they cannot enact outright bans. 652 P.2d

19  at 1059. And in *South Dakota Mining Ass'n*, the Eighth Circuit invalidated a countywide prohibi-

20  tion on surface mining, reasoning that it was "prohibitory, not regulatory, in its fundamental char-

21  acter" and posed a "clear obstacle" to federal mining objectives. 155 F.3d at 1011. SB 1137 has

22  the same defect: it forbids, rather than regulates, federally authorized land uses.

23      But even if SB 1137 could be characterized as an environmental regulation, it is still

24  preempted because it conflicts with federal objectives. *Kleppe* explained that Congress's enact-

25  ments under the Property Clause "necessarily override[] conflicting state laws under the Suprem-

26  acy Clause." 426 U.S. at 543. *Granite Rock* likewise said that a state law is preempted "to the

27  extent it actually conflicts with federal law." 480 U.S. at 581. SB 1137 squarely meets that de-

28  scription. Congress authorized oil and gas leasing on federal lands through the MLA and FLPMA,

and it has established a regulatory framework for balancing mineral development with environmental protection. Because SB 1137 effectively prohibits or obstructs those federally authorized activities, it is preempted, whether it is an environmental regulation or not.

SB 1137 regulates the United States even though it nominally applies to lessees rather than the federal government itself. In *United States v. California*, the court rejected a nearly identical defense to California Senate Bill 50, which sought to regulate the recording of federal land conveyances. 2018 WL 5780003, at *1. The court explained: "[a law] may not expressly name the federal government as its intended object of regulation, but that does not mean the law does not directly regulate the United States." *Id*. at *4. By subjecting federally authorized land-use decisions to state approval, SB 1137 actually conflicts with federal land-use policy. That is because SB 1137 limits how lessees may develop federal lands. It effectively undermines Congress's decisions on the permissible uses of federal lands and substitutes them with California's contrary decisions.

In short, SB 1137 is not a reasonable environmental regulation. Its text, history, and operation illustrate that it functions as a land-use restriction that categorically excludes federal oil and gas development within HPZs. It is not tied to environmental standards, and even if it were, it would still frustrate the purposes of the MLA and FLPMA by impeding federally authorized activities on public lands. As the Supreme Court has long recognized, "state . . . legislation . . . must be entirely consistent with the Federal laws, otherwise it is of no effect." *Butte City Water Co.*, 196 U.S. at 125. SB 1137 is neither consistent with nor complementary to federal law. Therefore, it is preempted and invalid.

**II.     The United States has suffered, and will continue to suffer, irreparable harm.**

Upon demonstrating a likelihood of success on the merits, a plaintiff must also establish that, absent the preliminary injunction, there is a likelihood that the defendant's conduct will cause irreparable harm. *See Winter*, 555 U.S. at 22. Preliminary injunctive relief is necessary here because SB 1137 is causing irreparable harm to the United States' sovereign interests, and this harm will only grow as time passes.

SB 1137 inflicts ongoing injury to the United States' sovereign interests in managing federal lands, implementing national energy policy, enforcing federal law, and preventing the

1   usurpation of federal authority. By obstructing fossil fuel development authorized under federal

2   law, SB 1137 directly interferes with the federal government's ability to carry out the purposes

3   and objectives of Congress, including productive use of federal lands and the promotion of domes-

4   tic energy production. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592,

5   601 (1982) (federal government has cognizable "sovereign interests" in both its "power to create

6   and enforce a legal code, both civil and criminal," and in "recognition [of that code] from other

7   sovereigns"); *see also Arizona*, 567 U.S. at 398 ("Federalism, central to the constitutional design,

8   adopts the principle that both the National and State Governments have elements of sovereignty

9   the other is bound to respect.").

10          Without question, a complaint "asserts an injury to the United States" if it alleges an "injury

11   to [U.S.] sovereignty arising from violation of its laws." *Vermont Agency of Nat. Res. v. United*

12   *States ex rel. Stevens*, 529 U.S. 765, 771 (2000). So "[w]hen state governments enact laws that

13   impugn the United States' sovereignty, a personal injury to the United States arises." *La Union del*

14   *Pueblo Entero (LUPE) v. Abbott*, 604 F. Supp.3d 512, 527 (W.D. Tex. 2022); *see also id.* at 526

15   ("Undoubtedly, the United States suffers a concrete harm to its sovereignty when its laws are vio-

16   lated" by a state.).

17          Courts routinely hold that the United States suffers per se irreparable harm when states

18   violate its laws. *See, e.g.*, *Arizona*, 641 F.3d at 366 (finding irreparable harm to the United States

19   based on preempted Arizona immigration law); *Texas v. Yellen*, 105 F.4th 755, 774 (5th Cir. 2024)

20   (holding that laws affecting "sovereign authority" inflict irreparable harm); *Daimler Truck N. A.,*

21   *LLC v. Cal. Air Cres. Bd.*, No. 2:25-cv-02255, 2025 U.S. Dist. LEXIS 215580, *1, *53-54 (E.D.

22   Cal. Oct. 31, 2025) (finding "per se irreparable harm in the absence of an injunction barring en-

23   forcement of" an agreement that conflicted with federal law); *United States v. Texas*, 719 F. Supp.

24   3d 640, 695 (W.D. Tex. 2024) *vacated,* 144 S. Ct. 797 (2024), *aff'd,* 144 F.4th 632 (5th Cir. 2025),

25   *reh'g en banc granted, opinion vacated,* 150 F.4th 656 (5th Cir. 2025) (recognizing "per se irrep-

26   arable harm" to the United States when a state attempts to usurp federal authority and enforce

27   preempted laws); *Texas v. Becerra*, 577 F. Supp. 3d 527, 557 (N.D. Tex. 2021) (injury to "sover-

28   eign interest is necessarily irreparable" (citation modified)); *see also New Orleans Pub. Serv., Inc.*

*v. Council of New Orleans (NOPSI)*, 491 U.S. 350, 366-67 (1989) (irreparable injury may be es-

tablished "by a showing that the challenged state statute is flagrantly and patently violative of"

federal law (quotation marks omitted)).

Unless enjoined, SB 1137 will obstruct Congress's policy decisions in the MLA and

FLPMA promoting fossil fuel development and impair BLM's ability to administer valid leases

and advance national energy goals during the pendency of this litigation. This infringement causes

ongoing and irreparable harm to the United States sovereign interests. *See, e.g.*, Compl. ¶¶ 55-73.

**III.      The balance of the equities and the public interest favor injunctive relief.**

The balance of the hardships suffered by parties and the public interest favor granting the

United States' request to enjoin the challenged provisions of SB 1137. This action seeks to protect

the interests of the United States as a whole, so the burdens that will result without injunctive relief

are directly tied to the public benefits that will be protected if this Court issues the requested in-

junction. *Cf. Nken v. Holder*, 556 U.S. 418, 129 (2009) (the "harm to the opposing party" and

"public interest" factors "merge when the Government is the opposing party" because harm to the

Government is harm to the public interest). This is especially true here because this lawsuit seeks

to vindicate the supremacy of federal law. *See United States v. California*, 921 F.3d 865, 893-94

(9th Cir. 2019) (recounting the Ninth Circuit's long-standing "recognition that preventing a viola-

tion of the Supremacy Clause serves the public interest"); *Am. Trucking Ass'ns, Inc. v. City of Los

Angeles*, 559 F.3d 1046, 1059-60 (9th Cir. 2009) (determining that "balance of equities and the

public interest [ ] weigh in favor of a preliminary injunction" against a likely preempted ordinance).

The public interest will be served by the issuance of the requested injunction. To start,

preliminary injunctive relief will preserve the United States' sovereign authority to manage its

lands and prevent California from overriding national energy policy. *See United States v. Oakland

Cannabis Buyers' Coop.*, 532 U.S. 483, 496-98 (2001) (when weighing the public interest, courts

of equity must respect Congress's policy choices as set forth in a statute). A preliminary injunction

would also help keep lessees and operators solvent—ensuring they can continue bidding on leases

and developing resources—which would support energy production, lower prices, protect jobs,

and maintain a stable domestic oil supply.[6] *See* Richardson Decl.") ¶¶ 9-11 (preliminary injunction would enable E&B Resources to resume development of 189 wells); Eller Decl. ¶ 14 (preliminary injunction would enable Holmes Western Oil Corporation to resume development of fourteen wells); Budy Decl. ¶¶ 4, 10 (preliminary injunction would enable Sentinel Peak Resources to resume development of twenty-four wells); Combs Decl. ¶¶ 9-12 (preliminary injunction would enable Termo to resume development of well USL-G 20 and other wells); *see also Louisiana v. Biden*, 543 F. Supp. 3d 388, 404-05 (W.D. La. 2021) (identifying "loss of jobs and economic damage" from federal leasing pauses as "particularized and concrete" injuries). A preliminary injunction would also limit, or perhaps avoid, SB 1137's negative effects on the national energy markets,[7] *see* Warren Decl. ¶ 30, it would reduce the harms "[c]aused by the harmful and

---

[6] SB 1137 devastates smaller oil and gas leases and operators—essential to leasing development and community-level economic health—who may lack the financial resilience to sustain delays or loss of access to their leases. *See* Zierman Decl.") ¶ 6 (SB 1137 threatens the viability of small independent operators, which in turn jeopardizes the livelihoods of employees, suppliers, contractors, and the communities); Richardson Decl. ¶ 32 (noting SB 1137's deleterious impact on company). Thus, SB 1137 both jeopardizes the federal government's ability to lease and manage mineral resources on its lands and risks losing thousands of jobs tied directly (and indirectly) to the oil and gas sector. *See* Zierman Decl. ¶¶ 5-7 (SB 1137 deters small independent operators from bidding on new leases and developing their existing leases); Cal. Chamber of Com., *CalChamber Tags SB 1137 as Job Killer* (Aug. 25, 2022), https://advocacy.calchamber.com/2022/08/25/cal-chamber-tags-sb-1137-as-job-killer (California Chamber of Commerce estimated that SB 1137 jeopardizes approximately 8,000 jobs, including 3,000 high-paying positions in the oil and gas sector, plus up to 5,000 jobs in supplying industries—many of which are tied to federal leases). These harms to operators ultimately harm the United States, separate and apart from the irreparable harm to its sovereign interests.

[7] California's average retail gasoline prices are routinely 40% to 50% higher than the national average, which is attributable in part to a longstanding decline in in-state production. Michael A. Mische, *Ensuring California's Gasoline Security for the 21st Century* 3, 5 (May 5, 2025), https://files.constantcontact.com/6ddc9aab901/d3ac27a3-d4d4-44f3-9a3b-f91f88735d11.pdf. The California Energy Commission recently confirmed that "[i]n California, recent years have been marked by higher gasoline retail prices, in-state petroleum refinery conversions and exits, and a growing reliance on fuel imports to meet consumer demand," and that "[t]hese impacts are not isolated to California and are also being felt nationally and globally." Cal. Energy Comm., *Response to Governor Newsom's Letter* (June 27, 2025), https://www.energy.ca.gov/sites/default/files/2025-07/CEC%27s_Response_to_Governor_Newsom%27s_Letter_June-27-

shortsighted [energy] policies of the previous administration," *see* Executive Order 14156, *Declaring a National Energy Emergency* (Jan. 20, 2025), and it would ensure the public benefits from lease bonuses, royalty payments, and other income the federal government derives from fossil fuel development.

By contrast, a preliminary injunction will not meaningfully burden California. SB 1137 only recently went into effect and is not fully implemented, so an injunction in this context would have the effect of merely preserving the recent status quo. *See U.S. Philips Corps. v. KBC Bank*, 590 F.3d 1091, 1094 (9th Cir. 2010) ("[T]he very purpose of a preliminary injunction . . . is to preserve the status quo and the rights of the parties until a final judgment issues in the cause."). If this Court ultimately concludes that SB 1137 does not offend the Supremacy Clause, California would then be able to implement and enforce SB 1137 without having suffered any substantial burden. But given that this litigation implicates the management of federal lands—in which, by any plausible account, the federal interest is paramount—any burden on California from a preliminary injunction would be modest. Indeed, California has no legitimate interest in the enforcement of a law that likely violates the Supremacy Clause. *See Chamber of Com. of U.S. v. Edmonson*, 594 F.3d 742, 771 (10th Cir. 2010) ("Oklahoma does not have an interest in enforcing a law that is likely constitutionally infirm."); *see also Nat'l City of Indiana v. Boutris*, No. Civ. S-03-0655, 2003 WL 21536818, at *7 (E.D. Cal. July 2, 2003) (harm to California and the public interest "drop from the case" when "Plaintiffs have shown the relevant provisions of the California law are preempted by federal law and that they will suffer irreparable harm").

## CONCLUSION

SB 1137 imposes immediate and irreparable harm on the United States by blocking development of federal oil and gas leases, undermining federal land-use planning and leasing decisions, and infringing on the federal government's sovereign authority to manage its lands. The United States is likely to succeed on the merits, and the balance of equities and public interest weigh

2025_ada.pdf. The sharp contraction in domestic production exacerbates energy insecurity and increases reliance on imported oil.

1  heavily in favor of preserving the federal government's constitutional authority. The Court should

2  grant the United States' motion and preliminarily enjoin the challenged provisions of SB 1137.

3

4

5  DATED: January 16, 2026                    Respectfully submitted,

6

7                                             ADAM R.F. GUSTAFSON
                                              Principal Deputy Assistant Attorney General

8                                             PETER M. TORSTENSEN, JR.
9                                             Deputy Assistant Attorney General

10                                            */s/ John K. Heise*
11                                            DUSTIN J. WEISMAN (CO Bar #44818)
                                              JOHN K. HEISE (CA Bar #331615)
12                                            Trial Attorneys
                                              Natural Resources Section
13                                            Environment and Natural Resources Division
14                                            U.S. Department of Justice
                                              950 Pennsylvania Avenue NW
15                                            Washington, DC 20530
                                              Telephone: (303) 844-1369
16                                            Email: dustin.weisman@usdoj.gov
17                                            Email: john.heise@usdoj.gov

18                                            ERIC GRANT
19                                            United States Attorney
                                              Eastern District of California

20
21                                            *Attorneys for the United States*

22

23

24

25

26

27

28