|||
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>Defendants. | Case No. 2:26−CV−00107−DC−SCR<br><br>**DECLARATION OF MATTHEW WARREN IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA
# SACRAMENTO DIVISION

I, Matthew Warren, declare as follows:

1. I am employed as the Oil and Gas Program Lead, Division of Fluid Minerals, in the Energy, Minerals, and Realty Management Directorate of the Bureau of Land Management (BLM), within the U.S. Department of the Interior, a position I have held since February 14, 2021. The directorate provides policy development and oversight to the BLM's minerals programs and its realty programs nationwide.

2. I make this Declaration in support of the United States' motion for a preliminary injunction. I make the statements of fact in this declaration of my own personal knowledge. If called as a witness in this action, I would testify competently to the facts set forth herein.

3. In my role as the Oil and Gas Program Lead, I provide technical and policy guidance regarding oil and gas development on federal lands, including well permitting, drilling and completions, well plugging, Federal agreements, inspection and enforcement, and general program policy guidance, to BLM leadership and BLM staff working in the oil and gas program.

4. Prior to my role as the Oil and Gas Program Lead, I was the Supervisory Petroleum Engineer in the BLM Buffalo Field Office, a position I held for 11 years. Prior to that, I held the position of Petroleum Engineer with BLM in multiple field office locations. I am familiar with the laws and regulations governing BLM's oil and gas program, including leasing, permitting, and development of oil and gas projects on federally managed lands.

**BLM's Land Management Process**

5. The Department of the Interior manages lands and the underlying minerals owned by the United States. The Department of the Interior, through the BLM, leases lands managed by the BLM to oil and gas companies, who produce oil and gas pursuant to the terms of their lease. BLM manages approximately 245 million surface acres and 700 million acres of onshore mineral estate across the United States.

6. BLM manages onshore oil and gas development on federal lands through a structured, three-stage process: (1) land-use planning under the Federal Land Policy and Management Act and other applicable statutes; (2) leasing; and (3) permitting. At each stage, BLM conducts the requisite review under the National Environmental Policy Act (NEPA). The process incorporates multiple opportunities for public participation, including notice and comment, and, at certain stages, formal protests or objections. Through these environmental review processes, BLM evaluates whether proposed activities may significantly affect environmental and other resources—including air and water quality, public health and safety, and wildlife—and, where appropriate, imposes mitigation measures or conditions to avoid or reduce adverse impacts.

**Land-Use Planning**

7. At the first stage of BLM's onshore oil and gas program—land-use planning—a BLM district or field office prepares a Resource Management Plan (RMP) governing public lands within a defined geographic area, often encompassing millions of acres. *See* 43 U.S.C. § 1712(a). Because an RMP involves multiple federal statutes and reflects a programmatic land-use decision, its development involves extensive technical and environmental analysis and typically takes several years, culminating in a Record of Decision.

8. An RMP describes, for a particular area, allowable uses and goals for future condition of the land. In the oil and gas context, an RMP makes an affirmative federal determination regarding whether lands will be available for oil and gas development and specifies the conditions or stipulations governing that development. *See* 43 C.F.R. § 1601.0-5(n).

9. In reaching these determinations, BLM evaluates the reasonably foreseeable impacts of making lands available for development—including effects on public health and safety, socioeconomics, air and water resources, and wildlife—pursuant to NEPA. Each RMP is also subject to a 60-day Governor's consistency review, and BLM must respond in detail to any objections before issuing a Record of Decision.

10. The Federal Land Policy and Management Act (FLPMA) requires BLM to manage public lands for multiple use and sustained yield, 43 U.S.C. § 1701(a)(7), and expressly recognizes mineral exploration and production as a principal use. Through the RMP process, BLM implements these statutory mandates by deliberately determining where, and under what conditions, fossil fuel development may proceed on federal lands.

## The Leasing Process

11. At the second stage—leasing—BLM may issue oil and gas leases for specific parcels that an RMP has designated as open to leasing and subject to the RMP's terms and conditions. *See* 43 U.S.C. § 1712(e); 43 C.F.R. § 3120.11. Leases may include stipulations designed to protect environmental and other resource values. 43 C.F.R. § 3101.13.

12. A lease does not itself authorize development or surface disturbance; it merely conveys a conditional right to seek approval for future operations through the permitting process. *See* 43 C.F.R. § 3162.3-1(c). BLM may designate lands for leasing, but it does not develop federal minerals itself. Instead, leasing reflects a considered federal decision to make specific parcels available for potential oil and gas development, subject to subsequent environmental review and approval.

13. In determining which lands to offer for lease, BLM considers public expressions of interest and conducts its own internal review. BLM may also self-nominate parcels for leasing where lands are subject to drainage—typically within a federal communitization or unit agreement[1]—or where leasing is a high priority, such as parcels adjacent to new or existing

---

[1] Communitization agreements allow the amalgamation of leases sufficient for the granting of well permit(s) under applicable spacing requirements, when a lease or portion thereof cannot otherwise be independently developed under the well-spacing or well-development program. Unit

Decl. of Matthew Warren                                                                                                   3

production. *See* 43 C.F.R. §§ 3120.11, 3120.32. Before any lease sale, BLM evaluates each potential parcel for conformance with the applicable RMP.

14. BLM posts a list of parcels under consideration for leasing for public scoping and solicits public comment. As part of this process, BLM often engages directly with interested parties, including Indian Tribes and local, state, and federal agencies. After the scoping period, BLM conducts the required NEPA review, which includes opportunities for public participation and protest, and issues a decision identifying which parcels will be offered for lease and which will not.

15. If BLM elects to proceed with leasing, it issues a Notice of Competitive Lease Sale at least 45 days before the sale. 30 U.S.C. § 226(f). The Sale Notice identifies the parcels available for bid, their location and acreage, and any stipulations that will attach to the leases. *See* 43 C.F.R. § 3120.41. Members of the public may protest the inclusion of specific parcels. BLM may defer offering protested parcels until those protests are resolved, or BLM may offer those lands but cannot issue a lease for those lands until any protests are resolved. 43 C.F.R. § 3120.13.

**The Permitting Process**

16. At the third stage, the permitting stage, a lessee that wishes to develop federal minerals on a valid lease must seek permission to do so by filing an Application for Permit to Drill (APD). 43 C.F.R. § 3162.3-1(c). APDs are subject to BLM review and approval. 43 C.F.R. § 3101.12. Approved APDs direct operators to comply with state and local laws and regulations to the extent such laws and regulations are applicable to oil and gas operations on federal leases. However, BLM does not condition APD approval on compliance with state law and, from BLM's perspective, after an APD is approved the lessee has permission to begin drilling.

**BLM's Regulation of Fossil Fuel Development**

17. BLM regulates the development of oil and gas resources on federal lands through an extensive and detailed regulatory framework. *See* 43 C.F.R. Part 3160. These regulations

---

agreements allow for the consolidation of separate leases into a single unit, without regard to separate ownership rights, under a cooperative plan of development and operation. The object of these agreements is to pool or bring together separately owned (or separate interests in) tracts to prevent drilling of unnecessary and uneconomic wells.

govern all phases of operations under a federal lease—from the requirement to obtain approval to drill, through well abandonment and lease relinquishment—and impose enforceable obligations on lessees throughout the life of a project. Operators must conduct operations in a manner that protects mineral resources, other natural resources, and environmental quality. 43 C.F.R. § 3162.5.

18. The submission and review of APDs are governed by 43 C.F.R. Subpart 3171, which specifies the minimum information required for approval, including a drilling plan, surface use plan, and any additional information BLM deems necessary. *See* 43 C.F.R. § 3171.4. APDs require onsite inspections and coordination with the surface owner or, where applicable, the surface-managing agency. Each APD is subject to a 30-day public posting period, and BLM completes the appropriate NEPA review before issuing an approval.

19. The Mineral Leasing Act (MLA) and BLM's regulations also require operators to post financial assurances sufficient to cover plugging, abandonment, and reclamation. Operations conducted under a federal lease remain subject to ongoing inspection and enforcement, and BLM may impose civil penalties or cancel a lease for noncompliance. Through this permitting and enforcement regime, BLM retains continuous oversight and control over where, when, and how oil and gas development occurs on federal lands.

**Revenue From Leases**

20. The Department of the Interior receives revenue from federal oil and gas leasing through payment of bids, rentals, and royalties. The statutory minimum bid is $10 per acre. 30 U.S.C. § 226(b)(2)(B). Annual rentals are set by statute at $3 per acre for the first two years of a lease, $5 per acre for the next three years, and $15 per acre for each remaining year. 30 U.S.C. § 226(d).

21. At the close of bidding, BLM identifies the high bidder and confirms the bidder's qualifications. Winning bids may range from the statutory minimum to more than $215,000 per acre (New Mexico Lease Sale January 2026). Before a lease may be issued, the successful high bidder must pay the full bid amount and the first year's rental. Upon receipt of these monies, BLM is required to issue the lease within 60 days. *See* 43 C.F.R. § 3120.53. Submitted bids are irrevocable.

22. Once a lease is issued and production begins, the lessee must pay the United States a royalty of not less than 12.5 percent of the value of oil and gas produced. 30 U.S.C. § 226(b). If no bids are received in a competitive sale, the lands may be leased noncompetitively. 30 U.S.C. § 226(c). Noncompetitive leasing requires payment of an application fee of at least $75 and the first year's rental. If lands are not leased, they must be renominated for a future sale, and the United States receives no leasing revenue for those parcels.

23. The Department of the Interior also receives royalties from the extraction of fossil fuels from onshore leases. Once a lease begins producing oil and/or gas, the lessee must begin paying royalties. The royalty amount is set out in the lease and must be not less than 12.5% of the value of the oil and gas produced from the lease.

24. Fossil-fuel leasing on federal lands generated over $13.8 billion of revenue for the United States in fiscal year 2024 ($78,932,714 of which was attributable to federal land in California)[2], including more than $950 million from gas and $12.4 billion from oil:

| Fiscal Year 2024 U.S. Onshore Mineral Revenue | | |
|---|---|---|
| **Revenue Type** | **Mineral Lease Type** | **Total Revenue** |
| Bonus | Coal | $693,280.00 |
| Other revenues | Coal | $19,098,566.88 |
| Rents | Coal | $1,134,023.00 |
| Royalties | Coal | $420,646,241.33 |
| Bonus | Oil & Gas | $142,272,695.90 |
| Other revenues | Oil & Gas | $150,363,164.60 |
| Rents | Oil & Gas | $3,999,250.28 |
| Royalties | Gas | $762,507,769.74 |
| Royalties | Natural gas liquids | $661,760,721.05 |
| Royalties | Oil | $5,876,928,082.02 |

*See* U.S. DEP'T OF THE INTERIOR, NATURAL RESOURCES REVENUE DATA, https://revenuedata.doi.gov/ (last visited December 15, 2025). The states hosting the federal leases share in those revenues. 30 U.S.C. §§ 191(a)-(b), 355.

## SB 1137's Impact

---

[2] In fiscal year 2023, Federal oil and gas production in California generated approximately $90,994,580.00.

Decl. of Matthew Warren                                                                                          6

25. Federal revenues from oil and gas leasing in California may decline as a direct or indirect result of SB 1137's setback provision, which could deter bidders from competing for Federal leases. These revenue losses could compound over time as operators redirect capital and development efforts away from federal leases in California. BLM is aware of operators who report that SB 1137's setback provision has frustrated or delayed ongoing projects on federal lands.

26. If operators abandon or scale back projects tied to federal leases in California and shift investment elsewhere, BLM anticipates reduced competition in future lease sales, diminished development on existing leases, and corresponding decreases in federal production-based revenues.

27. BLM anticipates that the setback provisions of SB 1137 will create significant regulatory uncertainty for federal lessees and operators. This uncertainty stems from not knowing whether a federal lease will fall within a HPZ in the future, if there will be state permitting delays or denials related to the setback provision, or conflicts between federal and state land management.

28. As a result of these uncertainties, BLM expects that lessees and operators may:

   a. Reduce participation in federal lease auctions, leaving otherwise viable tracts unleased, which could limit exploration of new geologic targets, decrease competition, and result in lower bonus bids and reduced federal revenues.

   b. Seek royalty rate reductions from the Department of the Interior to offset risks and costs.

   c. Request suspensions of operations and/or production under applicable regulations (43 CFR Part 3100). BLM has discretion to grant or deny a suspension, and if it does grant it, such suspensions may relieve the lessee of the obligation to pay rentals, minimum royalties, or production royalties during the suspension period, potentially decreasing federal revenues.

   d. Become unable to diligently explore or develop the federal lease in accordance with its terms, which could lead to oil and gas resources going undeveloped.

   e. Experience an inability to protect correlative rights by preventing drainage (i.e., migration of hydrocarbons or associated resources) from adjacent non-federal

wells, potentially resulting in stranded minerals that may not be recoverable in the future.

  f. Prematurely abandon operations, leading to stranded resources and increased risks of orphaned wells.

29. These responses from lessees and operators are expected to reduce revenue to the United States through the loss of lease sale revenue and royalties. Because royalty revenues from onshore leases are shared with the state hosting production, *see* 30 U.S.C. §§ 191, 355, any such impacts would reduce the state's revenue as well.

30. In sum, SB 1137's setback provision undermines BLM's ability to lease and manage mineral resources on federal lands, and thus disrupts the federal government's statutory land management and policy priorities. SB 1137's setback provision prevents development on lands that BLM has carefully selected and authorized for oil and gas production. Thus, SB 1137's setback provision serves to negate BLM's land use decisions and substitute the State's land use decisions. Further, by banning or severely limiting fossil fuel production on federal lands, SB 1137's setback provision is expected to reduce the domestic supply of oil and gas, which in turn may place upward pressure on energy prices and increase market volatility. This instability may affect not only California consumers but also the broader national energy market, which relies on steady output from federally managed resources.

31. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 15th day of January 2026, in Santa Fe, New Mexico.

/s/ Matthew Warren

Matthew Warren
(original signature retained by Attorney John K. Heise)

Decl. of Matthew Warren 8