**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:26-cv-00107-DC-SCR |
| Plaintiff, | **DECLARATION OF GARY RICHARDSON IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| STATE OF CALIFORNIA, et al., | Judge: Hon. Dena M. Coggins |
| Defendants. | Magistrate Judge: Hon. Sean C. Riordan |

I, Gary Richardson, declare as follows:

1. I am the Vice President of Business Development and Corporate Secretary at E&B Natural Resources Management Corporation ("E&B"). I am also Corporate Secretary of Elysium West, LLC ("Elysium"), a 100% commonly owned affiliate of E&B. I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction. I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently to those facts.

2. I have over 40 years of experience in the oil and gas industry in California.

3. Elysium is the lessee and E&B is the contract operator of various mineral leases with the U.S. Bureau of Land Management ("BLM"). The areas encompassed by two of these federal leases, CAS021129 and CAS045775 (together, the "Leases"), cover areas known as Mabry and Anza, respectively. Mabry and Anza are located within the Poso Creek Oil Field in Kern County, California.

4. BLM owns the underlying mineral estate in fee and is the lessor under the Leases. The surface estate for Mabry and Anza is privately owned by another entity that is 100% commonly owned by E&B. Although E&B's affiliate owns the surface estate associated with the Leases, it does not own the majority of the surface area of the parcels to the east and southeast of the Leases.

5. Under the Leases, E&B is contractually obligated to explore, develop, and test hydrocarbon reserves by drilling for commercial quantities of oil.

6. In 2018, E&B submitted a Master Development Plan to BLM for the Mabry-Anza Project ("MAP"), as required by BLM regulations.

7. The MAP is an oil and gas development project designed to employ thermal enhanced oil recovery ("EOR") techniques to access heavy oil underlying the Leases. Thermal EOR involves injecting steam either continuously (steam flood) or intermittently (cyclic steam). The MAP proposes using both types of wells to recover the minerals under the Leases.

8. The MAP contemplates drilling 189 new wells over the life of the project. Construction activities would include initial development (e.g., well pad construction, drilling, installation of new wells, and construction of ancillary facilities) as well as operational activities (e.g., routine maintenance and equipment operation).

9. Currently, the Leases contain 27 producing wells (only ten of which are active) and one active production facility. From engineering and safety perspectives, the current infrastructure is not suitable for thermal EOR. To implement the MAP, these existing wells would need to be plugged and abandoned, and the production facility would require expansion and upgrades to accommodate EOR operations.

10. Given the scope of the project, E&B anticipated that the MAP would be operational in 2029.

11. In September 2022, Governor Newsom signed Senate Bill ("SB") 1137, which became fully effective in June 2024. SB 1137, codified at Public Resources Code § 3280 et seq., establishes a 3,200-foot "Health Protection Zone" ("HPZ") around "sensitive receptors." Under this law, the California Geologic Energy Management Division ("CalGEM"), the state agency responsible for permitting wells, is prohibited from approving Notices of Intent for wells or production facilities located within an HPZ unless there is a health and safety need for the work. The MAP would not qualify for such an exception.

12. There are currently five sensitive receptors, as defined by SB 1137, within 3,200 feet of the Leases and the MAP area. These sensitive receptors are not owned by E&B. The HPZs created by these receptors cover nearly all of both Leases, such that less than 3% of the leasehold

acreage is presently outside of an HPZ. As a result, only six of the MAP's 189 proposed wells fall outside an HPZ and could be permitted by CalGEM.

13. Although six of the proposed MAP wells are outside an HPZ, they cannot access the majority of mineral reserves on the Leases. Accessing minerals within an HPZ would require horizontal drilling from wells outside the HPZ. However, horizontal wells cannot efficiently achieve the steam patterns necessary for heavy oil recovery.

14. The MAP would inject steam into the Basal Etchegoin zone of the Etchegoin formation. The Basal Etchegoin zone in the Leases is a heterogeneous reservoir consisting of three main sands (E1, E2, and E3), separated by low-permeability shales and/or clays. The Basal Etchegoin is a low-dipping reservoir with undulating structural contours.

15. Horizontal wells are highly dependent on reservoir uniformity and are very sensitive to minor elevation changes along the lateral. This makes them a poor choice for undulating reservoirs, like those found in the Leases' formations. The undulating nature prevents steam from traveling uniformly and efficiently along the lateral. Instead of an even distribution of steam, it will accumulate at slight elevations in the structure. These steam pockets create cold zones in areas without consistent steam and localized hotspots elsewhere. These hotspots can cause buckling or deformation of the well casing or liner, screen damage, and sand failures. Small, damaged sections of casing or liner are difficult to repair without major interventions.

16. The lack of consistent steam sweep across the lateral makes horizontal wells less effective at pushing oil toward producers. Cold zones and hotspots cause steam to follow the path of least resistance, bypassing areas of lower permeability. This inability to push steam through lower-permeability zones undermines the purpose of thermal EOR. Without consistent steam flood across the lateral, steam simply reheats or reuses previous pathways without accessing new oil. This results in high fuel and water costs with minimal additional oil production.

17. Given the heavy oil and geologic conditions, horizontal drilling is not an economical recovery method for the MAP. The inability to place thermal EOR wells in a way that ensures adequate and consistent steam distribution across the reservoir prevents E&B from

accessing most of the underlying minerals. Therefore, while the six MAP wells outside an HPZ could recover some reserves from the Leases, this would represent only an extremely small fraction of what is available and otherwise recoverable.

18. Moreover, because E&B does not own the surface estate of all properties surrounding the Leases, new sensitive receptors may be constructed in the future, which could result in the six MAP wells presently outside an HPZ becoming enclosed within an HPZ. In that event, the entirety of the Leases would fall within an HPZ.

19. Due to SB 1137's impact on the MAP, E&B has effectively abandoned the project. E&B has not submitted well permit applications to BLM because it cannot obtain the majority of the required state permits from CalGEM.

20. Although E&B could drill the six MAP wells outside the HPZ, doing so is uneconomical. Constructing and operating a thermal EOR project with only six wells is not viable, nor is drilling six non-thermal wells. Accordingly, E&B has no plans to develop the Leases in any capacity within the limited areas outside the HPZ.

21. Without the MAP, development on the Leases is limited to the existing ten active wells and one production facility. These wells do not employ thermal EOR and therefore produce relatively small volumes of oil compared to what could be achieved using EOR.

22. Of the existing wells, all but two wells are located within an HPZ. Because of SB 1137, E&B cannot obtain Notices of Intent to perform the work needed to extend the productive life of these wells within an HPZ.

23. Once the existing wells reach the end of their useful life, E&B will be required to plug and abandon them. E&B estimates that the remaining useful life of these wells is approximately 15 years.

24. Without production from the existing wells, E&B will no longer be able to maintain the Leases, which require ongoing production to remain in effect. Once the wells are plugged and abandoned, E&B will lose the Leases under their terms.

25. SB 1137 effectively prevents E&B from developing the Leases beyond the existing wells, which will soon need to be plugged and abandoned.

26. SB 1137 also reduces the development potential to such an extent that any additional investment to expand production in the limited, permissible ways the statute would allow on the Leases is uneconomical. As a result, once the current wells reach the end of their useful life, there will be no production on the Leases.

27. E&B estimates that the MAP would have produced approximately 8.67 million gross barrels of oil between 2029 and 2040. E&B estimates that, at its full potential, the wells from the MAP would produce approximately 4,500 barrels of oil per day ("BOPD") by 2031 and approximately 800 BOPD by the end of the project in 2040. By comparison, the ten active wells currently on the Leases produce approximately 48 BOPD.

28. Based on a 12.5% royalty, E&B estimates that this lost production translates to approximately $67 million in lost royalty revenue to BLM over the eleven-year life of the MAP.

29. SB 1137 also impacts E&B's federal leases even when there are no HPZs on the lease. For example, E&B has another federal lease, referred to as the Grimes lease, located in the Poso Creek Oil Field in the same general vicinity as the MAP. Presently there are no HPZs on the Grimes lease. E&B has a commingling agreement with BLM that allows production from the Grimes lease to be sent to the existing production facility on the Mabry lease. However, to accommodate the additional production from Grimes, the Mabry facility would need to be expanded, which would, in turn, require a Notice of Intent from CalGEM.

30. The Mabry production facility is within an HPZ. Accordingly, because of SB 1137, E&B cannot expand the facility as needed to process production from the Grimes lease. Without the ability to use current infrastructure, E&B must build an entirely new and separate facility to handle production from the Grimes lease. This will require going through the full permitting process for a new facility and incurring significant additional costs beyond what would otherwise be required if the Mabry facility could be simply expanded.

31. Going forward, E&B would not bid on additional federal leases where the majority of the leased minerals are located within an HPZ. For federal leases with any portion within an HPZ, E&B would have to adjust its bid to reflect the loss of developable acreage. Even for federal leases not currently affected by an HPZ, E&B must factor in the possibility that HPZs could be developed in the future, which would undermine its investment.

32. E&B is a smaller, independent operator in California. SB 1137 threatens to undermine E&B's business statewide, particularly if new HPZs are created that restrict continued development of vested assets. The loss of currently operating assets, combined with the inability to develop significant projects such as the MAP, adversely impacts the overall profitability of the company.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 18 day of December, Bakersfield California.

/s/ Gary Richardson
Gary Richardson
(original signature retained by
Attorney Michael N. Mills of Stoel Rives LLP)