1　Rob Bonta, State Bar No. 202668
　　Attorney General of California
2　Anthony R. Hakl, State Bar No. 197335
　　Todd Grabarsky, State Bar No. 286999
3　Supervising Deputy Attorneys General
　　Christopher J. Kissel, State Bar No. 333937
4　Jerry T. Yen, State Bar No. 247988
　　Deputy Attorneys General
5　　1300 I Street, Suite 125
　　　Sacramento, CA 95814
6　　Telephone: (916) 210-7836
　　　Fax: (916) 324-8835
7　　E-mail: Jerry.Yen@doj.ca.gov
　　*Attorneys for Defendants State of California,*
8　*Governor Gavin Newsom, California Department of*
　　*Conservation, Geologic Energy Management*
9　*Division, and Doug Ito*

10　　　　　　IN THE UNITED STATES DISTRICT COURT

11　　　　　FOR THE EASTERN DISTRICT OF CALIFORNIA

12

| 13 | **UNITED STATES OF AMERICA,** | Case No. 2:26-cv-00107-DC-SCR |
| 14 | Plaintiff, | **DEFENDANTS' OPPOSITION TO** |
| 15 | v. | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| 16 | | |
| 17 | **STATE OF CALIFORNIA; GAVIN** | Date: March 20, 2026 |
| 18 | **NEWSOM, in his official capacity as Governor of the State of California;** | Time: 1:30 p.m. |
| 19 | **CALIFORNIA DEPARTMENT OF CONSERVATION, GEOLOGIC ENERGY** | Courtroom: 10 |
| 20 | **MANAGEMENT DIVISION; and DOUG ITO, in his official capacity as State Oil and** | Judge: Hon. Dena M. Coggins |
| 21 | **Gas Supervisor,** | Action Filed: January 14, 2026 |
| 22 | Defendants. | |

23

24

25

26

27

28

---

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................ 1

Factual Background ..................................................................................................... 2

    I.     Calgem's Statutory Mandate Includes Protecting Public Health ........................... 2

    II.    California's Oil And Gas Permitting Process .......................................................... 2

    III.   SB 1137 Addresses Health Harms Caused By Proximity to Oil Extraction .......... 4

Legal Standard ............................................................................................................ 6

Argument .................................................................................................................... 6

    I.     Plaintiff Has Not Demonstrated A Likelihood Of Success On The Merits Of Its Preemption Challenge To SB 1137's Application To Federal Land ........... 6

          A.    SB 1137 Is A Public-Health And Environmental Regulation Of The Sort That Is Generally Not Preempted By Federal Mineral-Rights Laws .............................................................................................................. 8

          B.    SB 1137 Does Not Conflict With The MLA Or FLPMA ........................ 12

          C.    SB 1137 Does Not Obstruct The Purposes Of The MLA Or FLPMA ................................................................................................... 14

    II.    Plaintiff Has Not Established Irreparable Harm ................................................. 17

    III.   The Balance Of The Equities And Public Interest Weigh Strongly Against Preliminary Injunctive Relief .......................................................................... 20

Conclusion ............................................................................................................... 22

Defendants' Opposition to Preliminary Injunction Motion (2:26-cv-00107)

# TABLE OF AUTHORITIES

**Page**

CASES

*Arizona v. United States*
    567 U.S. 387 (2012) ................................................................................................ 19, 22

*Arkla Exploration Co. v. Texas Oil & Gas Corp.*
    734 F.2d 347 (8th Cir. 1984) ........................................................................................ 13

*Beaver v. Tarsadia Hotels*
    816 F.3d 1170 (9th Cir. 2016) ........................................................................................ 7

*Bohmker v. Oregon*
    903 F.3d 1029 (9th Cir. 2018) .............................................................................. *passim*

*Brubaker v. Board of County Commissioners*
    652 P.2d 1050 (Colo. 1982) ........................................................................................ 16

*Cal. Coastal Comm'n v. Granite Rock Co.*
    480 U.S. 572 (1987) .............................................................................................. *passim*

*Cal. Trucking Ass'n v. Bonta*
    996 F.3d 644 (9th Cir. 2021) .......................................................................................... 7

*California v. Azar*
    911 F.3d 558 (9th Cir. 2018) ........................................................................................ 20

*Caribbean Marine Servs. Co. v. Baldrige*
    844 F.2d 668 (9th Cir. 1988) .................................................................................. 18, 19

*Center for Biological Diversity v. BLM*
    937 F. Supp. 2d 1140 (N.D. Cal. 2013) ...................................................................... 13

*Chinatown Neighborhood Ass'n v. Harris*
    794 F.3d 1136 (9th Cir. 2015) .................................................................................... 7, 8

*Cohen v. Apple Inc.*
    46 F.4th 1012 (9th Cir. 2022) .................................................................................... 7, 8

*Daimler Truck N. A., LLC v. Cal. Air Res. Bd.*
    No. 2:25-cv-02255-DC-AC, 2025 WL 3049944 (E.D. Cal. Oct. 31, 2025) ...................... 18

*Developmental Servs. Network v. Douglas*
    666 F.3d 540 (9th Cir. 2011) ...................................................................................... 17

*Doe v. San Diego Unified Sch. Dist.*
    19 F.4th 1173 (9th Cir. 2021) ...................................................................................... 19

## TABLE OF AUTHORITIES
### (continued)

Page

*Fla. Lime & Avocado Growers v. Paul*
   373 U.S. 132 (1963) ........................................................................................ 14

*Gilstrap v. United Air Lines, Inc.*
   709 F.3d 995 (9th Cir. 2013) ........................................................................... 7

*Hillsborough County v. Automated Med. Labs, Inc.*
   471 U.S. 707 (1985) ........................................................................................ 12

*Hoyl v. Babbitt*
   129 F.3d 1377 (10th Cir. 1997) ....................................................................... 13

*Jones v. Google LLC*
   73 F.4th 636 (9th Cir. 2023) ............................................................................ 7

*Klamath Siskiyou Wildlands Center v. Boody*
   468 F.3d 549 (9th Cir. 2006) ........................................................................... 13

*Lafarge Corp. v. Campbell*
   813 F.Supp. 501 (W.D. Tex. 1993) .................................................................. 11

*Lydo Enters., Inc. v. City of Las Vegas*
   745 F.2d 1211 (9th Cir. 1984) ......................................................................... 18

*Maryland v. King*
   567 U.S. 1301 (2012) ...................................................................................... 22

*Medtronic, Inc. v. Lohr*
   518 U.S. 470 (1996) ..................................................................................... 9, 12

*Nat. Res. Def. Council v. Berklund*
   458 F. Supp. 925 (D.D.C. 1978) ...................................................................... 13

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*
   434 U.S. 1345 (1977) ........................................................................................ 4

*People v. Rinehart*
   1 Cal.5th 652 (2016) ................................................................................... 7, 17

*Rocky Mtn. Farmers Union v. Corey*
   913 F.3d 940 (9th Cir. 2019) ........................................................................ 8, 9

*Rocky Mtn. Oil and Gas Ass'n v. Watt*
   696 F.2d 734 (10th Cir. 1982) ......................................................................... 13

**TABLE OF AUTHORITIES**
(continued)

Page

*Shell Offshore Inc. v. Greenpeace, Inc.*
  864 F. Supp. 2d 839 (D. Alaska 2012) .................................................................. 21

*South Dakota Mining Association v. Lawrence County*
  155 F.3d 1005 (8th Cir. 1998) .............................................................................. 16

*Texas v. Becerra*
  577 F. Supp. 3d 527 (N.D. Tex. 2021) .................................................................. 19

*Texas v. Yellen*
  105 F.4th 755 (5th Cir. 2024) ............................................................................... 19

*United States v. Arizona*
  641 F.3d 339 (9th Cir. 2011) ................................................................................ 19

*United States v. Texas*
  719 F. Supp. 3d 640 (W.D. Tex. 2024) ................................................................. 19

*United States v. Washington*
  596 U.S. 832 (2022) ............................................................................................... 8

*Ventura County v. Gulf Oil Corp.*
  601 F.2d 1080 (9th Cir. 1979) ................................................................... 14, 15, 16

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008) ............................................................................................. 6, 20

**STATUTES**

United States Code, Title 30
  § 21a ...................................................................................................................... 14
  § 187 ................................................................................................................ 13, 14
  § 189 ................................................................................................................ 13, 14
  § 225 ...................................................................................................................... 13

United States Code, Title 43
  § 1701(a)(8) ..................................................................................................... 13, 14
  § 1732(b) ................................................................................................................ 13

California Environmental Quality Act ........................................................................ 3

California Government Code
  § 65000, *et seq.* ...................................................................................................... 9
  § 66410, *et seq* ....................................................................................................... 9

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

California Public Resources Code

4

§ 3011(a). ................................................................................. 2
§ 3106 ...................................................................................... 2

5

§ 3106(a). ................................................................................. 2
§ 3280 ...................................................................................... 4

6

§ 3280(b) .................................................................................. 2
§ 3280(c) ............................................................................... 2, 5

7

§ 3281(a). ................................................................................. 5
§ 3281(a)(1). ........................................................................... 11

8

§ 3282 ...................................................................................... 6

9

§ 3283 ...................................................................................... 6
§ 3284 ...................................................................................... 6

10

§ 3288 ...................................................................................... 6

11

Federal Land Policy Management Act of 1976 ............................... *passim*

12

Forest Management Act ...................................................................... 15

13

Mineral Leasing Act of 1920 ........................................................ *passim*

14

**OTHER AUTHORITIES**

15

California Code of Regulations, Title 14, div. 2, Chapter 4, Article 2.5

16

§ 1721 .................................................................................... 16
§ 1765.2 ................................................................................... 6

17

§ 1765.3 ................................................................................... 6
§ 1765.6 ................................................................................... 6

18

19

California Senate Bill No. 1137 ..................................................... *passim*

20

California Senate Bill No. 1137

§ 1 ......................................................................................... 10

21

§ 2 ...................................................................................... 4, 5

22

H.R. Rep. No. 65-206 (1917) ............................................................ 12

23

H.R. Rep. No. 65-1138 (1919) .......................................................... 12

24

25

26

27

28

Defendants' Opposition to Preliminary Injunction Motion (2:26-cv-00107)

# INTRODUCTION

California enacted Senate Bill No. 1137 (SB 1137) in 2022 to protect communities near oil and gas wells from the significant health problems created by exposure to toxic emissions and other health hazards from those operations. Relying on studies and other evidence demonstrating that geographic proximity to oil and gas development causes a higher concentration of pollutants and an increase in adverse health outcomes, the Legislature established a 3,200-foot "setback" from "sensitive receptors," such as housing, schools, retail stores, and hospitals, called "health protection zones." With certain exceptions, the statute prohibits new drilling or reworking of oil and gas wells within that 3,200-foot radius around those sensitive receptors. SB 1137 also requires existing oil and gas operations in those areas to comply with specific health, safety, and environmental requirements.

Now, over three years after the law was enacted, the federal government suddenly seeks a preliminary injunction barring application of SB 1137 to oil and gas drilling on federal lands. But California and the federal government have exercised concurrent authority over oil and gas operations on federal land *for decades*: In addition to requirements under federal law, oil and gas operators have long had to comply with California laws that protect the environment and public health as well. The federal government here does not challenge that baseline reality of concurrent jurisdiction; instead, it argues only that select provisions of SB 1137 are preempted as applied to federal lands. The federal government is mistaken. SB 1137 is a public health and environmental regulation, on par with dozens of other state laws that the federal government does not dispute would apply to operations on federal lands. SB 1137 does not conflict with federal law either, nor does it obstruct federal policy for leasing mineral-development rights.

To argue for preemption, the federal government attempts to characterize SB 1137 as a "zoning ordinance." But there is no support for that label. It does not regulate "land use" in a classic sense, distinguishing it from a local zoning law that was challenged in a Ventura County case on which the federal government heavily relies. Rather, SB 1137 regulates *activities* that pose specific environmental and health threats when they occur close to where people live, work, and go to school. SB 1137 was enacted to protect public health and is fundamentally an

1

1    environmental regulation.  As such, it does not conflict with or obstruct the purposes of federal

2    law governing leasing of mineral rights on federal land.  Accordingly, the federal government is

3    unlikely to succeed on the merits of its preemption challenge.

4        The federal government has also failed to establish any of the other factors required to

5    justify preliminarily enjoining the enforcement of SB 1137 as applied to federal land.  It has not

6    shown that enforcement of the law causes irreparable harm or that the balance of equities tips in

7    its favor.  The State and its residents, by contrast, would undoubtedly suffer irreparable harm if

8    SB 1137—which protects communities near oil and gas operations—could not be enforced,

9    upending the status quo and imperiling public health.

10       The motion for a preliminary injunction should be denied.

11                              **FACTUAL BACKGROUND**

12   **I.    CALGEM'S STATUTORY MANDATE INCLUDES PROTECTING PUBLIC HEALTH**

13       The California Department of Conservation, Geologic Energy Management Division

14   (CalGEM) oversees "the drilling, operation, maintenance, and abandonment" of oil and gas wells.

15   Cal. Pub. Resources Code, § 3106.[1]  It is also responsible for "protecting public health and safety

16   and environmental quality."  § 3011(a).  CalGEM must exercise its responsibilities in a manner

17   that, *inter alia*, "prevent[s], as far as possible, damage to life, health, property, and natural

18   resources."  § 3106(a).  For example, in this case, except in certain circumstances, CalGEM

19   protects the public from the adverse health impacts of oil and gas operations by not permitting the

20   drilling or reworking of wells within 3,200 feet of homes, schools, playgrounds, hospitals, and

21   other "sensitive receptors."  §§ 3280(b), (c); 3281(a).

22   **II.   CALIFORNIA'S OIL AND GAS PERMITTING PROCESS**

23       Oil and gas operators seeking approval for new wells or to rework existing wells must first

24   obtain approval from local authorities, where applicable.  Decl. of Trey Powell (Powell Decl.)

25   ¶ 5.  Then, before commencing operations, the operator must also submit to CalGEM an

26   application for a Notice of Intention (NOI), colloquially referred to as a permit.  *Id.*  CalGEM

---

27       [1] All statutory references are to the California Public Resources Code unless otherwise
28   indicated.

1    reviews each permit application for adherence to health and safety rules, environmental rules such

2    as the California Environmental Quality Act, and other state laws and guidelines.  *Id*. ¶ 6.

3    CalGEM will only approve an NOI application if it meets all CalGEM's regulatory requirements

4    and if any potential impacts to health, safety, or the environment identified by CalGEM are

5    effectively addressed by mitigating permit conditions.  *Id*.

6          This permitting process has long worked the same for oil and gas operators with leases to

7    operate on federal lands.  *See id*. at ¶¶ 5–6.  Just like operators drilling on private lands, federal

8    lessees submit NOIs to CalGEM and may not begin operations until and unless CalGEM

9    approves the NOI.  *Id*.  This longstanding approach ensures that the same rules and protections

10   generally apply to oil and gas operations on federal lands as on other (private or state) lands,

11   which in many parts of California are interspersed in a "checkerboard" pattern of alternating one-

12   square-mile squares, as shown below.  *See* Decl. of Lloyd Light (Light Decl.) ¶ 8, Exhs. 1 and 2

13   (showing the scattering of BLM leases among private and state land near Bakersfield, which is

14   generally representative of BLM lease locations that are near health protection zones throughout

15   California).



### III.  SB 1137 ADDRESSES HEALTH HARMS CAUSED BY PROXIMITY TO OIL EXTRACTION

In 2022, the California Legislature passed and Governor Newsom signed Senate Bill 1137, which added Article 4.6 (commencing with Section 3280) to Chapter 1 of Division 3 of the California Public Resources Code.  Cal. Stats. 2022, ch. 365 (SB 1137), § 2.  SB 1137 aims to protect "frontline communities that have been most polluted by the fossil fuel industry."  *Id.*, § 1(e).  The Legislature found that a "growing body of research shows direct health impacts from proximity to oil extraction," "proximity to oil and gas extraction sites pose significant health risks, especially due to increased air pollution," and "studies have shown evidence of harm at distances less than one kilometer, which is approximately 3,200 feet."  *Id.*, § 1(a), (c), (d).  And so, while recognizing that *existing* oil and gas wells near communities could not be eliminated outright because of investments already made in their development and operations, the Legislature sought to limit future harms by prohibiting *new* wells, which would generate new health risks for decades to come, within 3,200 feet of "sensitive receptors" like homes and schools.  *See, e.g.*, Decl. of Jerry Yen (Yen Decl.), Ex. B (Assembly Committee on Natural Resources, Bill Analysis on SB 1137) at 3–5 (noting that approved well permits are generally good indefinitely but there is a need now to "limit the exposure from toxic contaminates and protect our frontline communities" from the "disastrous health implications" resulting from proximity to oil and gas wells).

The Legislature specifically noted two scientific reviews of studies on the health impact of oil and gas operations: the 2015 California Council on Science and Technology Assessment of Well Stimulation and the 2021 Scientific Advisory Panel Memorandum to CalGEM.  Yen Decl., Ex. A (Senate Rules Committee, Bill Analysis on SB 1137) at 5; Ex. B at 4–5.  The Council on Science and Technology assessment was drafted by scientists and peer-reviewed by 18 technical experts.  Yen Decl., Ex. C (*An Independent Scientific Assessment of Well Stimulation in California* – Executive Summary), at 1.  The Council on Science and Technology assessment concluded that "[m]any of the constituent[] [chemicals] used in and emitted by oil and gas development can damage health, and place disproportionate risks on sensitive populations, including children, pregnant women, the elderly, and those with pre-existing respiratory and

4

1   cardiovascular conditions." *Id*. at 13.  It also concluded that "[o]il and gas development poses

2   more elevated health risks when conducted in areas of high population density . . . because it

3   results in larger population exposures to toxic air contaminants." *Id*.

4         Similarly, the Scientific Advisory Panel, which was composed of 13 public health and

5   environmental experts, concluded that oil and gas development operations "present health risks,

6   especially to those living in close proximity."  Yen Decl., Ex. D (October 1, 2021 Memorandum

7   from Scientific Advisory Panel to CalGEM) at 2.  In particular, the panel concluded "with a high

8   level of certainty that there is a causal relationship between close proximity to [oil and gas

9   developments] and adverse perinatal and respiratory outcomes." *Id*.at 4.  The panel pointed to

10  studies reporting "associations between exposure to [oil and gas development] and adverse birth

11  outcomes," with one study reporting "statistically significant reductions in infant health index

12  within 1 km of both conventional and unconventional drilling sites in Oklahoma." *Id*. at 2.  Other

13  studies "reported an association between [oil and gas development] and asthma exacerbations,

14  asthma hospitalizations, and respiratory symptoms." *Id*. at 4.  Those studies led the Scientific

15  Advisory Panel to conclude "with a high level of certainty that concentrations of health-damaging

16  air pollutants, including criteria air pollutants and toxic air contaminants, are more concentrated

17  near [oil and gas development] activities compared to further away" and that "the likelihood and

18  magnitude of exposure decreases with increasing distance." *Id*. at 11, 12.  In addition, "neither

19  setbacks [nor] engineering controls alone are sufficient to reduce the health hazards and risks

20  from [oil and gas development] activities—both approaches are needed in tandem." *Id*. at 13.

21        Based on these scientific studies and conclusions regarding the health risks associated

22  with proximity to oil and gas development operations, SB 1137 prohibits the issuance of an NOI

23  to drill or rework (i.e., reconstruct) oil or gas wells within a health protection zone, defined as the

24  area within 3,200 feet of a "sensitive receptor." § 3281(a).  A "sensitive receptor" includes any

25  residence, education resource (e.g., school), community-resource center, healthcare facility, live-

26  in housing, or building with a business open to the public.  § 3280(c).  There are certain

27  exceptions to the prohibition, such as when well repair is needed to prevent a threat to public

28  health or safety, or permits are needed to plug and abandon a well.  § 3281(a).

1   For existing oil and gas wells within a health protection zone, SB 1137 requires operators

2   to follow separate requirements to mitigate the impact on nearby communities.  §§ 3282–3284.

3   The federal government does not challenge those requirements for existing wells on federal lands;

4   it challenges only the restriction on drilling and reworking such wells.

5   Pursuant to California Public Resources Code section 3288, CalGEM adopted emergency

6   regulations to implement SB 1137, which are still in effect.  *See* Cal. Code Regs., tit. 14, div. 2,

7   ch. 4, art. 2.5.  These regulations provide additional detail on statutory definitions and

8   requirements, such as measuring distances for establishing a health protection zone, requirements

9   for NOI submissions, and guidance for submitting sensitive receptor inventories and maps.  *See*

10  *id*. at §§ 1765.2, 1765.3, 1765.6.

## LEGAL STANDARD

12  "A preliminary injunction is an extraordinary remedy never awarded as a matter of right."

13  *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008).  To prevail, "a plaintiff must show

14  (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff

15  if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) that an

16  injunction is in the public interest."  *Id*. at 7, 20.

## ARGUMENT

18  **I.    PLAINTIFF HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS**
        **OF ITS PREEMPTION CHALLENGE TO SB 1137'S APPLICATION TO FEDERAL LAND**

20  Plaintiff's request for a preliminary injunction against application of SB 1137 to federal

21  land rests completely on its claim that such application is preempted by federal law.  In particular,

22  Plaintiff asks the Court to enjoin application of SB 1137 to federal land by barring Defendants

23  from enforcing the law "against the United States, its agencies, its officers, and its lessees."[2]

24  Plaintiff's Proposed Order, ECF No. 4-10.  But Plaintiff is not likely to succeed on the merits of

---

[2] The federal government's motion states that it is seeking "a preliminary injunction to enjoin Defendants . . . from enforcing California Senate Bill No. 1137."  Notice of Mot. for Prelim. Injunction, ECF No. 4, at 1; *see, e.g.*, Memorandum in Support of Mot. for Prelim. Injunction (Mot.), ECF No. 4-1, at 25 ("The Court should grant the United States' motion and preliminarily enjoin the challenged provisions of SB 1137.").  However, based on Plaintiff's proposed order and arguments, Defendants understand these statements to be seeking an injunction against the application of SB 1137 to federal land only.

1   its preemption claim.  First, SB 1137 is the kind of environmental and public-health protection

2   that both the Supreme Court and the Ninth Circuit have concluded is not preempted by federal

3   laws that govern mineral-resource development on federal land.  And second, it is not impossible

4   for the lessees of federal lands to comply with both federal law and SB 1137, nor does SB 1137

5   obstruct federal policy governing federal mineral-rights leases.  SB 1137 was enacted based on

6   scientific studies reporting serious health risks from exposure to oil and gas operations at

7   distances less than 3,200 feet.  California has an affirmative duty to protect its residents from

8   those kinds of health risks.  Federal law does not require that California limit its protections to

9   residents who live, work, and study near private lands, while leaving those who live, work, and

10  study near federal lands exposed to harm.

11          There is a "strong presumption against preemption."  *Beaver v. Tarsadia Hotels*, 816 F.3d

12  1170, 1180–81 (9th Cir. 2016).  Courts "presum[e] that Congress does not intend to supplant state

13  law, particularly in areas of traditional state regulation."  *Cal. Trucking Ass'n v. Bonta*, 996 F.3d

14  644, 654 (9th Cir. 2021) (citation omitted).  Indeed, the presumption against preemption is

15  "especially strong" when "Congress has legislated in a field which the states have traditionally

16  occupied."  *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1141 (9th Cir. 2015)

17  (citation omitted).  The presumption against preemption also applies when there is a claim that

18  state regulations are preempted due to their application on federal land.  "Absent consent or

19  cession a State undoubtedly retains jurisdiction over federal lands within its territory . . . ."  *Cal.*

20  *Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580 (1987).  So, "to displace the application

21  of state law on federal land, Congress must act affirmatively."  *People v. Rinehart*, 1 Cal.5th 652,

22  660 (2016).

23          State laws can be preempted in three ways—express preemption, field preemption, or

24  conflict preemption.  *Jones v. Google LLC*, 73 F.4th 636, 641 (9th Cir. 2023).  Express

25  preemption occurs when Congress "enact[s] a statute containing an express preemption

26  provision."  *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1003 (9th Cir. 2013).  Field

27  preemption occurs "when the scope of a [federal] statute indicates that Congress intended federal

28  law to occupy a field exclusively."  *Cohen v. Apple Inc.*, 46 F.4th 1012, 1027 (9th Cir. 2022).

1    Conflict preemption occurs when compliance with state and federal law is impossible.

2    *Chinatown*, 794 F.3d at 1141.  That can occur, in turn, when state law "stands as an obstacle to

3    the accomplishment and execution of the full purposes and objectives of Congress, *Cohen*, 46

4    F.4th at 1027—also called "obstacle preemption."

5        In this case, Plaintiff contends that SB 1137 is preempted by the Mineral Leasing Act of

6    1920 (MLA) and the Federal Land Policy Management Act of 1976 (FLPMA).[3]  Mot. at 14.  It

7    argues only that SB 1137 conflicts with the MLA and FLPMA and obstructs federal policy under

8    the MLA and FLPMA, both conflict-preemption arguments.  *Id.*  Neither argument has merit

9    because state environmental protections do not conflict with or pose an obstacle to federal law.

10       **A.    SB 1137 Is A Public-Health And Environmental Regulation Of The Sort**
         **That Is Generally Not Preempted By Federal Mineral-Rights Laws**
11

12       In federal preemption cases involving mineral-extraction rights, the Supreme Court has

13    distinguished between state laws regulating land use (which the Court assumed, without deciding,

14    may be preempted) and state laws generally providing for environmental protections (which

15    generally are not preempted).  *Granite Rock*, 480 U.S. at 585, 587–89; *see also Bohmker v.*

16    *Oregon*, 903 F.3d 1029, 1039 (9th Cir. 2018) (noting that the Supreme Court in *Granite Rock*

17    "held that only 'state land use plans' would be preempted, not state 'environmental regulation'");

18    Mot. at 12-13; *id.* at 15 (acknowledging that "Congress has not barred California from regulating

19    federal lands for environmental purposes").  "Land use planning in essence chooses particular

20    uses for the land; environmental regulation, at its core, does not mandate particular uses of the

21    land but requires only that, however the land is used, damage to the environment is kept within

22    prescribed limits."  *Granite Rock*, 480 U.S. at 587.  More generally, "States traditionally have had

23    great latitude under their police powers to legislate as to the protection of the lives, limbs, health,

24    comfort, and quiet of all persons."  *Rocky Mtn. Farmers Union v. Corey*, 913 F.3d 940, 946 (9th

25    Cir. 2019) (quoting *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756 (1985)).

26    ───────────────
         [3] While the federal government mentions the intergovernmental immunity doctrine in its
27    "Applicable Law" section, Mot. at 13, it does not make any arguments as to how SB 1137
      "directly regulate[s]" or "discriminate[s] against" the federal government.  *United States v.*
      *Washington*, 596 U.S. 832, 835 (2022).  Since SB 1137 plainly does not do either, Defendants do
28    not address the doctrine.

8

1   Courts presume that a state's exercise of such core police powers are *not* preempted because of

2   "the historic primacy of state regulation of matters of health and safety." *Medtronic, Inc. v. Lohr*,

3   518 U.S. 470, 485 (1996). "Legislation designed to free [the air] from pollution . . . clearly falls

4   within the exercise of even the most traditional concept of . . . the police power." *Rocky Mtn.*

5   *Farmers*, 913 F.3d at 946 (quoting *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440,

6   442 (1960)).

7        Since the Supreme Court's decision in *Granite Rock*, the Ninth Circuit has provided

8   additional insight into applying the distinction between a land-use regulation and an

9   environmental regulation.  In *Bohmker v. Oregon*, the Ninth Circuit held that an Oregon law

10  banning the use of certain mining equipment in particular "zones" was not preempted by federal

11  mining laws when applied on federal land.  903 F.3d at 1041–42.  In particular, the Court rejected

12  the argument that the law should be considered a *land-use planning* regulation simply because it

13  "prohibit[ed]" a particular "use" of land in particular "zones."  *Id*.  Instead, the Court concluded

14  that the law was a non-preempted *environmental* regulation because it "did not mandate particular

15  uses of the land," was "not part of Oregon's extensive and distinct land use system," and served

16  an "obvious and important environmental purpose" to protect certain animal species.  *Id*. at

17  1042-1043.

18       SB 1137 is an environmental regulation for the same basic reasons.  First, it does not dictate

19  a specific land use.  As explained above, it only limits the environmental *impacts* of oil and gas

20  operations to public health by establishing minimum distances for new and reworked wells from

21  "sensitive receptors" such as homes and schools.  Second, SB 1137 is not part of California's

22  "extensive and distinct land use system," *Bohmker*, 903 F.3d at 1042, which, like the land-use

23  system in Oregon, exists to coordinate and develop local land-use plans.  *See* Cal. Gov. Code,

24  §§ 65000, *et seq.* (Planning and Zoning Law); *id*., §§ 66410, *et seq.* (Subdivision Map Act).  SB

25  1137 "stands apart from that regime"; it is part of the Oil and Gas Conservation section of

26  California's Public Resources Code.  *Bohmker*, 903 F.3d at 1043.  And third, SB 1137 serves an

27  "obvious and important environmental purpose"—one that the Legislature took pains to include

28  in the text of the statute itself: to protect the public from increased pollution and significant health

9

1  risks resulting from residing, studying, working, or otherwise living in close proximity to oil and

2  gas extraction sites.  SB 1137, § 1.

3          Plaintiff attempts to distinguish SB 1137 from the Oregon law in *Bohmker* by

4  characterizing SB 1137 as a land-use planning statute that operates as a "de facto ban on *all* new

5  development activities (as well as current and future maintenance necessary to continue

6  development activities) in [health protection zones]."  Mot. at 17; *see also id*. at 4, 9, 18–19.  That

7  is wrong.  Only about ten percent all BLM-managed land in California—including lands that have

8  not been leased—is within a verified or potential health protection zone,[4] with only 0.2% within a

9  verified health protection zone.  Light Decl. ¶ 10.  For BLM leases in California, only about ten

10  percent is within a verified or potential health protection zone, with roughly one percent impacted

11  by a verified health protection zone.  *Id*. ¶ 6.  When filtering out leases in California identified by

12  BLM as "closed," SB 1137 impacts roughly nineteen percent of the land covered by the "active"

13  BLM leases.  *Id*. ¶ 7.  In short, SB 1137 has a limited impact on BLM-managed land and leases

14  and is not a ban on all new development.  Lessees may obtain permits for oil and gas wells on any

15  of the federal land outside of health protection zones.  *See Bohmker*, 903 F.3d 1042 n.7 (stating

16  that the challenged law prohibiting motorized mining in areas designated as an essential salmon

17  habitat was not a "ban" on mining because only some of the plaintiffs' mining claims were

18  located in those designated areas).

19          Indeed, SB 1137 does not ban development of oil and gas resources; it only limits the

20  drilling or reworking of oil and gas wells within health protection zones, on federal lands and

21  private lands alike.  SB 1137 does not limit using wells outside of health protection zones to reach

22  oil and gas resources within health protection zones—for example, laterally drilled wells allow

23  access to mineral resources hundreds or thousands of feet beneath sensitive receptors, while

24  keeping the wellhead at the surface, and its associated emissions at a safer distance from sensitive

25  receptors.  *See* Powell Decl. ¶ 9 (explaining methods to reach oil and gas resources underneath a

26  health protection zone without having to drill on the surface of such a zone).  And even within

27          [4] A verified health protection zone is an area confirmed by CalGEM to be within 3,200
      feet of a sensitive receptor.  Light Decl. ¶ 4.  A potential health protection zone is an area
28  preliminarily identified as being with 3,200 feet of a sensitive receptor.  *Id*.

1  health protection zones, there are exceptions for "threat[s] to public health, safety, or the

2  environment." § 3281(a)(1).  CalGEM has approved 77 such exceptions, including on federal

3  land.  *See* Powell Decl. ¶ 7. In other words, SB 1137 limits only a specific method of oil and gas

4  development: drilling and reworking oil and gas wells within health protection zones.  It does not

5  ban oil and gas operations, nor does it mandate any particular use of land.

6       Plaintiff further argues that SB 1137 cannot be an environmental regulation because it does

7  "not impose standards designed to minimize emissions, mitigate surface impacts, or protect

8  groundwater."  Mot. at 19.  But that is not the standard for distinguishing between land-use

9  planning and environmental regulations.  Indeed, in *Bohmker*, the Ninth Circuit flatly rejected the

10 argument that the Supreme Court in *Granite Rock* had "define[d] the entire universe of

11 environmental regulation as consisting solely of limit-prescribing standards."  903 F.3d at 1042.

12 "That formalistic approach ignores the practical reality that environmental regulation may take

13 several forms . . . ."  *Id.*  One such form is limiting certain activities when they take place near

14 communities to protect health and safety—just like SB 1137.  *See e.g., Lafarge Corp. v.*

15 *Campbell*, 813 F.Supp. 501, 507–08 (W.D. Tex. 1993) (concluding that a state statute prohibiting

16 the issuance of permits for hazardous waste facilities within half a mile of residences, schools,

17 and other public areas to protect human health and safety was not preempted by federal laws

18 governing disposal of hazardous waste).

19      Plaintiff also argues that SB 1137 constitutes a land-use "ban" because SB 1137 may

20 require operators to use alternative methods of reaching oil and gas resources, increasing the cost

21 for developers.  *See* Mot. at 10–11.  But limiting methods of operation is not the same thing as a

22 "ban" on an activity if another method may be used.  Besides, the Ninth Circuit has rejected "a

23 commercial impracticability test" for preemption because "virtually every environmental

24 regulation will render at least some mining claims commercially impracticable."  *Bohmker*, 903

25 F.3d at 1041; *see also id.* (the "preemption inquiry does not turn on profitability.").  "Standards

26 designed to minimize emissions, mitigate surface impacts, or protect groundwater" no doubt

27 increase costs to developers, yet Plaintiff acknowledges that such standards would not be

28 preempted.  Mot. at 19.

1    Tellingly, Plaintiff does not even acknowledge SB 1137's purpose: to protect communities

2    from the adverse health and environmental impacts of oil and gas operations.  As the author of

3    SB 1137 explained, "approximately five and a half million Californians . . . live within a mile of

4    one or more oil and gas wells, [and] one-third live in areas that are the most burdened by

5    environmental pollution."  Yen Decl., Ex. A at 12.  As discussed above, in creating health

6    protection zones, the Legislature relied on a scientific advisory panel's conclusions that pollutants

7    "are more concentrated near oil and gas development activities compared to further away" and

8    that "studies consistently demonstrated evidence of harm at distances less than 1 km."  *Id*. at 5

9    (quoting October 1, 2021 Memorandum from scientific advisory panel to CalGEM); *see also id*.,

10   Ex. D at 11, 12.  The Legislature also relied on the scientific advisory panel's analysis and its

11   conclusion that "close proximity to oil and gas development causes significant adverse health

12   effects, including poor birth outcomes, asthma, and reduced lung functions."  *Id*., Ex. B at 4; *see*

13   *also id*., Ex. D at 3-4.

14        In sum, SB 1137 is not a land-use planning statute, but an environmental regulation that,

15   like the Oregon law in *Bohmker*, restricts a specific activity within a limited number of specific

16   zones to protect the environment.  Here, that environmental regulation validly protects the public

17   from the adverse health effects resulting from proximity to oil and gas operations.  In fact,

18   public-health regulations are rarely found to be preempted because "regulation of health and

19   safety matters is primarily, and historically, a matter of local concern."  *Hillsborough County v.*

20   *Automated Med. Labs, Inc.,* 471 U.S. 707, 719 (1985); *see also Medtronic*, 518 U.S. at 485

21   (noting "the historic primacy of state regulation of matters of health and safety.").  Accordingly,

22   SB 1137's regulation of oil and gas operations within a health protection zone to protect public

23   health is not subject to federal preemption.

24        **B.    SB 1137 Does Not Conflict With The MLA Or FLPMA**

25        The MLA was enacted in response to the "monopoly and waste and other lax methods that

26   ha[d] grown up in the administration of our public-land laws."  H.R. Rep. No. 65-1138, at 19

27   (1919) (Conf. Rep.); *see also* H.R. Rep. No. 65-206, at 6 (1917) ("Careful provisions relative to

28   continued development to prevent waste and speculation are inserted in the bill that will …

1   practice conservation of this resource that is so universally used and in which we all feel a keen

2   interest in the prevention of its waste in any form.").  It grants authority to the Bureau of Land

3   Management (BLM), located within the U.S. Department of the Interior, to lease mineral rights

4   on federal land and ensure that "all reasonable precautions [are taken] to prevent waste" and to

5   "safeguard[] the public welfare."  30 U.S.C. §§ 187, 225; 43 U.S.C. § 1732(b); *see also Arkla*

6   *Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984); *Center for*

7   *Biological Diversity v. BLM*, 937 F. Supp. 2d 1140, 1151 (N.D. Cal. 2013).  Protecting the public

8   welfare includes protection from environmental harm.  *See Hoyl v. Babbitt,* 129 F.3d 1377, 1380

9   (10th Cir. 1997); *Nat. Res. Def. Council v. Berklund,* 458 F. Supp. 925, 936 & n.17 (D.D.C.

10  1978).

11      Most important, the MLA contains an express savings clause to *protect* state regulations:

12  Congress provided that the Act shall "not be construed or held to affect the rights of the States or

13  other local authority to exercise any rights which they may have," which have historically

14  included the right to enact state environmental regulations.  30 U.S.C. § 189; *see also id.* at § 187

15  ("none [of the leases] shall be in conflict with the laws of the State in which the leased property is

16  situated").

17      The FLPMA provides "a comprehensive statement of congressional policies concerning the

18  management of the public lands" owned by the United States.  *Rocky Mtn. Oil and Gas Ass'n v.*

19  *Watt*, 696 F.2d 734, 737 (10th Cir. 1982).  It directs BLM to manage federal lands on a "multiple

20  use" basis, "making the most judicious use of the land for some or all of the[] resources," and,

21  when appropriate, "using 'some land for less than all of the resources.'"  *Id*. at 738 (quoting

22  43 U.S.C. §§ 1701 (a)(7); 1702 (c)).  In essence, the FLPMA "establishes requirements for land

23  use planning on public land."  *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 555

24  (9th Cir. 2006).  It also directs BLM to "protect the quality of the scientific, scenic, historical,

25  ecological, environmental, air and atmospheric, water resource, and archeological values."  43

26  U.S.C. § 1701(a)(8).

27      Although Plaintiff contends that SB 1137 "directly conflicts" with the MLA and FLPMA, it

28  does not explain how compliance with both SB 1137 and the MLA and FLPMA are impossible.

1    Mot. at 14; *see also Fla. Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142–43 (1963) (state

2    law conflicts with federal law when it is impossible to comply with both).  To the contrary, as

3    Plaintiff acknowledges, oil and gas operations on federal land have been historically governed by

4    both state and federal law.  *See* Mot. at 2; *see also, e.g.*, *Ventura County v. Gulf Oil Corp.*, 601

5    F.2d 1080, 1082 (9th Cir. 1979) (approval for oil and gas drilling issued by U.S. Interior and

6    Agriculture Departments and California Resources Agency).  Indeed, the MLA acknowledges

7    that it should not be construed to impact the states' authority in certain areas, such as

8    environmental regulations.  *See* 30 U.S.C. §§ 187, 189.  Thus, it is not impossible for oil and gas

9    developers on federal land to comply with SB 1137 and federal laws.

10          While the MLA and FLPMA grant BLM the authority to lease mineral rights on federal

11   land, they do not grant federal lessees the right to drill oil and gas wells anywhere on federal land.

12   *See* Warren Decl., ECF No. 4-3, ¶ 12 (a federal lease "merely conveys a conditional right to seek

13   approval for future operations").  And, as discussed above, SB 1137's protections around

14   sensitive receptors apply to only roughly ten percent of the land in California covered by BLM

15   leases and about nineteen percent of the land covered by "active" BLM leases—lessees remain

16   free to drill elsewhere on their leased land.  Light Decl. ¶¶ 6, 7.  Moreover, neither the MLA nor

17   the FLPMA guarantee that extracting oil and gas will be profitable or that lessees will be immune

18   from local regulations.  In short, complying with both SB 1137 and federal laws is not

19   impossible, and therefore there is no conflict preemption.

20          **C.     SB 1137 Does Not Obstruct The Purposes Of The MLA Or FLPMA**

21          As discussed above, the MLA and FLPMA grants BLM the authority to lease the right to

22   develop mineral resources, but not at the expense of environmental harm or public health.  *See* 30

23   U.S.C. § 21a; 43 U.S.C. § 1701(a)(8); *see also* Mot. at 5–6.  Here, SB 1137 does not obstruct that

24   policy.  Contrary to Plaintiff's obstacle-preemption argument, SB 1137 does not prohibit oil and

25   gas operations altogether or mandate a particular use of land.  It only imposes a setback for those

26   operations to locations at least 3,200 feet from homes, schools, hospitals, and other sensitive

27   receptors to protect the health of communities.  It has no impact on oil and gas operations outside

28   of health protection zones and does not prevent operators from accessing oil and gas resources

beneath land that is within health protection zones, so long as a well is drilled laterally to place the wellhead outside the setback zone. Moreover, for verified and potential health protection zones, SB 1137 only impacts about ten percent of BLM-managed land in California and about thirteen percent of all federally managed land in California. Light Decl. ¶¶ 10, 11. For just verified health protection zones, the percentages drop to less than one percent. *Id.* Ultimately, California's regulations on oil and gas operations within health protection zones do not obstruct the purpose of the MLA and FLPMA to lease development of mineral resources while protecting the public from environmental harm.

For these reasons, SB 1137 would not be preempted by the federal laws at issue here even if it were interpreted to be a land-use regulation rather than (or in addition to) an environmental regulation. Neither the Supreme Court nor the Ninth Circuit has decided when, if ever, state land-use regulations conflict with the MLA and FLPMA. *See Granite Rock*, 480 U.S. at 585 (assuming without deciding that the FLPMA and National Forest Management Act together preempt state land-use plans on unpatented mining claims in national forests); *Bohmker*, 903 F.3d at 1040 (same). And SB 1137 is a far cry from the type of blanket prohibition that could potentially trigger such a conflict.

It is not, for example, like the zoning-permit requirement that the Ninth Circuit concluded was preempted in *Ventura County v. Gulf Oil Corp*, 601 F.2d 1080, a decision that predates *Granite Rock.* The *Ventura County* ordinance was part of the county's zoning laws and gave the local planning commission complete discretion over whether to issue an oil exploration and extraction permit, with the power to deny a permit on any ground at all; the ordinance itself had nothing to do with protecting the environment or the health of communities. *See Ventura County*, 601 F.2d at 1082, 1084. Instead, the county purported to assert its own land-use zoning authority over that of the federal government. *See id.* at 1082 (zoning federal land as open space and requiring a permit for oil and gas exploration on that land).

In contrast, SB 1137 regulates only certain oil and gas activities (reworking wells and drilling new wells) and only locations near sensitive receptors, for the purpose of addressing the health risks associated with proximity to oil and gas extraction sites. SB 1137, § 1. It does not

1  purport to grant CalGEM or any other entity the authority to make land-use decisions about

2  federal land.  Moreover, the *Ventura County* court acknowledged that the MLA did not preempt

3  certain state laws, such as laws regarding "well spacing of federal mineral lessee operations,"

4  even though such laws could be characterized as having a clear land-use dimension.  *Id*. at 1086

5  (citing *Texas Oil & Gas Corp*. *v. Phillips Petroleum Co.* 277 F. Supp. 366, 371 (1967 W.D.

6  Okla.)).  Indeed, laws restricting the location and spacing of wells, which the *Ventura County*

7  court would have deemed *not* to be preempted, are similar in kind to SB 1137's location and

8  spacing requirements that wells be located a minimum distance from sensitive receptors for the

9  protection of health, safety, and the environment.  *See* Cal. Code Regs., tit. 14, § 1721.

10      Plaintiff's reliance on *South Dakota Mining Association v. Lawrence County*, 155 F.3d

11  1005 (8th Cir. 1998), and *Brubaker v. Board of County Commissioners*, 652 P.2d 1050 (Colo.

12  1982) is also misplaced.  Mot. at 19.  In *South Dakota Mining*, the county ordinance at issue

13  prohibited issuing new permits for surface mining in a specific area that mostly encompassed

14  federal land.  155 F.3d at 1007.  The Eighth Circuit concluded that the ordinance acted as a "per

15  se ban" on *all* mining in that area because "surface metal mining [was] the only practical way . . .

16  to mine the valuable mineral deposits located on federal land," and thus presented an obstacle to

17  the congressional purpose of encouraging mining on federal land.  *Id*. at 1011.  Unlike that

18  ordinance, which affected mostly federal land, SB 1137 applies across all of California; only a

19  small percentage of which constitutes federal land (of which only thirteen percent is affected by

20  the regulation).  *See* Light Decl. ¶ 11.  And as explained above, drilling from surface locations

21  within a health protection zone is not the only possible method of extracting oil and gas resources

22  underneath a health protection zone on federal land.  Powell Decl. ¶¶ 9–10 (explaining horizontal

23  drilling and the use of that drilling method in California).

24      More importantly, the *South Dakota Mining* ordinance was a zoning provision unrelated to

25  environmental concerns,155 F.3d at 1007—just like in *Ventura County* and *Brubaker*, both of

26  which involved permit denials based on zoning regulations, not challenges to independent,

27  generally applicable environmental regulations.  *Ventura County*, 601 F.2d at 1082; *Brubaker*,

28

1  652 P.2d at 1060.  SB 1137, on the other hand, is not part of any local or state zoning scheme and

2  exists solely for the purpose of protecting public health.

3      SB 1137 is more like the moratorium on dredging permits at issue in *People v. Rinehart*, 1

4  Cal.5th 652.  California passed the moratorium to eliminate dredge mining's adverse

5  environmental impacts on fish species, water quality, and public health.  *Id*. at 658.  The

6  defendant, who had been criminally charged with unpermitted use of a suction dredge on federal

7  land, asserted that California's moratorium was preempted by federal mining law because the

8  moratorium interfered with Congress's intent to grant individuals a federal right to mine.  *Id*. at

9  658, 660, 664.  The California Supreme Court disagreed.  The court stated that, while federal laws

10  granted specific mining rights, those laws did not "guarantee that mining would prove feasible"

11  and did not create a "grant of immunity against local regulation."  *Id*. at 666.  Accordingly,

12  California's moratorium did not conflict with "congressional purposes and objectives" and was

13  not preempted.  *Id*. at 657, 661.

14      At bottom, SB 1137 does not obstruct the purposes of the MLA or FLPMA: to lease

15  mineral rights on federal land while protecting the public from environmental harm.  There is no

16  obstacle preemption.

17  **II.    PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM**

18       Plaintiff's assertion of irreparable harm hinges on the likelihood of success of its

19  preemption claim.  Mot. at 20–22.  Because Plaintiff has failed to show that the preemption claim

20  is likely to succeed on the merits, it cannot show that it has suffered irreparable harm.

21  *Developmental Servs. Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011) ("[I]f a plaintiff

22  fails to show that he has some chance on the merits, that ends the matter.").

23      Even assuming Plaintiff could demonstrate a likelihood of success on the merits, it has

24  established that it will suffer irreparable harm in the absence of an injunction.  While a

25  *presumption* of irreparable harm may sometimes be warranted if there is a finding of preemption,

26  Plaintiff cites no binding authority for the proposition that an irreparable-harm finding is

27  automatic.   To the contrary, irreparable harm depends, for instance, on the likelihood that a

28  plaintiff's interests will *actually* be harmed, and that they will be harmed *irreparably*:

1    "[P]laintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a

2    preliminary injunction."  *Daimler Truck N. A., LLC v. Cal. Air Res. Bd.*, No. 2:25-cv-02255-DC-

3    AC, 2025 WL 3049944, at *14 (E.D. Cal. Oct. 31, 2025) (quoting *Ctr. for Food Safety v. Vilsack*,

4    636 F.3d 1166, 1172 (9th Cir. 2011)).  Accordingly, Plaintiff still has the burden to show that it

5    will suffer irreparable harm in the absence of an injunction and it cannot meet that burden here for

6    at least three reasons.

7        *First*, Plaintiff's delay in seeking court intervention belies any claim of irreparable harm.

8    As Plaintiff acknowledges, SB 1137 was enacted in 2022 and "California fully implemented SB

9    1137 on June 28, 2024."  Mot. at 8, n.3.  Over the past 18 months, SB 1137 has applied

10   statewide—including to federal leases—with no apparent irreparable harm occurring that would

11   require extraordinary preliminary injunctive relief.  Yet Plaintiff now suddenly asks the Court for

12   that emergency remedy, with no explanation of what has changed.  "By sleeping on its rights a

13   plaintiff demonstrates the lack of need for speedy action."  *Lydo Enters., Inc. v. City of Las*

14   *Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984).  Plaintiff's own delay in bringing this case undercuts

15   any argument that there is an imminent risk of irreparable harm such that any remedy Plaintiff is

16   entitled to could not await a final decision on the merits, after the complex issues presented in

17   Plaintiff's Complaint are fully adjudicated on a complete record.

18       *Second*, Plaintiff has not demonstrated the law will have an immediate effect on drilling on

19   federal land.  SB 1137 has no impact on permits that CalGEM has already approved, so drilling

20   pursuant to those permits can continue.  Nor do the challenged provisions of SB 1137 affect the

21   operations of existing wells.  A new permit is only required to begin drilling a new well or to

22   rework a well.  Yet Plaintiff acknowledges that BLM has currently paused any new oil and gas

23   leasing in California.  Karuzas Decl, ECF No. 4-2, ¶ 8.  And there is no effect on existing wells

24   until reworking of the well is needed, and Plaintiff has presented no evidence that there have been

25   any permit applications for reworking a well on federal land within a setback zone.  Powell Decl.

26   ¶ 8.  In other words, for SB 1137 to have any immediate effect on federal land in California,

27   "[m]ultiple contingencies must occur" such that the effects of SB 1137 on drilling in federal lands

28   is "too speculative to constitute irreparable harm."  *Caribbean Marine Servs. Co. v. Baldrige*, 844

1  F.2d 668, 675 (9th Cir. 1988); *see also id*. at 674 ("[P]laintiff must *demonstrate* immediate

2  threatened injury as a prerequisite to preliminary injunctive relief."); *Doe v. San Diego Unified*

3  *Sch. Dist.*, 19 F.4th 1173, 1181 n.7 (9th Cir. 2021) (explaining that speculative injuries do not

4  constitute irreparable harm).

5      *And third*, Plaintiff cannot show anything beyond relatively minor "harm" it would suffer in

6  the absence of an injunction given the mere ten percent of BLM-managed land in California that

7  would be affected at all by SB 1137.  Light Decl. ¶ 10.

8      Nor is there any merit to Plaintiff's suggestion that an allegation of preemption in a

9  complaint establishes "per se" irreparable harm to the federal government, such that Plaintiff need

10 not make any further showing.  Mot. at 21.  None of the cases that Plaintiff cites support an

11 automatic finding of irreparable harm.  To the contrary, *Texas v. Yellen*—a case about a

12 permanent injunction, not a preliminary one—did not involve a federal preemption claim, but a

13 State's sovereign authority over tax policy.  105 F.4th 755, 774–75 (5th Cir. 2024).  And in *Texas*

14 *v. Becerra*, the Northern District of Texas also emphasized the *States'* interests in "enforcing

15 [their] duly enacted laws."  577 F. Supp. 3d 527, 557 (N.D. Tex. 2021).

16     Here, the harm to California's sovereign authority to protect its residents' health and safety

17 outweighs any impact to Plaintiff's land-use authority, making a per-se finding of irreparable

18 harm particularly inappropriate.  This is especially true given that the enforcement of SB 1137

19 affects only a limited portion of federal land in California.

20     The other cases Plaintiff relies upon—*United States v. Arizona*, 641 F.3d 339, 350 (9th Cir.

21 2011) and *United States v. Texas*, 719 F. Supp. 3d 640, 695 (W.D. Tex. 2024)—also do not

22 support Plaintiff's "per se" irreparable harm argument.  Those cases concerned clear-cut

23 preemption involving a different and more sweeping kind of federal sovereign authority: the

24 federal government's "broad, undoubted power over the subject of immigration and the status of

25 aliens."  *Arizona v. United States*, 567 U.S. 387, 394 (2012); *Texas*, 719 F. Supp. 3d at 663. [5]

26 That type of obvious preemption is not at issue here: both federal and state law permissibly and

27

28       [5] In *United States v. Texas*, Texas did not contest the question of per se irreparable harm, so that question was likely not fully litigated before the court there.  719 F. Supp. 3d at 695.

1   concurrently govern oil and gas operations, and the line where the federal government's exclusive

2   land-use authority ends "will not always be bright." *Granite Rock*, 480 U.S. at 587.

3       For these reasons, Plaintiff has not met its burden of showing that it would likely suffer

4   irreparable harm while this case proceeds on the merits.

5   **III.  THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH STRONGLY AGAINST PRELIMINARY INJUNCTIVE RELIEF**

6

7       The balance of equities and the public interest also militate against a preliminary injunction.

8   These factors merge when the government is a party. *California v. Azar*, 911 F.3d 558, 581 (9th

9   Cir. 2018).  In undertaking its inquiry, the Court "must balance the competing claims of injury

10  and must consider the effect on each party of the granting or withholding of the requested relief."

11  *Winter*, 555 U.S. at 24.  Here, the health harms to residents living, working, and attending school

12  close to potential oil and gas well drilling sites, and the harms to California's ability to protect the

13  health of its citizens, far outweigh the abstract harms and monetary injuries cited by Plaintiff.

14      First and foremost, an injunction would leave Californians vulnerable to the health impacts

15  that the Legislature sought to avoid, based on expert input, simply because they live or spend

16  their days closer to a "federal square" (purple, blue, and yellow squares in the map below) on a

17  checkerboard of federal and state lands rather than a "state square."  *See* Powell Decl. ¶ 11, Exhs.

18  1 and 2 (providing examples of oil fields and oil wells on BLM-managed land within 3,200 feet

19  of schools and neighborhoods); Light Decl. ¶ 8, Exhs. 1 and 2 (showing the patchwork of BLM

20  leases among private and state land near Bakersfield).

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17    As discussed above, studies have shown that those individuals are exposed to higher

18    concentrations of pollutants and experience adverse birth and respiratory outcomes.

19        Plaintiff ignores these adverse health impacts, arguing instead that the public interest would

20    be served by "keep[ing] lessees and operators solvent." Mot. at 22. By arguing that the

21    economic interests of certain businesses outweigh the need to protect public health, Plaintiff gets

      the public-interest inquiry backward. The health harms that residents in proximity to oil and gas
22
      operations will suffer if SB 1137 is enjoined are exactly the types of harms that courts consider to
23
      be irremediable. *See Shell Offshore Inc. v. Greenpeace, Inc.*, 864 F. Supp. 2d 839, 851 (D.
24
      Alaska 2012), *aff'd*, 709 F.3d 1281 (9th Cir. 2013) ("It is well established that demonstrated risks
25
      to health and safety constitute the type of irreparable harm for which there is no adequate remedy
26
      at law.") (citing cases).
27
28

1    Moreover, the federal government's sovereign interests are not the only sovereign interests

2    at stake in this matter. "[B]oth the National and State Governments have elements of sovereignty

3    the other is bound to respect." *Arizona v. United States*, 567 U.S. at 398. Enjoining SB 1137

4    would inflict a separate irreparable harm on California by preventing it "from effectuating [a]

5    statute[] enacted by representatives of its people.". *See Maryland v. King*, 567 U.S. 1301, 1303

6    (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,

7    434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

8    Having failed to show that it is likely to suffer *any* immediate and irreparable harm if SB

9    1137 remains in effect, much less a harm that would outweigh the harm caused to the public and

10   the State if SB 1137 were enjoined, Plaintiff has not established that the equities and public

11   interest favor a preliminary injunction.

12                                    **CONCLUSION**

13   Defendants respectfully request that the Court deny Plaintiff's motion for a preliminary

14   injunction.

15

16

17   Dated:  February 20, 2026                         Respectfully submitted,

18                                                     ROB BONTA
                                                       Attorney General of California
19                                                     ANTHONY R. HAKL
                                                       TODD GRABARSKY
20                                                     Supervising Deputy Attorneys General

21

22                                                     */s/ Jerry T. Yen*

23                                                     JERRY T. YEN
                                                       CHRISTOPHER J. KISSEL
24                                                     Deputy Attorneys General
                                                       *Attorneys for Defendants State of California,*
25                                                     *Governor Gavin Newsom, California*
                                                       *Department of Conservation, Geologic*
26                                                     *Energy Management Division, and Doug Ito*

27

28

                                        22

# CERTIFICATE OF SERVICE

Case Name:  **United States of America v.**          No.    **2:26-cv-00107**
            **State of California, et al.**

I hereby certify that on <u>February 20, 2026</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1.  **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

2.  **DECLARATION OF TREY POWELL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S PRELIMINARY INJUNCTION MOTION**

3.  **DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S PRELIMINARY INJUNCTION MOTION**

4.  **DECLARATION OF LLOYD LIGHT IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S PRELIMINARY INJUNCTION MOTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>February 20, 2026</u>, at Sacramento, California.

| Ksenia Lavrushchak | */s/ Ksenia Lavrushchak* |
|:---:|:---:|
| Declarant | Signature |