1   Colin C. O'Brien, State Bar No. 309413
    Elizabeth A. Fisher, State Bar No. 311366
2   Michelle Ghafar, State Bar No. 315842
    Gabriel F. Greif, State Bar No. 341537
3   cobrien@earthjustice.org
    efisher@earthjustice.org
4   mghafar@earthjustice.org
    ggreif@earthjustice.org
5   EARTHJUSTICE
    1 Sansome Street, Suite 1700
6   San Francisco, CA 94104
    Telephone: (415) 217-2000
7   Facsimile: (415) 217-2040

8   *Attorneys for Proposed Defendant-Intervenors*
    *Food & Water Watch, Friends of the Earth,*
9   *Los Padres ForestWatch, and Sierra Club*

10  (List of counsel continued following caption)

11              **UNITED STATES DISTRICT COURT**
            **FOR THE EASTERN DISTRICT OF CALIFORNIA**
12                  **SACRAMENTO DIVISION**

13

14  UNITED STATES OF AMERICA,                    Case No. 2:26-cv-00107-DC-SCR

                Plaintiff,
15
                                                 **PROPOSED INTERVENORS'**
16          v.                                   **[PROPOSED] OPPOSITION TO**
                                                 **PLAINTIFF'S MOTION FOR**
    STATE OF CALIFORNIA; GAVIN NEWSOM,           **PRELIMINARY INJUNCTION**
17  Governor of the State of California, in his official
    capacity; CALIFORNIA GEOLOGIC ENERGY         Judge: Hon. Dena M. Coggins
18  MANAGEMENT DIVISION, an agency of the        Magistrate Judge: Hon. Sean C. Riordan
    State of California; and DOUG ITO, State Oil  Hearing Date: April 3, 2026
19  and Gas Supervisor, in his official capacity;  Time: 1:30 pm

20              Defendants,

21              and

22  CENTER FOR BIOLOGICAL DIVERSITY,
    FOOD & WATER WATCH, FRIENDS OF THE
23  EARTH, LOS PADRES FORESTWATCH, and
    SIERRA CLUB,
24
                Proposed Defendant-Intervenors.
25

26

27

28

        [PROPOSED] OPPOSITION TO PRELIMINARY INJUNCTION

1  Victoria Bogdan Tejeda, State Bar No. 317132
   Cooper Kass, State Bar No. 346472
2  vbogdantejeda@biologicaldiversity.org
   ckass@biologicaldiversity.org
3  CENTER FOR BIOLOGICAL DIVERSITY
   2100 Franklin Street, Suite 375
4  Oakland, CA 94612
   Telephone: (510) 844-7100
5
   Jason C. Rylander, DC Bar No. 474995 (pro hac vice pending)
6  jrylander@biologicaldiversity.org
   CENTER FOR BIOLOGICAL DIVERSITY
7  1411 K St. NW, Suite 1300
   Washington, D.C. 20005
8  Telephone: (202) 849-8401

9  *Attorneys for Proposed Defendant-Intervenor*
   *Center for Biological Diversity*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] OPPOSITION TO PRELIMINARY INJUNCTION                    2

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES ............................................................................ 4

LIST OF SUPPORTING DECLARATIONS ................................................... 9

INTRODUCTION .......................................................................................... 10

BACKGROUND ............................................................................................ 11

    I.     California's SB 1137 ............................................................................ 11

    II.    Cooperative state and federal regulation of federal land ..................... 13

STANDARD FOR PRELIMINARY INJUNCTION ...................................... 16

ARGUMENT .................................................................................................. 16

    I.     BLM is unlikely to prevail on the merits. ............................................ 17

        A.    BLM must meet a "high threshold" and show that SB 1137 "clearly" conflicts with specific statutory text. ........................... 17

        B.    SB 1137 is fully consistent with the congressional purposes and objectives set forth in the MLA and FLPMA. ............................. 18

        C.    BLM misconstrues and misapplies *Granite Rock* and other case law. .............................................................................................. 21

        D.    BLM does not argue it is likely to prevail on intergovernmental immunity. ...................................................................................... 26

    II.    BLM has not shown irreparable harm ................................................. 26

    III.   The balance of equities and public interest tip sharply against an injunction ........ 28

    IV.   If the Court grants an injunction, it must be narrowly tailored ............ 32

CONCLUSION .............................................................................................. 33

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Aamer v. Obama,*
  742 F.3d 1023 (D.C. Cir. 2014) ....................................................................... 26

5

*ACA Connects v. Bonta,*
  24 F.4th 1233 (9th Cir. 2022)........................................................................... 16

6

7

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
  458 U.S. 592 (1982) .......................................................................................... 28

8

9

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011)..................................................................... 16, 28

10

*Amoco Prod. Co. v. Vill. of Gambell, AK,*
  480 U.S. 531 (1987) .......................................................................................... 32

11

12

*Anglers of the AU Sable v. U.S. Forest Serv.,*
  402 F. Supp. 2d 826 (E.D. Mich. 2005) ........................................................... 32

13

14

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity,*
  950 F.2d 1401 (9th Cir. 1991)........................................................................... 27

15

*Beame v. Friends of the Earth,*
  434 U.S. 1310 (1977) ........................................................................................ 27

16

17

*Beard et al. v. California et al.,*
  L.A. Cnty. Super. Ct. Case No. 25STCP01395 (Apr. 16, 2025) ...................... 28

18

19

*Bohmker v. Oregon,*
  903 F.3d 1029 (9th Cir. 2018)........................................................................... 24

20

*Brubaker v. Board of County Commissioners, El Paso County,*
  652 P.2d 1050 (Colo. 1982) .............................................................................. 24

21

22

*Cal. Coastal Comm'n v. Granite Rock,*
  480 U.S. 572 (1987) ................................................. 13, 14, 17, 21, 22, 23, 24, 25

23

24

*California ex rel. Lockyer v. U.S. Dep't of Agric.,*
  468 F. Supp. 2d 1140 (N.D. Cal. 2006) ............................................................ 32

25

*California v. BLM,*
  286 F. Supp. 3d 1054 (N.D. Cal. 2018) ............................................................ 32

26

27

*Caribbean Marine Servs. Co. v. Baldrige,*
  844 F.2d 668 (9th Cir. 1988)............................................................................. 30

28

*Chamber of Com. of U.S. v. Whiting*,
    563 U.S. 582 (2011) ................................................................................. 18, 19, 26

*Coal. for Econ. Equity v. Wilson*,
    122 F.3d 692 (9th Cir. 1997) ............................................................................. 27, 28

*Collins v. U.S. Citizenship & Immigr. Servs.*,
    820 F.3d 1096 (9th Cir. 2016) ................................................................................... 21

*Commonwealth Edison Co. v. Montana*,
    453 U.S. 609 (1981) ......................................................................................... 19, 21

*Doe v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) ..................................................................................... 30

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ............................................................................. 28, 31

*Dream Games of Arizona, Inc. v. PC Onsite*,
    561 F.3d 983 (9th Cir. 2009) ........................................................................................ 26

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990) ............................................................................................ 17, 18

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
    98 F.4th 1180 (9th Cir. 2024) ................................................................................... 33

*Foothill Church v. Watanabe*,
    654 F.Supp.3d 1054 (E.D. Cal. 2023) ........................................................................ 32

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ............................................................................. 26, 27

*Goldie's Bookstore, Inc. v. Super. Ct. of Cal.*,
    739 F.2d 466 ............................................................................................................... 30

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ..................................................................................................... 28

*Hillsborough County, Fla. v. Automated Med. Lab'ys, Inc.*,
    471 U.S. 707 (1985) ..................................................................................................... 29

*Huron Portland Cement Co. v. Detroit*,
    362 U.S. 440 (1960) ..................................................................................................... 18

*Kleppe v. New Mexico*,
    426 U.S. 529 (1976) ..................................................................................................... 13

*L.A. Memorial Coliseum Comm'n v. NFL*,
    634 F.2d 1197 (9th Cir. 1980) ..................................................................................... 30

*Leiva-Perez v. Holder,*
   640 F.3d 962 (9th Cir. 2011) ............................................................................... 17

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ............................................................................................ 16

*Melendres v. Maricopa County,*
   897 F.3d 1217 (9th Cir. 2018) ............................................................................. 33

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
   241 F.3d 722 (9th Cir. 2001) ............................................................................... 32

*Native Oil Producers and Emps. of California et al. v. California et al.,*
   L.A. Cnty. Super. Ct. Case No. 25STCP01509 (Apr. 23, 2025) ........................ 28

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) .............................................................................................. 14

*Oakland Trib., Inc. v. Chron. Publ'g Co.,*
   762 F.2d 1374 (9th Cir. 1985) ............................................................................. 27

*Oklahoma v. Castro-Huerta,*
   597 U.S. 629 (2022) ........................................................................... 18, 19, 22, 26

*Pacific Gas & Electric Co. v. State Energy Resources Conservation &*
   *Development Commission,*
   461 U.S. 190 (1983) ...................................................................................... 20, 21

*People v. Rinehart,*
   377 P.3d 818 (Cal. 2016) ............................................................................... 24, 25

*Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.,*
   485 U.S. 495 (1988) ............................................................................................ 18

*Sampson v. Murray,*
   415 U.S. 61 (1974) .............................................................................................. 30

*San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Service,*
   657 F. Supp. 2d 1233 (D. Colo. 2009) ............................................................... 32

*South Dakota Mining Association, Inc. v. Lawrence County,*
   155 F.3d 1005 (8th Cir. 1998) ......................................................................... 23, 24

*Surplus Trading Co. v. Cook,*
   281 U.S. 647 (1930) ............................................................................................ 14

*United States v. Shumway,*
   199 F.3d 1093 (9th Cir. 1999) ............................................................................. 14

*Ventura County v. Gulf Oil Corp.,*
   601 F.2d 1080 (9th Cir. 1979) ............................................................................. 24

*Virginia Uranium, Inc. v. Warren*,
    587 U.S. 761 (2019) ................................................................................ 18, 19

*WildEarth Guardians v. Zinke*,
    368 F.Supp.3d 41 (D.D.C. 2019) .................................................................... 31

*Williams v. County of Alameda*,
    26 F. Supp. 3d 925 (N.D. Cal. 2014) ............................................................... 26

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................... 16, 27, 28

**Statutes**

National Forest Management Act
    16 U.S.C. § 1600 et seq. ............................................................................... 22

30 U.S.C.
    § 21a ............................................................................................... 19
    § 22 ................................................................................................ 14
    § 26 ................................................................................................ 14
    § 28 ................................................................................................ 14

Mineral Leasing Act of 1920
    30 U.S.C. § 181 et seq. ................................................................................ 14
    30 U.S.C. § 187 ................................................................................... 14, 20
    30 U.S.C. § 189 ................................................................................... 14, 20

42 U.S.C.
    § 15910 ............................................................................................. 21
    § 15910(a)(2) ....................................................................................... 21

43 U.S.C.
    § 1332(1) ........................................................................................... 21
    § 1332(3) ........................................................................................... 21
    § 1332(5) ........................................................................................... 21

Federal Land Policy and Management Act
    43 U.S.C. § 1701 et seq. .............................................................................. 14
    43 U.S.C. § 1701 ................................................................................. 15, 21
    43 U.S.C. § 1701(a)(7) ............................................................................... 14
    43 U.S.C. § 1701(a)(8) ........................................................................... 14, 20
    43 U.S.C. § 1701(a)(12) .......................................................................... 14, 20
    43 U.S.C. § 1702(c) .................................................................................. 14
    43 U.S.C. § 1712(c)(8) ........................................................................... 15, 20

Cal. Pub. Res. Code
§ 3280 ............................................................................................. 12, 22
§ 3280(b) ................................................................................................ 23
§ 3281 ..................................................................................................... 12
§ 3281(a) ............................................................................... 12, 22, 23, 33
§ 3281(a)(1)-(3) ...................................................................................... 12
§ 3281(a)(2) ..................................................................................... 13, 23
§ 3281(b) .................................................................................. 12, 22, 33
§ 3282 ..................................................................................................... 12
§ 3282(b)-(g) ........................................................................................... 23
§ 3283 ............................................................................................. 12, 23
§ 3284 ..................................................................................................... 23
§ 30240(b) .............................................................................................. 23

Cal. Stats. 1976, Ch. 1330 ............................................................................. 23

Pub. L. No. 94–579, title VII, § 701(g), 90 Stat. 2743 (1976) .............................. 15, 21

**Other Authorities**

78 Fed. Reg. 29151 (May 17, 2023) .................................................................. 25

80 Fed. Reg. 16128 (Mar. 26, 2015) ................................................................. 25

82 Fed. Reg. 61924 (Dec. 29, 2017) ................................................................. 15

89 Fed. Reg. 38712 (May 7, 2024) .................................................................... 25

89 Fed. Reg. 104202 (Dec. 20, 2024) ................................................................ 25

AB 218, 2023-2024 Cal. Leg., Reg. Sess. (2024)
§ 1 ......................................................................................................... 13
§ 2 ......................................................................................................... 13

SB 1137, 2021-2022 Cal. Leg., Reg. Sess. (2022)
§ 1(a) .................................................................................................... 12
§ 1(b) .................................................................................................... 12
§ 1(c)-(d) .............................................................................................. 26
§ 1(e) .................................................................................................... 25
§ 2 ......................................................................................................... 12
§ 3 ......................................................................................................... 33

U.S. Const. art. IV, § 3, cl. 2 ....................................................................... 13, 14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LIST OF SUPPORTING DECLARATIONS**

1.  Declaration of Dr. Lara Cushing in Opposition to Preliminary Injunction, with Exhibits 1 and 2

2.  Declaration of Gabrief Greif in Support of Motion to Intervene and in Opposition to Plaintiff's Motion for Preliminary Injunction, with Exhibits A through T

**INTRODUCTION**

In this action, Plaintiff United States, on behalf of the federal Department of the Interior's Bureau of Land Management (BLM), challenges the application of California Senate Bill 1137 (SB 1137) to federal land and leases on the grounds that the state law is preempted by contrary federal law. SB 1137 establishes a public health buffer designed to protect residents by ensuring that new oil and gas development occurs at least 3,200 feet away from homes, schools, parks, and other sensitive locations where air pollution and other impacts from industrial activity are most harmful. Adopted in 2022, after years of advocacy by frontline community members and allied organizations demanding stronger health protections, SB 1137 reflects the recommendations of experts that reviewed available scientific studies and identified a causal connection between a person's proximity to oil and gas development and adverse health effects.

BLM presently seeks a preliminary injunction to halt application of SB 1137 to federal land, but it has failed to meet its heavy burden to justify such extraordinary relief. BLM asserts that it needs an immediate remedy from this Court, but SB 1137 was enacted more than three years ago, and the law has been fully in effect for more than 18 months, undermining any claim of urgency. Even more fundamentally, BLM is unable to show that it is likely to prevail on the merits, as state and federal authorities have long jointly regulated oil and gas development on federal land, consistent with congressional intent as explicitly set forth in federal statutes. BLM likewise is unable to demonstrate likely irreparable harm, relying as it does on a purely legal interest that is only impaired if BLM is correct about the merits—which it is not. But even if it were correct, any harm to BLM is temporary and insubstantial. BLM's arguments on the balance of harms and the public interest are also inadequate, as it offers nothing more than exaggerated and unsupported claims of economic harm. Instead, equity and the public interest are best served by allowing SB 1137 to remain in place until the Court decides this case in the ordinary course; without SB 1137, California residents will be irreparably harmed by increased exposure to air pollution and other health-harming consequences of nearby oil and gas development.[1]

---

[1] Contemporaneous with this proposed opposition brief, Center for Biological Diversity et al. have filed a motion for leave to intervene. If leave to intervene is denied, Proposed Defendant-Intervenors request that the Court accept and consider this brief as an amicus curiae brief.

1

**BACKGROUND**

2

**I.    California's SB 1137**

3    Oil and gas drilling and associated development produces "chemical and physical

4  stressors" that can be harmful to human health, "including air pollutants, surface-water and

5  groundwater contaminants, vibration, noise, and odors." Greif Decl. Ex. A at 6. In the face of

6  these stressors and their harmful impacts, for more than a decade, affected California residents

7  and allied environmental and public health organizations have pushed state and local authorities

8  to adopt protective buffers to keep drilling away from sensitive locations where people live, work,

9  attend school, receive healthcare, and recreate. *See generally* Center for Biological Diversity et

10  al.'s Memorandum in Support of Motion for Leave to Intervene (Feb. 20, 2025).

11    In 2019, the California state oil and gas regulator, known as the California Geologic

12  Energy Management Division (CalGEM), announced its intention to establish "rules designed to

13  protect residents and communities near oil and gas extraction sites." Greif Decl. Ex. B at 2. The

14  agency commenced a process to "consider the best available science and data to inform new

15  protective requirements," *id.*, and assembled a blue-ribbon panel of experts called the California

16  Oil and Gas Public Health Rulemaking Scientific Advisory Panel. Greif Decl. Ex. A at 2.

17    Based upon its review of an extensive body of scientific literature, in October 2021, the

18  Scientific Advisory Panel released its initial conclusions. The Panel "conclude[d] with a high

19  level of certainty that concentrations of health-damaging air pollutants . . . are more concentrated

20  near [oil and gas development] activities compared to further away." Greif Decl. Ex. D at 13. It

21  also "conclude[d] with a high level of certainty that there is *a causal relationship* between close

22  geographic proximity to [oil and gas development] and adverse perinatal and respiratory" health

23  effects, including poor birth outcomes and asthma episodes and hospitalizations. *Id.* Ex. D at 4-8

24  (emphasis added). According to the Panel, "studies consistently demonstrate evidence of harm at

25  distances less than 1 [kilometer] km" or approximately 3,200 feet from oil and gas development,

26  although some studies also showed evidence of harm at greater distances." *Id.* Ex. D at 12.[2]

27

28  ───────────────

[2] After the release of its initial conclusions, in 2024, the Panel issued a full, 523-page report
detailing its review and conclusions. *See generally* Greif Decl. Ex. A (executive summary).

1    Equipped with the Scientific Advisory Panel's recommendations, the California

2    Legislature enacted SB 1137 in August 2022 and Governor Newsom signed it into law a month

3    later, adding sections 3280 through 3291 to the California Public Resources Code. *See generally*

4    SB 1137, 2021-2022 Cal. Leg., Reg. Sess. (2022) (SB 1137) § 2. SB 1137 established a statewide

5    buffer of 3,200 feet (i.e., "health protection zones") between oil and gas sites and sensitive

6    receptors wherein permitting for new drilling, new production facilities, and expansion of existing

7    oil and development is generally disallowed. Cal. Pub. Res. Code §§ 3280, 3281. The law does

8    include some exceptions, authorizing CalGEM to issue permits in health protection zones when

9    needed to plug wells, to address emergencies, or to comply with court orders "finding that

10   denying approval would amount to a taking of property." Cal. Pub. Res. Code § 3281(a)(1)-(3).

11   For existing drill sites within a health protection zone, SB 1137 phases in stricter limits on air,

12   noise, and light pollution and a requirement that operators develop a leak detection and response

13   plan. Cal. Pub. Res. Code §§ 3282, 3283. In this litigation, BLM only challenges SB 1137's

14   provisions that limit new permitting in health protection zones but not the additional requirements

15   for existing drill sites. Memo 3:25-4:4 (stating the U.S. "challenges two core provisions" of SB

16   1137, "Section 3281(a)" and "Section 3281(b)").

17   SB 1137 also included legislative findings. The Legislature echoed the Scientific

18   Advisory Panel's finding that "a growing body of research shows direct health impacts from

19   proximity to oil extraction," and also highlighted that "[t]hese impacts are disproportionately

20   impacting Black, indigenous, and people of color in California, who are most likely to live in

21   close proximity to oil extraction activities . . . ." SB 1137 § 1(a), (b).

22   As originally enacted, SB 1137 specified that the restrictions on new permitting in health

23   protection zones would commence January 1, 2023, with heightened control and monitoring

24   requirements applicable to existing wells set to take effect in 2025 and 2027. SB 1137 § 2. After

25   going into effect on January 1, 2023, implementation of the law was delayed on February 3, 2023,

26   until June 2024, owing to an oil industry-funded referendum that received sufficient signatures to

27   suspend SB 1137 but was then withdrawn. Memo 3:19-22; Greif Decl. Ex. E at 1. Since SB

28   1137's original enactment, the California Legislature has amended the provisions that cover

[PROPOSED] OPPOSITION TO PRELIMINARY INJUNCTION          12

1  existing sources, extending some compliance deadlines. *See generally* AB 218, 2023-2024 Cal.

2  Leg., Reg. Sess. (2024) (AB 218), §§ 1-2.

3         The effect of SB 1137 on federal land is modest, especially in the short term. More than

4  95 percent of oil and gas activity on BLM-administered land in California occurs within its

5  Bakersfield and Central Coast Field Offices planning areas; those two offices collectively oversee

6  684,000 acres of public land and an additional 959,000 acres of federal mineral estate. Karuzas

7  Decl. ¶¶ 7-11. BLM acknowledges that new leasing within these two areas "is currently paused

8  due to a settlement agreement." *Id*. ¶ 8. Current leases managed by BLM in California cover

9  115,388 acres. *Id*. ¶ 4. BLM acknowledges that, by its own calculations, most of this acreage—

10  nearly 84 percent—is unaffected by SB 1137 as it lies outside of any verified health protection

11  zones. *Id*. ¶¶ 4, 17. The fact that a particular surface area is encompassed in a verified health

12  protection zone does not necessarily mean that the underlying oil or gas resources will be

13  inaccessible, given that directional drilling is common in California. Greif Decl. Ex. N at 9

14  (noting "many wells in the southern San Joaquin Basin are directionally drilled"). Moreover, SB

15  1137 provides for exceptions to its prohibition on new permitting in health protection zones if a

16  property interest holder demonstrates to a court that denying new permits constitutes "a taking of

17  property." Cal. Pub. Res. Code § 3281(a)(2).

18  **II.   Cooperative state and federal regulation of federal land**

19         The Property Clause of the U.S. Constitution vests Congress with the power to "make all

20  needful rules and regulations respecting the territory or other property belonging to the United

21  States." U.S. Const. art. IV, § 3, cl. 2. The Property Clause does not displace the application of

22  state law on federal land, however, except when Congress has acted affirmatively. As the U.S.

23  Supreme Court explained in *Kleppe v. New Mexico*:

24         Absent consent or cession a State undoubtedly retains jurisdiction
           over federal lands within its territory, but Congress equally surely
25         retains the power to enact legislation respecting those lands pursuant
           to the Property Clause. *And when Congress so acts*, the federal
26         legislation necessarily overrides conflicting state laws under the
           Supremacy Clause.
27

28  426 U.S. 529, 543 (1976) (emphasis added) (citation modified); *accord Cal. Coastal Comm'n v.*

1   *Granite Rock*, 480 U.S. 572, 580-581 (1987) (rejecting argument that Property Clause "exempts

2   federal lands from state regulation whether or not those regulations conflict with federal law");

3   *Surplus Trading Co. v. Cook*, 281 U.S. 647, 650 (1930) (stating federal "ownership and use" of

4   land within a state "without more do not withdraw the lands from the jurisdiction of the state").

5           Reflecting the constitutional principle that federal authority over federal land is not

6   exclusive, state and federal laws governing the same land routinely coexist, often at the express

7   direction of Congress. For example, the Mining Law of 1872 (Mining Law) encourages the

8   development of a domestic mining industry but also expressly requires compliance with all state

9   and local laws that do not conflict with federal law. *See* 30 U.S.C. § 26 (stating mineral locators

10  must "comply with . . . State, territorial, and local regulations not in conflict with the laws of the

11  United States"); *see also id*. §§ 22, 28 (recognizing regulations developed by local "mining

12  districts," so long as they are not in conflict with federal law). These provisions reflect that, at the

13  time of the Mining Law's enactment, mining was already governed by local law and custom. *See*

14  *United States v. Shumway*, 199 F.3d 1093, 1097-98 (9th Cir. 1999).

15          When Congress later adopted the Mineral Leasing Act of 1920 (MLA), 30 U.S.C. § 181 et

16  seq., it likewise specified that "[n]othing in this [Act] shall be construed or held to affect the

17  rights of the States or other local authority to exercise any rights which they may have." *Id*. § 189.

18  Indeed, the MLA directs that federal lease provisions may not be "in conflict with the laws of the

19  State in which the leased property is situated." *Id*. § 187.

20          Congressional respect for state and local requirements on federal land is also enshrined in

21  the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., which

22  establishes a "multiple use and sustained yield" framework for managing federal land. *Id*.

23  § 1701(a)(7). FLPMA directs BLM and other federal land managers to "protect the quality of

24  scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and

25  archeological values" while "recogniz[ing] the Nation's need for domestic sources of minerals,

26  food, timber, and fiber." *Id*. § 1701(a)(8), (12); *see also Norton v. S. Utah Wilderness All.*, 542

27  U.S. 55, 58 (2004) (FLPMA requires "striking a balance among the many competing uses to

28  which land can be put" (citing 43 U.S.C. § 1702(c)). When it enacted FLPMA, Congress directed

1   federal land managers to "compl[y] with applicable pollution control laws, including State" laws,

2   *id*. § 1712(c)(8), and adopted a savings clause that specifies "[n]othing in this Act shall be

3   construed . . . as a limitation upon . . . the police power of the respective States, . . . or as

4   depriving any State or political subdivision thereof of any right it may have to exercise civil and

5   criminal jurisdiction on the national resource lands." *Id*. § 1701 (note re "Savings Provision,"

6   Pub. L. No. 94–579, title VII, § 701(g), 90 Stat. 2743, 2786 (1976)).

7        Consistent with the Mining Law, MLA, FLPMA, and other federal authorities, BLM itself

8   has recognized the importance of state law and insisted on compliance. For example, in 2017,

9   when BLM adopted a federal rule deferring to state authorities' regulation of an oil and gas

10  practice known as hydraulic fracturing (or fracking) on federal land, it declared that "State and

11  local laws apply on Federal lands, except to the extent that they are preempted by Federal law,"

12  which "is rare." 82 Fed. Reg. 61924, 61926, (Dec. 29, 2017). BLM further explained that when

13  state requirements are "more stringent" than federal law, preemption still typically is not an issue

14  because an "operator can comply with both . . . by meeting the more stringent state requirement."

15  *Id.* at 61926. In the same rulemaking, BLM acknowledged there is a benefit to respecting state

16  regulatory programs because they "can more readily address local conditions than may the

17  BLM's rules." *Id*. at 61937.

18       BLM's analysis and decisions for onshore oil and gas development in California similarly

19  recognize dual state and federal authority over federal land. For example, BLM's record of

20  decision approving the 2014 Resource Management Plan for BLM's Bakersfield Field Office,

21  which governs many of the leases that BLM asserts are affected by SB 1137 (Karuzas Decl. ¶ 7),

22  states that "BLM requires operators on Federal minerals to acquire all necessary Federal, state,

23  and local permits prior to developing a lease," noting that where state regulations are "more

24  stringent than [federal requirements], they will serve as additional safeguards." Greif Decl. Ex. O

25  at 28. In a 2020 environmental assessment performed for BLM's most recent oil and gas lease

26  sale in the area, it reiterated that "[o]perations at leased well sites would be required to comply

27  with BLM orders, guidance, and lease conditions as well as Federal, and all applicable State and

28  local regulations." Greif Decl. Ex. P at 15. Drilling permits issued by BLM in California likewise

1    have required, as a "condition[] of approval" that the operator "shall comply with all relevant

2    federal, and applicable tribal, state, and local laws during project implementation." Greif Decl.

3    Ex. Q at 1, 3 (approving ten Applications for Permit to Drill for Holmes Western Oil

4    Corporation).

5                            **STANDARD FOR PRELIMINARY INJUNCTION**

6              "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

7    *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the

8    moving party must demonstrate: (1) it is likely to succeed on the merits; (2) it is likely to suffer

9    irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its

10   favor; and (4) an injunction is in the public interest. *ACA Connects v. Bonta*, 24 F.4th 1233, 1240

11   (9th Cir. 2022) (citing *Winter*, 555 U.S. at 20). Alternatively, the Ninth Circuit has stated that

12   "'serious questions going to the merits' [rather than a likelihood of success on the merits] and a

13   hardship balance that tips *sharply* toward the plaintiff can support issuance of a preliminary

14   injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild*

15   *Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (emphasis added). Under either test, the

16   moving party must "establish that irreparable harm is *likely*, not just possible, in order to obtain a

17   preliminary injunction." *Id*. at 1131; *accord id*. at 1135. Because a preliminary injunction is a

18   "drastic remedy," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), the party seeking such an

19   injunction must make "a clear showing that [it] is entitled to such relief." *Winter*, 555 U.S. at 22.

20                                          **ARGUMENT**

21             BLM does not meet its heavy burden in seeking preliminary relief. BLM is not likely to

22   prevail on the merits, as Congress has clearly expressed its intention to accommodate state

23   regulations on federal land, rather than preempt them. Because BLM is not likely to succeed on

24   the merits it does not demonstrate likely irreparable harm, as it relies exclusively on purported

25   legal interests that are only diminished if its claims are correct. BLM's long delay in filing suit

26   also undercuts its request for urgent relief from the Court. Finally, the balance of harms and

27   public interest also favor withholding injunctive relief, as the protections that SB 1137 provides

28   against increased exposure to air pollution and adverse health consequences outweigh BLM's

1 speculative claims of temporary and reparable economic harm.

2 **I.    BLM is unlikely to prevail on the merits.**

3 Preemption of state law "fundamentally is a question of congressional intent," *English v.*

4 *Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990), and for BLM to prevail on its preemption claim, it

5 must show that "Congress has enacted legislation respecting . . . federal land that would preempt"

6 the reasonable limitations on oil and gas development imposed by SB 1137. *Granite Rock*, 480

7 U.S. at 581. BLM has not made the required showing here, as it merely offers broad

8 characterizations of federal statutes that are not only too general to establish preemptive intent,

9 but contradicted by statutory language that explicitly preserves California's authority to regulate

10 oil and gas development on federal land and leases to reduce residents' exposure to

11 environmental impacts and protect public health. Not only is BLM unlikely to prevail on the

12 merits, it has also failed to raise serious questions going to the merits.[3]

13
14 **A.    BLM must meet a "high threshold" and show that SB 1137 "clearly" conflicts with specific statutory text.**

15 Congress may preempt state law "through explicit statutory language" that defines the

16 extent to which its enactments take precedence. *English*, 496 U.S. at 78-79. In the absence of an

17 explicit preemption provision, state law is nonetheless preempted "to the extent that it actually

18 conflicts with federal law." *Id.* at 79. Courts have found that implied "conflict" preemption arises

19 when "it is impossible for a private party to comply with both state and federal requirements," or

20 "where state law stands as an obstacle to the accomplishment and execution of the full purposes

21 and objectives of Congress." *Id.* (citation modified).

22 Here, BLM concedes that Congress has not adopted any provision that explicitly prohibits

23 California from regulating oil and gas activity on federal land (Memo 15:11-12), and it makes no

24 argument that it is impossible for a private oil and gas operator to comply with both SB 1137 and

25 federal law. *See generally* Memo. Rather, BLM argues exclusively that SB 1137 "obstructs

26 federal policy" as purportedly reflected in the MLA and FLPMA. *Id.* 14:5-7, 14:17-20.

27

28 _____
[3] A showing of "serious questions" requires a plaintiff to demonstrate a "substantial case for relief on the merits." *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011).

1    To prevail on its claim of implied "purposes and objectives" preemption, BLM must meet

2    a high bar and demonstrate—based on statutory text—that Congress clearly intended to preempt

3    protective state requirements like SB 1137. As the U.S. Supreme Court has explained, "[t]he

4    Supremacy Clause cannot 'be deployed' 'to elevate abstract and unenacted legislative desires

5    above state law.'" *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (quoting *Virginia*

6    *Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (lead opinion)). Supreme Court precedents

7    therefore "establish that a high threshold must be met if a state law is to be preempted for

8    conflicting with the purposes of a federal Act." *Chamber of Com. of U.S. v. Whiting*, 563 U.S.

9    582, 607 (2011) (citation modified). This high bar may only be met by identifying "the text of a

10   law," which "controls over purported legislative intentions unmoored from any statutory text."

11   *Castro-Huerta*, 597 U.S. at 642; *accord Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum*

12   *Corp.,* 485 U.S. 495, 503 (1988) ("[t]here is no federal pre-emption *in vacuo*, without a

13   constitutional text or a federal statute to assert it"); *English*, 496 U.S. at 90 ("The 'teaching of this

14   Court's decisions . . . enjoin[s] seeking out conflicts between state and federal regulation where

15   none clearly exists'" (quoting *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 446 (1960)).

16
17       **B.   SB 1137 is fully consistent with the congressional purposes and objectives set
             forth in the MLA and FLPMA.**

18   BLM erroneously claims that, in adopting the MLA and FLPMA, Congress intended to

19   preempt the application of state environmental and health laws like SB 1137 to federal land.

20   Memo 14-18. To the contrary, both the MLA and FLPMA explicitly reflect Congress's intention

21   to accommodate state laws—rather than preempt them—to help ensure that federal land

22   management effectively balances development with other, equal congressional objectives like

23   environmental protection.

24   Without citing any specific statutory text, BLM argues in the first instance that "Congress

25   passed the MLA and FLPMA to plan for, promote, authorize, and regulate mineral development

26   on federal lands," alleging that SB 1137 obstructs this purported federal policy. Memo 15:3-5; *see*

27   *also id*. 19:23-20:12 (characterizing the statutes without citing any express statutory language).

28   BLM's general, conclusory descriptions of the MLA and FLPMA are plainly inadequate to

1    establish that Congress intended to preempt SB 1137. The U.S. Supreme Court "has repeatedly

2    stated" that "the text of a law controls over purported legislative intentions unmoored from any

3    statutory text," which is what BLM improperly attempts to rely on here. *Castro-Huerta*, 597 U.S.

4    at 642; *accord Whiting*, 563 U.S. at 607 ("Implied preemption analysis does not justify a

5    freewheeling judicial inquiry into whether a state statute is in tension with federal objectives;

6    such an endeavor would undercut the principle that it is Congress rather than the courts that pre-

7    empts state law." (citation modified)); *Virginia Uranium*, 587 U.S. at 767 ("Invoking some

8    brooding federal interest or appealing to a judicial policy preference should never be enough to

9    win preemption of a state law.").

10    To the extent BLM does cite specific statutory language, the provisions it invokes simply

11    do not reflect any congressional intent to preempt state authority on federal land. For example,

12    with respect to the MLA, BLM quotes 30 U.S.C. § 21a to ostensibly assert an unqualified

13    "'continuing policy . . . to foster and encourage . . . the orderly and economic development of

14    domestic mineral resources' in order 'to help assure satisfaction of industrial, security, and

15    environmental needs.'" Memo 15:19-22. This provision, adopted in the Mining and Minerals

16    Policy Act of 1970, does not suggest Congress intended to prioritize development over all other

17    objectives, nor does it say anything about overriding state law, especially one that helps reduce

18    residents' exposure to air pollution and protects health. To the contrary, on its face, 30 U.S.C.

19    § 21a emphasizes that development should be "orderly" to "assure satisfaction" of several

20    objectives, including "environmental needs."

21    Moreover, even if the congressional purpose underlying federal mining law is to

22    encourage unlimited development (it is not), such a broad and general statement would be

23    insufficient to preempt all state regulations that affect fulfillment of that purpose. In a case closely

24    analogous to the present dispute, *Commonwealth Edison Co. v. Montana*, the U.S. Supreme Court

25    recognized several federal statutes "encouraging the use of coal," but rejected "appellants'

26    implicit suggestion that these general statements demonstrate a congressional intent to pre-empt

27    all state legislation that may have an adverse impact on the use of coal." 453 U.S. 609, 633, 636

28    (1981) (upholding Montana state severance tax on coal mining). The Court reached a similar

1    conclusion in *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development*

2    *Commission*, 461 U.S. 190 (1983). There, the Court ruled that an Act's statement of purpose "to

3    encourage the development of the atomic energy industry" did not mean "[p]romotion of nuclear

4    power . . . at all costs" and was therefore insufficient to establish implied purposes and objectives

5    preemption of a California state law regulating spent nuclear fuel storage. *Id*. at 220-23 (citation

6    modified).

7         Meanwhile, BLM ignores MLA sections that are fatal to its claim of preemption. For

8    example, far from prioritizing extraction over all other objectives, 30 U.S.C. § 187 specifies that

9    all leases issued subject to the Act "shall contain provisions for . . . insuring the exercise of

10   reasonable diligence, skill, and care in the operation of said property," including provisions "for

11   the safeguarding of the public welfare." In furtherance of these several purposes, including

12   safeguards for public welfare, 30 U.S.C. § 187 also directs that "[n]one of such provisions" in

13   federal leases "shall be in conflict with the laws of the State in which the leased property is

14   situated." *Id*. Congress further affirmed respect for state law in 30 U.S.C. § 189, which states

15   "[n]othing in this [Act] shall be construed or held to affect the rights of the States or other local

16   authority to exercise any rights which they may have."

17        As for FLPMA, BLM similarly identifies a single provision, 43 U.S.C. § 1701(a)(12),

18   which declares a policy to manage "public lands . . . in a manner which recognizes the Nation's

19   need for domestic sources of minerals." Memo 15:22-24. But BLM cites only the twelfth of

20   thirteen enumerated declarations of policy in the Act, and other provisions declare that federal

21   lands shall be managed "in a manner that will protect the quality of scientific, scenic, historical,

22   ecological, environmental, air and atmospheric, water resource, and archeological values." 43

23   U.S.C. § 1701(a)(8). For this reason, FLPMA specifies that federal land use plans must "provide

24   for compliance with applicable pollution control laws, including State . . . air, water, noise, or

25   other pollution standards or implementation plans." *Id*. § 1712(c)(8). Additionally, in enacting

26   FLPMA, Congress adopted a savings clause that expressly preserves state authority on federal

27   land, stating that "[n]othing in this Act shall be construed . . . as a limitation upon . . . the police

28   power of the respective States, . . . or as depriving any State or political subdivision thereof of any

1    right it may have to exercise civil and criminal jurisdiction on the national resource lands." *Id*.

2    § 1701 (note re "Savings Provision," Pub. L. No. 94–579, title VII, § 701(g), 90 Stat. 2743, 2786

3    (1976)); *see also Collins v. U.S. Citizenship & Immigr. Servs.*, 820 F.3d 1096, 1099-1100 (9th

4    Cir. 2016) (crediting uncodified savings clause as reflecting Congress's intent).

5         Separately, BLM invokes two provisions that are not closely tied to the MLA or FLPMA

6    (Memo 15:24-27), neither of which supports its claim of preemption. One of these statutes, 42

7    U.S.C. § 15910, authorizes the Interior Department to develop a program of oil production

8    incentives, but only for the express, narrow purpose of promoting the capture and reinjection of

9    carbon dioxide and other gases released by oil and gas operations to be stored underground and/or

10   to enhance production. 42 U.S.C. § 15910(a)(2). This provision does not encourage extraction

11   over all other land values, nor does it suggest limiting state authority in any way. But even if it

12   did express a general purpose to encourage extraction, it would still be insufficient to preempt

13   state law. *See Commonwealth Edison*, 453 U.S. at 633; *Pac. Gas & Elec. Co.*, 461 U.S. at 220-23.

14   BLM's citation to 43 U.S.C. § 1332(3) is even less relevant; the provision exclusively applies to

15   offshore extraction on the Outer Continental Shelf. *Id*. § 1332(1). Notably, just as it did in

16   FLPMA for onshore lands, Congress declared its intention that offshore oil and gas development

17   should be developed "subject to environmental safeguards," including "the rights and

18   responsibilities of all States . . . to preserve and protect their marine, human, and coastal

19   environments through . . . regulation of land, air, and water uses." *Id*. § 1332(3), (5).

20        **C.   BLM misconstrues and misapplies *Granite Rock* and other case law.**

21        Unable to identify any federal statutory provisions establishing a congressional intent to

22   preempt state laws that address environmental impacts and protect health like SB 1137, BLM

23   highlights case law including the U.S. Supreme Court's *Granite Rock* decision. Memo 18-20.

24   BLM misapprehends and misapplies *Granite Rock* and other decisions.

25        In *Granite Rock*, the Court *upheld* a state law that required a mining operator on national

26   forest land near the coastline to obtain a permit from the California Coastal Commission that

27   potentially could include "conditions" to address air pollution, water quality, erosion, and impacts

28   on sensitive areas. 480 U.S. at 585-86. In upholding the law, the Court distinguished between

1    state environmental regulations, which it concluded are lawful on federal land, and state-imposed

2    "land use planning," which the Court assumed may be preempted by a "combination of the

3    [National Forest Management Act, 16 U.S.C. § 1600 et seq.,] and the FLPMA." *Id.* at 585-89.[4]

4         *Granite Rock* does not support BLM's insistence that a protective air-pollution buffer like

5    the one instituted by SB 1137 must be deemed "an impermissible land-use regulation" as opposed

6    to "a reasonable environmental regulation." Memo 18:4-5. For starters, the Court's opinion

7    cautioned that "[t]he line between environmental regulation and land use planning will not always

8    be bright" and only assumed—"without deciding this issue"—that the latter is preempted. *Granite*

9    *Rock* at 585, 587. Relying on dicta, BLM is therefore mistaken to insist that the self-serving "land

10   use" label it has assigned to SB 1137 is dispositive. Memo 18:16-18. Ultimately, BLM still bears

11   the burden to show by reference to specific statutory text that Congress clearly intended to

12   preempt a state law like SB 1137. *See e.g.*, *Castro-Huerta*, 597 U.S. at 642-43.

13        In any event, BLM's argument (Memo 18:4-19:22) fails because SB 1137 is fully

14   consistent with *Granite Rock*. The Court in *Granite Rock* presumed that it would be unlawful for

15   a state law to "choose[] particular uses" for federal land, 480 U.S. at 587, but SB 1137 does not

16   require land or leased areas to be used in specific ways. Rather, for areas where oil and gas

17   development is contemplated or already underway, SB 1137 institutes requirements to ensure

18   that, as *Granite Rock* determined is proper, "damage to the environment is kept within prescribed

19   limits." *Id.* at 587. While BLM attempts to paint SB 1137 as a "blanket land-use ban" on federal

20   property (Memo 18:25), the law only applies to specific, limited areas—within larger federal

21   properties and leasing areas—where new drilling and the development of new production

22   facilities is disallowed but other land uses are unaffected. Cal. Pub. Res. Code §§ 3280, 3281(a)-

23   (b). BLM itself estimates that SB 1137's verified health protection zones only affect a modest

24   16.3 percent of existing federal lease acreage (Karuzas Decl. ¶ 17), and none of the operators

25   supporting BLM's motion assert that the entirety of their currently leased areas is unavailable to

26   them. Significantly, SB 1137 provides an exception if a property rights holder can demonstrate to

27

28   ---

     [4] BLM has not argued that the National Forest Management Act preempts SB 1137 and therefore
     has waived any argument that it does.

1    a court that the restriction on new permitting would constitute a taking, Cal. Pub. Res. Code

2    § 3281(a)(2), and the law allows existing oil and gas sites to continue their current operations,

3    subject to heightened control and reporting requirements that BLM has not challenged. *Id.*

4    §§ 3282(b)-(g), 3283, 3284. Furthermore, directional or horizontal drilling may allow an operator

5    to reach oil and gas resources that underlie a surface area that is off limits because it falls within a

6    verified health protection zone. *See e.g.*, Greif Decl. Ex. N at 9.

7        A close read of the case reveals that *Granite Rock* specifically approved state authority

8    closely analogous to what California has sought to accomplish with SB 1137. Specifically, the

9    Court accepted state officials' plans to "use permit conditions to impose environmental

10   regulation," including potential siting restrictions to reduce "impact on environmentally sensitive

11   habitat areas." 480 U.S. at 585-86 (citing Cal. Pub. Res. Code § 30240(b)); *accord id*. at 593

12   (noting Commission identified "a possible set of permit conditions not in conflict with federal

13   law"). Section 30240(b) of the California Public Resources Code, as reviewed and accepted by

14   the Court as presumably lawful, stated that "[d]evelopment in areas adjacent to environmentally

15   sensitive habitat areas and parks and recreation areas *shall be sited . . . to prevent impacts* which

16   would significantly degrade those areas." Cal. Stats. 1976, Ch. 1330 at 5961 (emphasis added).[5]

17   SB 1137 operates in exactly the same way, requiring that proposed oil and gas development near

18   sensitive receptors must be sited at least 3,200 feet away from the receptors. Cal. Pub. Res. Code

19   §§ 3280(b), 3281(a).

20       Like the siting regulation addressed in *Granite Rock*, the limited and targeted focus of SB

21   1137 differentiates it from other cases relied upon by BLM—all of which invalidated land-use

22   restrictions that entirely precluded extraction over expansive areas. For example, in *South Dakota*

23   *Mining Association, Inc. v. Lawrence County*, the Eighth Circuit invalidated a local zoning

24   ordinance that disallowed all new permits and permit amendments for surface metal mining

25   across a specific, 40,000-acre area, amounting to a "de facto ban on mining" with no possibility

26

27   _____

     [5] For the Court's convenience, the original version of Cal. Pub. Res. Code § 30240(b) that was
28   enacted in 1976 and in force when *Granite Rock* was decided is provided as Ex. R to the Greif
     Declaration. The provision was modestly amended in 1991.

1   of any further mining across the entire area. 155 F.3d 1005, 1007, 1011 (8th Cir. 1998).[6]

2   Similarly, in *Ventura County v. Gulf Oil Corp.*, the Ninth Circuit disapproved a county's efforts

3   to exercise control over the entirety of a 120-acre federal lease via a permitting requirement that

4   would have allowed the county to impose "whatever conditions Ventura determines appropriate"

5   or decline to issue the permit "at all." 601 F.2d 1080, 1084 (9th Cir. 1979). And in *Brubaker v.*

6   *Board of County Commissioners, El Paso County*, the Colorado Supreme Court overturned a

7   county's decision to prohibit drilling because it did not reflect "reasonable regulations

8   supplementing the federal mining laws" but instead prioritized the county's "long-range land use

9   plans" that zoned the federal land as an agricultural district. 652 P.2d 1050, 1053, 1059 (Colo.

10  1982).

11         More on point are the much more recent decisions in *Bohmker v. Oregon* and *People v.*

12  *Rinehart*; BLM is unable to distinguish the former and pointedly omits any citation to the latter.

13  In *Bohmker*, the Ninth Circuit upheld an Oregon law that prohibits the use of motorized mining

14  equipment in rivers and streams containing essential salmon habitat, including on federal lands.

15  903 F.3d 1029, 1031 (9th Cir. 2018). In ruling the law was consistent with *Granite Rock* and not

16  preempted, the court rejected plaintiffs' arguments that the law is "a state land use planning law

17  because it 'prohibits a particular 'use' of the land . . .  in particular 'zones,'" *id.* at 1041, which is

18  essentially BLM's argument here. Instead, the court concluded the law was an environmental

19  regulation because "[i]t does not choose or mandate land uses, has an express environmental

20  purpose . . . , is not part of [the state's] land use system and is carefully and reasonably tailored to

21  achieve its environmental purpose." *Id.* at 1040. All the same is true of SB 1137. Significantly,

22  the court upheld Oregon's law even though it "will adversely impact the ability of some miners to

23  extract gold deposits from their mining claims," declaring "these impacts are the unavoidable

24  consequences of a federal scheme that seeks to foster both the development of valuable mineral

25  resources and proper stewardship and protection of the nation's natural resources." *Id.*

26  _____

27  [6] The United States was not a party in *South Dakota Mining Association*, it did not participate as
    amicus, and by the time the case reached the Eighth Circuit, the county defendant had changed its

28  position and filed a brief supporting the plaintiffs' arguments that the zoning rule was preempted.
    155 F.3d at 1005-08, 1008 n.3.

1    In *Rinehart,* the California Supreme Court likewise validated a ban on a harmful mining

2    technique in state waterways, even on federal land. 377 P.3d 818, 820 (Cal. 2016). In upholding

3    the defendant's criminal conviction for violating the ban, the court ruled that "while Congress

4    sought to protect miners' real property interests, it did not go further and guarantee to them a right

5    to mine immunized from exercises of the states' police powers." *Id.* In reaching this conclusion,

6    the court aptly observed that "state and federal laws governing the same land routinely coexist"

7    and "[d]ual sovereignty is the rule, federal exclusivity the exception." *Id*. at 822.

8    BLM also argues that SB 1137 operates like a "setback" akin to a "zoning ordinance,"

9    citing a handful of references to these terms in the legislative history (Memo 18:26-19:5), but

10   these descriptions do not mean SB 1137 is not, at bottom, an environmental regulatory provision.

11   BLM completely overlooks that the California Legislature adopted SB 1137 to assist frontline

12   communities "by cleaning up pollution" and "remediating negative health impacts." SB 1137

13   § 1(e). BLM also overlooks that the agency, itself, frequently imposes similar protective buffers

14   to accomplish environmental regulatory purposes. *See, e.g.*, 89 Fed. Reg. 104202, 104203 (Dec.

15   20, 2024) (stating BLM adopted "buffers" from sensitive plants and riparian resources and

16   "setbacks" from "[w]ilderness . . . [a]reas" as "practicable means to avoid or minimize

17   environmental harm" from a project); 89 Fed. Reg. 38712, 38745 (May 7, 2024) (adopting "River

18   Setbacks" for new oil and gas development to "[m]inimize changes to water quality" and loss of

19   fish habitat); 78 Fed. Reg. 29151, 29153 (May 17, 2023) (stating BLM instituted a development

20   exclusion area and an additional operational "buffer" to "protect golden eagles," along with a

21   "1/4-mile set back from private land" to reduce "visual and noise resource concerns"). Moreover,

22   BLM previously acknowledged that "state set-back requirements would normally apply on

23   Federal lands." 80 Fed. Reg. 16128, 16179 (Mar. 26, 2015).

24   Finally, BLM argues that SB 1137 should not be viewed as an environmental regulation

25   because it "do[es] not impose standards designed to minimize emissions" or other environmental

26   impacts. Memo 19:6-12. BLM cites no authority for its cabined view of what may be deemed an

27   environmental regulation, which is contradicted by *Granite Rock*'s statement that "environmental

28   regulation, at its core" endeavors to keep environmental damage "within prescribed limits." 480

U.S. at 587. SB 1137 comfortably meets this definition because the law's 3,200-foot buffer is plainly a prescribed limit designed to reduce damage from residents' exposure to air pollution and other harmful impacts from the oil industry. SB 1137 § 1(c)-(d) (finding that "[p]roximity to oil and gas extraction sites pose significant health risks, especially due to increased air pollution," with studies showing "evidence of harm at distances less than one kilometer, which is approximately 3,200 feet").

For all the foregoing reasons, BLM has not shown that it is likely to prevail on the merits of its preemption claim. Implied purposes and objectives preemption is subject to a "high threshold," *Whiting*, 563 U.S. at 607, that requires a showing of congressional intent tied to "the text of a law." *Castro-Huerta*, 597 U.S. at 642. Far from indicating an intention to preempt state and local authority, the MLA and FLPMA underscore an intention to respect and accommodate it.

**D.  BLM does not argue it is likely to prevail on intergovernmental immunity.**

In addition to its federal preemption claim, BLM's complaint also alleges that SB 1137 violates the intergovernmental immunity doctrine. Compl. 13:20-14:8. However, BLM does not mention this second claim in its notice and motion for preliminary injunction (*see generally* Not. and Mot.), and nowhere in its memorandum does it argue that it likely to succeed on the merits of this claim. Memo. 14-20. Consequently, any argument that this claim might support issuance of a preliminary injunction is waived. *See Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 994-95 (9th Cir. 2009) (appellant "waived its argument" by "not specifically and distinctly" raising it "in appellant's opening brief"); *Williams v. County of Alameda*, 26 F. Supp. 3d 925, 937 n.4 (N.D. Cal. 2014) (stating that a party's argument raised "for the first time in their reply brief" is to be disregarded).

**II.  BLM has not shown irreparable harm.**

The Court need not reach BLM's allegations of irreparable harm. The first element in the preliminary injunction analysis, likelihood of success on the merits, "is the most important." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)). The Ninth Circuit has held that "[b]ecause it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits," a court "need not

1    consider the remaining three *Winter* elements." *Garcia*, 786 F.3d at 740. (citation modified). If

2    this Court does reach the irreparable harm inquiry, BLM has failed to make the required showing.

3            BLM argues that it is irreparably harmed in only one respect. It asserts that SB 1137

4    infringes upon the congressional purposes it perceives in the MLA and FLPMA and thereby

5    "causes ongoing and irreparable harm to the United States sovereign interests." Memo 22:4-7; *see*

6    *also id*. 20:21-22:3. This alleged irreparable injury is entirely reliant upon BLM's erroneous

7    argument that it is likely to prevail on the merits of its preemption claim. Unable to show a

8    likelihood of success on the merits, it necessarily fails to establish that irreparable harm is likely.

9    *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 710-11 (9th Cir. 1997) ("With no likelihood of

10   success on the merits . . . , there is no threat of irreparable injury or hardship to tip the balance in

11   plaintiffs' favor."); *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d

12   1401, 1412 (9th Cir. 1991) (for "an alleged constitutional infringement" to "constitute irreparable

13   harm," plaintiff must establish "a sufficient likelihood of success on the merits . . . to warrant the

14   grant of a preliminary injunction") (citation modified)).

15           BLM's dilatoriness in challenging SB 1137 also undercuts its assertions of irreparable

16   harm. SB 1137 was initially signed into law in September 2022, with an effective date of

17   January 1, 2023. Memo 3:14-19. While the law's initial implementation was suspended from

18   February 2023 through June 2024 owing to a certified ballot measure that was later withdrawn,

19   the law has been continuously in effect since June 28, 2024. Memo 3:21-22. In other words, BLM

20   waited more than three years after SB 1137 was first adopted—and more than 18 months since

21   the law has been fully in effect—to file the instant lawsuit. Such delay undermines BLM's

22   insistence that it is irreparably harmed by SB 1137. *See, e.g.*, *Beame v. Friends of the Earth*, 434

23   U.S. 1310, 1313 (1977) (finding applicants' delay of 110 days before "seeking a stay vitiate[d]

24   much of the force of their allegations of irreparable harm"); *see also Garcia*, 786 F.3d at 746

25   (affirming finding of no irreparable harm where the plaintiff "waited months to seek an

26   injunction"); *Oakland Trib., Inc. v. Chron. Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985)

27   (noting a "long delay before seeking a preliminary injunction implies a lack of urgency and

28

1    irreparable harm").[7]

2    **III.  The balance of equities and public interest tip sharply against an injunction.**

3         To obtain a preliminary injunction, BLM is also required to demonstrate that "the balance

4    of equities tips in [its] favor, and that an injunction is in the public interest. *Winter*, 555 U.S. at

5    20.[8] When the government is a party—as with both BLM and the State of California here—the

6    analyses of the balance of equities and public interest merge. *Drakes Bay Oyster Co. v. Jewell*,

7    747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted). As the U.S. Supreme Court has cautioned,

8    "courts of equity should pay particular regard for the public consequences in employing the

9    extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation modified). Here, the balance

10   of equities and the public interest favor denial of BLM's preliminary injunction motion and the

11   maintenance of SB 1137 to prevent irreparable harm to public health.

12        BLM's foremost argument is that a preliminary injunction would serve the public interest

13   by "vindicat[ing] the supremacy of federal law." Memo 22:15-16. As with BLM's effort to show

14   irreparable harm, this argument similarly assumes that BLM is likely to succeed on the merits,

15   which it is not, meaning "there is no . . . hardship to tip the balance" in BLM's favor. *Wilson*, 122

16   F.3d at 711.

17        Although there is a public interest in respecting federal law, this argument does not tip the

18   equities in BLM's favor because there is a symmetrical, countervailing public interest that is

19   served by maintaining a duly adopted and lawful state statute. *See, e.g.*, *Gregory v. Ashcroft*, 501

20   U.S. 452, 461 (1991) ("[T]he States retain substantial sovereign powers under our constitutional

21   scheme, powers with which Congress does not readily interfere."); *Alfred L. Snapp & Son, Inc. v.*

22   _____

23   [7] Several oil industry plaintiffs notably moved much faster than BLM, filing a pair of state court
     challenges to SB 1137 nine months ago. *See* Greif Decl. Exs. S, T (compls. for *Beard et al. v.*

24   *California et al.*, L.A. Cnty. Super. Ct. Case No. 25STCP01395 (Apr. 16, 2025) and *Native Oil*
     *Producers and Emps. of California et al. v. California et al.*, L.A. Cnty. Super. Ct. Case No.

25   25STCP01509 (Apr. 23, 2025)). The plaintiffs in those two cases, which are set for trial on
     November 13, 2026, have not sought preliminary relief. Greif Decl. ¶ 21.

26

27   [8] Under the Ninth Circuit's alternative sliding scale test, where a plaintiff has merely raised
     "serious questions going to the merits," the plaintiff must show that the "balance of hardships . . .

28   tips *sharply*" in its favor along with demonstrating "a likelihood of irreparable injury and that the
     injunction is in the public interest." *Cottrell*, 632 F.3d at 1135.

1    *Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601, 604 (1982) (noting States possess a "sovereign

2    interest[] . . . in the power to create and enforce a legal code, both civil and criminal" and "quasi-

3    sovereign interest" in protecting the "health and comfort" of their residents) (citation modified)).

4    State law interests weigh especially heavily in this case, because BLM cannot show that Congress

5    intended to preempt state law and because it is generally within "the historic police powers of the

6    States" to regulate "matters related to health and safety." *See, e.g.*, *Hillsborough County, Fla. v.*

7    *Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715 (1985).

8          Next, extrapolating from a handful of declarations, BLM asserts that a preliminary

9    injunction will promote a lengthy parade of economic benefits—everything from strengthening

10   the solvency of individual companies to supporting energy production, lowering prices, and

11   protecting jobs. Memo 22:25-24:4. BLM's arguments are not credible and do not weigh heavily

12   in favor of a preliminary injunction for several reasons.

13         *First*, the statistics that BLM offers regarding the impact of SB 1137 on federal land and

14   leases in California are totally unsubstantiated. For example, BLM avers that approximately 16.3

15   percent of its 115,388 leased acres in California is encompassed in SB 1137-imposed verified

16   health protection zones (Karuzas Decl. ¶¶ 4, 17), affecting about one-third of its existing federal

17   leases in the state. Memo 8:17-22, 16:16-17, 17:5-6. But BLM does not explain how it arrived at

18   these figures, offering only that they reflect unexplained "calculations performed by BLM."

19   Karuzas Decl. ¶ 17. Without more, it is difficult to credit these figures—though it should be noted

20   that BLM's own numbers demonstrate that most of its leases (two-thirds) and the overwhelming

21   majority of its currently leased acreage (almost 84 percent) are wholly unaffected by SB 1137.[9]

22         *Second*, the economic injuries that BLM claims will befall the U.S. in the form of lost

23   royalties and other forms of lost federal income (Memo 10:2-9, 23:10-24:4) are purely

24   speculative and not immediate. Putting aside that BLM's predictions are premised on cryptic

25   _____

26   [9] Separately, BLM asserts "millions of acres of federal land are effectively rendered off limits to
     development" (Memo 16:16-18, citing Karuzas Decl. ¶¶ 15-21), but this is plainly wrong. BLM's
27   own declarant states that "BLM-managed leases in California" cover 115,388 acres in total, with
     approximately 18,781 of these acres impacted by SB 1137's verified health protection zones and
28   another 1,090 acres subject to potential health protection zones. Karuzas Decl. ¶¶ 4, 17.

1    "calculations," the statements of BLM staff admit to significant uncertainty. One attests to a

2    "belie[f] that SB 1137's setback provision is likely to inhibit oil and gas development on BLM-

3    managed land" (Karuzas Decl. ¶ 19), while the other merely states that "[f]ederal revenues . . .

4    may decline." Warren Decl. ¶ 25. "Subjective apprehensions and unsupported predictions of

5    revenue loss" of this sort are insufficient to support a grant of a preliminary injunction. *Caribbean*

6    *Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674-76 (9th Cir. 1988); *see also Goldie's*

7    *Bookstore, Inc. v. Super. Ct. of Cal.*, 739 F.2d 466, 472 ("Speculative injury does not constitute

8    irreparable injury."). BLM's dire predictions regarding SB 1137's potential impacts on national

9    energy markets (Memo 22:25-23:6, 23:9-10) are also pure supposition, premised on a lengthy

10   chain of conjecture about what private operators "may" do, how prices "may" react, and how

11   consumers "may" be affected. Warren Decl. ¶¶ 28, 30.

12       *Third*, the adverse economic impacts predicted by industry representatives likewise fail to

13   justify a grant of a preliminary injunction. *See* Memo 9:3-8, 9:12-15, 23 n.6. Like BLM's

14   declarations, the industry representatives similarly raise speculative, future concerns that do not

15   merit immediate intervention by the Court. *See, e.g.*, Richardson Decl. ¶¶ 10-30 (discussing a

16   project not expected to start operations until 2029); Zierman Decl. ¶ 4 (describing unattributed

17   hearsay conversations about future concerns).

18       Even where industry representatives allege more immediate and concrete harm from the

19   new permitting limits imposed by SB 1137, such purported economic injuries generally do not

20   weigh heavily in favor of preliminary relief because such injuries are reparable. *Sampson v.*

21   *Murray*, 415 U.S. 61, 90 (1974) (stating injuries that are "substantial, in terms of money, time and

22   energy necessarily expended in the absence of a stay, are not enough"); *Doe v. Trump*, 957 F.3d

23   1050, 1060 (9th Cir. 2020) (noting "monetary injury is not normally considered irreparable," and

24   "monetary injury to third parties . . . or to the economy in general provides an even weaker

25   justification for a finding of irreparable harm" (citations modified))*; L.A. Memorial Coliseum*

26   *Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980) (finding district court erroneously found

27   "lost revenues [that] would be compensable by a damage award" irreparable).

28       Here, to the extent individual oil and gas operators believe that they are, in fact, affected

1    by SB 1137 to an unlawful degree, they can file a takings lawsuit and seek their own remedies in

2    court. Indeed, two entities that offered declarations here (Zierman Decl. ¶ 1, Combs Decl. ¶ 1),

3    have done so. Greif Decl. ¶ 21, Ex. T. Moreover, industry representatives' complaints of permit

4    denials and uncertainty (*see, e.g.*, Budy Decl. ¶ 10, Richardson Decl. ¶ 32) do not sway the

5    equities or public interest in BLM's favor, given that regulated entities are cautioned against

6    presuming permitting outcomes generally, and the oil and gas industry, in particular, is heavily

7    regulated and highly uncertain. *See, e.g.*, *Jewell*, 747 F.3d at 1092-93 (when parties "anticipate[ ]

8    a pro forma result in permitting applications, they become largely responsible for their own

9    harm") (citation modified)); *WildEarth Guardians v. Zinke*, 368 F.Supp.3d 41, 84 n.35 (D.D.C.

10   2019) (observing "the risk of economic harm from procedural delay and industrial inconvenience

11   is the nature of doing business, especially in an area fraught with bureaucracy and litigation."

12   (citation modified)).

13        *Finally*, and most importantly, the equities and public interest are best served by

14   maintaining SB 1137's applicability to federal land for the ordinary duration of this litigation to

15   ensure that community members are not irreparably harmed by undue exposure to air pollution

16   and other harmful consequences of oil and gas drilling near sensitive locations. Though it is not

17   acknowledged by BLM (*see generally* Memo), oil and gas development produces "air pollutants,

18   surface-water and groundwater contaminants, vibration, noise, and odors." Greif Decl. Ex. A at 6.

19   Scientific studies, including studies conducted in California, "consistently show increased

20   potential for exposure to air pollution and noise, as well as increased risk for several adverse

21   health outcomes in populations living within [approximately 3,200 feet] of oil and gas well sites."

22   *Id.*; *see also* Cushing Decl. Ex. 2 at 8. Maintaining SB 1137 thus will reduce residents' exposure

23   to elevated levels of harmful fine particulate matter and other "health-damaging hazardous air

24   pollutants" including benzene, toluene, ethylbenzene, xylenes, hexane and formaldehyde. Greif

25   Decl. Ex. D at 12. Relatedly, maintaining SB 1137 will also reduce residents' risk of experiencing

26   the myriad adverse health consequences associated with oil and gas development, most notably

27   adverse birth outcomes and respiratory health conditions, which have been causally linked to

28   close proximity to oil and gas development activity. Greif Decl. Ex. D at 6-10; *see also* Cushing

1  Decl. Ex. 2 at 2, 8.

2  As the U.S. Supreme Court has advised, "[e]nvironmental injury, by its nature, can

3  seldom be adequately remedied by money damages and is often permanent or at least of long

4  duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).

5  Consequently, when environmental injury is "sufficiently likely," as is the case here, the balance

6  of harms "will usually favor . . . protect[ing] the environment." *Id.*; *see also Nat'l Parks &*

7  *Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (finding "loss of anticipated

8  revenues . . . does not outweigh the potential irreparable damage to the environment"), *abrogated*

9  *on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).

10  Following *Amoco*, courts have not hesitated to enjoin oil and gas activities to prevent

11  environmental damage, including harmful and unhealthy air pollution emissions. *See, e.g.,*

12  *California v. BLM*, 286 F. Supp. 3d 1054 (N.D. Cal. 2018) (enjoining BLM rule suspending

13  enforcement of restrictions on natural gas flaring on public lands because irreparable injury

14  resulting from increased air pollution outweighed marginal increase in compliance costs for oil

15  and gas operators on public lands); *San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife*

16  *Service*, 657 F. Supp. 2d 1233, 1240 (D. Colo. 2009) (finding oil "drilling . . . is likely to cause

17  irreparable injury to Plaintiffs' environmental . . . interests . . . in the water, wildlife, air, solitude

18  and quiet, and natural beauty" of an affected area); *Anglers of the AU Sable v. U.S. Forest Serv.*,

19  402 F. Supp. 2d 826, 838 (E.D. Mich. 2005) (stating "evidence suggests that irreparable injury

20  likely will occur if site preparation begins and drilling is permitted"). In this case, for the same

21  reasons of preventing irreparable environmental and public health harms, the balance of equities

22  and the public interest elements strongly favor denial of BLM's requested preliminary injunction.

23  **IV.  If the Court grants an injunction, it must be narrowly tailored.**

24  An injunction should always be "tailored to the violation of law" and "no broader . . . than

25  necessary to remedy" any legal violations. *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 468

26  F. Supp. 2d 1140, 1144 (N.D. Cal. 2006); *accord Foothill Church v. Watanabe*, 654 F.Supp.3d

27  1054 (E.D. Cal. 2023) (collecting cases holding relief must be narrowly tailored). "Federalism

28  principles make tailoring particularly important where . . . plaintiffs seek injunctive relief against

1    a state or local government." *Melendres v. Maricopa County*, 897 F.3d 1217, 1221 (9th Cir.

2    2018).

3            Here, to the extent the Court is persuaded that a preliminary injunction is warranted, it

4    should narrowly address the specific provisions of SB 1137 that BLM has challenged. BLM's

5    complaint and moving papers only address SB 1137's provisions that prohibit CalGEM from

6    approving new notices of intent to commence drilling or to construct or operate new production

7    facilities in health protections zones. Compl. 14 (citing Cal. Pub. Res. Code § 3281(a)-(b));

8    Memo 3:25-4:4 (same); Proposed Order (same). BLM does not contest severable provisions of

9    SB 1137 that impose stricter control and monitoring requirements on existing sources within

10   health protection zones, so any injunction should leave these requirements intact.[10]

11           Similarly, any injunction should only limit SB 1137's application to federal land. BLM's

12   complaint asserts that specific SB 1137 provisions and implementing regulations are facially

13   invalid (Compl. 14:14), but BLM otherwise argues that these requirements are unlawful "as

14   applied" to federal interests in federal land. *See* Compl. 2:26-27; Not. and Mot. 2:28; Memo

15   14:14-15, 24:22-24; Proposed Order 1:12-15. Ultimately, BLM's motion is premised on legal

16   arguments that are exclusive to federal authority over federal land; it's invocation of the Property

17   Clause, MLA, and FLPMA do not provide any basis for enjoining SB 1137 on state, local, or

18   private land in California. *See* Memo 14-22. Consequently, any grant of preliminary relief should

19   only address SB 1137's application to federal land and should not otherwise limit California's

20   ability to implement and enforce the law elsewhere. *See, e.g.*, *Flathead-Lolo-Bitterroot Citizen*

21   *Task Force v. Montana*, 98 F.4th 1180, 1196 (9th Cir. 2024) (finding injunction "geographically

22   overbroad" where it included "areas that Plaintiffs did not even ask to be covered by the

23   injunction").

24                                    **CONCLUSION**

25           BLM has not met its heavy burden of establishing that a preliminary injunction is

26   warranted. The Court therefore should deny BLM's motion.

27   _____

28   [10] *See* SB 1137 § 3 ("The provisions of this act are severable. If any provision of this act or its
     application is held invalid, that invalidity shall not affect other provisions or applications that can
     be given effect without the invalid provision or application.").

1                                          Respectfully submitted,

2

3   Dated: February 20, 2026             /s/ Colin C. O'Brien

4                                           Colin C. O'Brien, State Bar No. 309413
                                           Elizabeth A. Fisher, State Bar No. 311366

5                                          Michelle Ghafar, State Bar No. 315842
                                         Gabriel F. Greif, State Bar No. 341537

6                                          cobrien@earthjustice.org
                                         efisher@earthjustice.org

7                                          mghafar@earthjustice.org
                                         ggreif@earthjustice.org

8                                          EARTHJUSTICE
                                         1 Sansome Street, Suite 1700

9                                          San Francisco, CA 94104
                                         Telephone: (415) 217-2000

10                                          Facsimile: (415) 217-2040

11                                          *Attorneys for Proposed Defendant-Intervenors*
                                         *Food & Water Watch, Friends of the Earth,*
                                         *Los Padres ForestWatch, and Sierra Club*

12

13                                          Victoria Bogdan Tejeda, State Bar No. 317132
                                         Cooper Kass, State Bar No. 346472

14                                          vbogdantejeda@biologicaldiversity.org
                                         ckass@biologicaldiversity.org

15                                          CENTER FOR BIOLOGICAL DIVERSITY
                                         2100 Franklin Street, Suite 375

16                                          Oakland, CA 94612
                                         Telephone: (510) 844-7100

17                                          Jason C. Rylander, DC Bar No. 474995
                                         (pro hac vice pending)

18                                          jrylander@biologicaldiversity.org
                                         CENTER FOR BIOLOGICAL DIVERSITY

19                                          1411 K St. NW, Suite 1300
                                         Washington, D.C. 20005

20                                          Telephone: (202) 849-8401

21                                          *Attorneys for Proposed Defendant-Intervenor*
                                         *Center for Biological Diversity*

22

23

24

25

26

27

28