UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:26-cv-00107-DC-SCR |
| Plaintiff, | |
| v. | ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION |
| STATE OF CALIFORNIA, et al., | (Doc. No. 4) |
| Defendants. | |

This matter came before the court on March 20, 2026 for a hearing on Plaintiff's motion for a preliminary injunction. (Doc. No. 4.) Attorneys Adam Gustafson, Dustin Joseph Weisman, and John Karl Heise appeared on behalf of Plaintiff United States; Attorneys Jerry Tongwei Yen and Christopher Kessel appeared on behalf of Defendants State of California, Gavin C. Newsom, California Geologic Energy Management Division, and Doug Ito; and Attorneys Colin O'Brien and Elizabeth Fisher appeared on behalf of Proposed Intervenors Center for Biological Diversity, Food & Water Watch, Friends of the Earth, Los Padres ForestWatch, and Sierra Club ("Proposed Intervenors"). For the reasons explained below, the court will deny Plaintiff's motion for a preliminary injunction.

/////

/////

/////

1

**INTRODUCTION**

Plaintiff United States brings this action against Defendants State of California, Governor Gavin C. Newsom, California Geologic Energy Management Division ("CalGEM"), and State Oil and Gas Supervisor Doug Ito, asserting that federal law preempts certain provisions of a California statute—Senate Bill No. 1137 ("SB 1137")—which prohibits the drilling of new oil and gas wells, or the redrilling/deepening of existing wells, within 3,200 feet of "sensitive receptors" (e.g., residences, schools, hospitals). (Doc. No. 1.) Specifically, Plaintiff contends SB 1137 violates the Supremacy Clause of the United States Constitution and infringes on the United States' authority to manage federal lands and mineral resources under the Property Clause, the Mineral Leasing Act ("MLA"), and the Federal Land Policy and Management Act ("FLPMA"). (*Id.* at ¶ 3.) Plaintiff seeks declaratory and injunctive relief to prevent Defendants from enforcing SB 1137 as applied to federal land that has been leased to private operators pursuant to oil and gas leases issued under the MLA and FLMPA by the U.S. Department of the Interior, Bureau of Land Management ("BLM"). (*Id.* at ¶ 4.)

In short, California enacted SB 1137 to address significant environmental and public health risks facing populations in geographic proximity to oil and gas development—not by banning such development in California entirely, but by limiting new oil and gas drilling on the surface of land within 3,200 feet of sensitive receptors, a distance that is based on scientific studies demonstrating evidence of harm at distances less than 3,200 feet. As explained in detail below, because SB 1137 is a reasonable environmental regulation that does not preclude alternative methods of accessing the oil and gas within those locations and the vast majority of federal leased lands are not within 3,200 feet of sensitive receptors, Plaintiff has not demonstrated that it is likely to succeed in showing SB 1137 conflicts with federal law. Plaintiff has also not shown that it is likely to suffer irreparable harm given its substantial delay in seeking injunctive relief and the speculative nature of its alleged harm. Indeed, Plaintiff alleges it is harmed by the loss of revenue due to SB 1137's deterrent effect on prospective bidders who might not bid on oil and gas leases in California, but Plaintiff admits it "paused" its leasing program approximately ten years ago and has not issued leases since that time. Because Plaintiff has not met its burden of

showing it is likely to succeed on the merits of its preemption claim or that it is likely to suffer irreparably harm, Plaintiff's motion for a preliminary injunction will be denied.

**FACTUAL BACKGROUND[1]**

**A.      Permitting Process for Drilling Oil and Gas Wells on Federal Land in California**

After BLM identifies federal land available for oil and gas extraction, BLM is required to auction off parcels of the land in competitive lease sales to prospective operators. 30 U.S.C. § 226(b)(1)(A). The lessee oil and gas operators must then obtain approval before they can begin drilling operations. *See* 30 U.S.C. § 226(g). The federal and state governments each serve a role in permitting the drilling of oil and gas wells on federal land in California. (Doc. No. 4-2 at ¶ 6.) An operator must obtain both federal approval from BLM and state approval from CalGEM, the state agency overseen by the State Oil and Gas Supervisor, who is tasked with supervising "the drilling, operation, maintenance, and abandonment" of oil and gas wells. (Doc. No. 4-2 at ¶ 20); Cal. Pub. Res. Code §§ 3106, 3400.

For federal approval, an operator must submit an Application for Permit to Drill ("APD") to BLM. (Doc. No. 4-2 at ¶ 6.) BLM reviews the APD, conducts an on-site inspection, and completes an environmental review under the National Environmental Policy Act. (Doc. Nos. 4-2 at ¶ 6; 4-1 at 9.) BLM may then approve the APD, approve the APD with conditions, deny the APD, or defer its decision on the APD. (Doc. Nos. 4-2 at ¶ 6; 4-1 at 9.)

For state approval, an operator who seeks to drill new oil and gas wells or rework existing wells must submit an application for a Notice of Intention ("NOI"), colloquially referred to as a permit application, to CalGEM.[2] (Doc. No. 9-2 at ¶ 5.) CalGEM reviews each NOI application for compliance with health and safety rules, environmental rules (e.g., California Environmental

---

[1] This factual background is derived from Plaintiff's operative complaint and motion for a preliminary injunction along with their supporting declarations and exhibits (Doc. Nos. 1, 4), Defendants' opposition brief along with their supporting declarations and exhibits (Doc. No. 9), Proposed Intervenors' amicus brief along with their supporting declarations and exhibits (Doc. No. 10), and Plaintiff's reply brief (Doc. No. 19).

[2] California's permitting process for oil and gas wells is the same regardless of whether the wells are operated on federal land or private land. (Doc. No. 9-2 at ¶ 5.)

Quality Act), and other state laws and guidelines. (Doc. No. 9-2 at ¶ 6.) Operators may not commence drilling new wells or rework existing wells unless CalGEM approves the NOI application.[3] (*Id.* at ¶ 6); Cal. Pub. Res. Code § 3203.

In 2022, CalGEM's authority to approve NOIs was limited by California's enactment of SB 1137 into law. (Doc. No. 1-1 at 2.)

**B.      SB 1137 and California Public Resources Code § 3281(a)–(b)**

SB 1137 was passed by the California State Legislature in August 2022 and signed into law by Governor Newsom on September 16, 2022, thereby adding Article 4.6 titled "Health Protection Zones" to Chapter 1 of Division 3 of the California Public Resources, commencing with section 3280 and ending with section 3291. (Doc. No. 1-1 at 2); 2022 Cal. Stat. ch. 365 (S.B. 1137) §§ 1–4. The law went into effect on January 1, 2023, but on February 3, 2023, implementation of the law was temporarily suspended due to an industry-led referendum challenging the law. (Doc. No. 1 at ¶ 33.) The industry proponents withdrew the ballot referendum on June 27, 2024, and CalGEM notified operators that the new law is therefore "no

---

[3] The term "rework" does not appear in SB 1137, the challenged statutory provisions (Cal. Pub. Res. Code § 3281), its implementing regulations, or the statutory provisions setting forth the NOI application requirements (Cal. Pub. Res. Code § 3203). Notably, in the Oil and Gas Conservation chapter of the Public Resources Code, the term "rework" only appears in two statutory provisions that are not at issue in this case and pertain to nonfossil fuel production and deadlines to file records. *See* Cal. Pub. Res. Code § 3281.5 ("[T]he division may approve . . . a notice of intention to drill or rework an intercept well, if needed to plug and abandon or replug and abandon another well on the condition that the intercept well is itself plugged and abandoned."); Cal. Pub. Res. Code § 3281 ("Within 60 days after the date of cessation of drilling, rework, well stimulation treatment, or abandonment operations, . . . the operator shall file with the district deputy, . . . true copies of the log, core record, and history of work performed . . ."). Nonetheless, the parties use the term "rework" in describing the challenged statutory provisions. (*See* Doc. No. 9 at 7 ("With certain exceptions, the statute prohibits new drilling or reworking of oil and gas wells . . ."); Doc. No. 4-1 at 9 ("California law requires operators to obtain CalGEM approval by filing a NOI to drill or rework a well.")) Subparagraph (a) of Section 3203 of the California Public Resources Code imposes the NOI application requirement on operators "before commencing the work of drilling the well," i.e., for new wells. Cal. Pub. Res. Code § 3203(a). Whereas subparagraph (b) of section 3203 provides that the NOI application requirement applies "[a]fter completion of any well, . . . as far as may be, to the deepening or redrilling of the well, any operation involving the plugging of the well, or any operations permanently altering any manner of the casing of the well." Cal. Pub. Res. Code § 3203(b). For clarity, to the extent the parties and the court in this order use the term "rework," the use of that term refers to section 3203(b)'s provisions.

longer stayed" and "is currently in effect" as of June 28, 2024. (Doc. Nos. 1 at ¶ 34; 11-5 at 2.)

Relevant here, Plaintiff challenges only California Public Resources Code § 3281(a)–(b) and associated implementing regulations.[4] (Doc. No. 4-1 at 8 n.1, 10–11.)

Section 3281(a) provides as follows:

> Notwithstanding any other law, commencing January 1, 2023, the division[5] shall not approve any notice of intention under Section 3203 within a health protection zone, except for approvals of notices of intention necessary for any of the following purposes:
>
> (1) To prevent or respond to a threat to public health, safety, or the environment.
>
> (2) To comply with a court order finding that denying approval would amount to a taking of property, or a court order otherwise requiring approval of a notice of intention.
>
> (3) To plug and abandon or reabandon a well, including an intercept well necessary to plug and abandon or reabandon a well.

Cal. Pub. Res. Code § 3281(a).

Section 3281(b) provides as follows:

> An operator who submits a notice of intention under Section 3203, except for notices of intention described in paragraph (3) of subdivision (a), shall submit a sensitive receptor inventory and map pursuant to Section 3285 of the area within the 3,200-foot radius of the wellhead or proposed wellhead location to the division with the notice of intention or a statement certifying that the operator has confirmed, and the division has verified, that there are no sensitive receptors located within 3,200 feet of the wellhead location. . . . . No new production facilities shall be constructed or operated in a health protection zone unless associated with a notice of intention approved pursuant to subdivision (a) or as determined by the division to be necessary to protect public health and safety.

---

[4] Plaintiff refers to the implementing regulations, sections 1765 through 1765.10 of Title 14 of the California Code of Regulations (Doc. No. 4-1 at 8 n.1), but Plaintiff does not specify which of these regulations, or parts thereof, are challenged in this action. Notably, some of those regulations do not appear relevant to the arguments raised in Plaintiff's motion and instead appear to be implementing provisions of SB 1137 that are not at issue in this case. For example, the regulations in section 1765.4.1 set forth the requirements for providing notice to property owners and tenants as required by California Resources Code section 3284, a section added by SB 1137 that Plaintiff does not challenge in this action. *See* 14 Cal. Code Regs. § 1765.4.1.

[5] The term "division" in these statutes means the Geologic Energy Management Division in the Department of Conservation—i.e., CalGEM. Cal. Pub. Res. Code § 3002.

*Id.* § 3281(b).

Section 3280 provides definitions for the new terms used in provisions added by SB 1137. That section defines "health protection zone" to mean "the area within 3,200 feet of a sensitive receptor," to be measured "from the property line of the receptor unless the receptor building is more than 50 feet set back from the property line, in which case the measurement shall be made from the outline of the building footprint to 3,200 feet in all directions." *Id.* § 3280(b). "Sensitive receptor" is defined as any of the following:

> (1) A residence, including a private home, condominium, apartment, and living quarter.
>
> (2) An education resource, including a preschool, school maintaining transitional kindergarten, kindergarten, or any of grades 1 to 12, inclusive, daycare center, park, playground, university, and college. Where a university or college is the only sensitive receptor within 3,200 feet of the operator's wellheads or production facilities, the university or college is not a sensitive receptor if the operator demonstrates to the division's satisfaction that no building with nominal daily occupancy on the university or college campus is located within 3,200 feet of the operator's wellheads or production facilities.
>
> (3) A community resource center, including a youth center.
>
> (4) A health care facility, including a hospital, retirement home, and nursing home.
>
> (5) Live-in housing, including a long-term care hospital, hospice, prison, detention center, and dormitory.
>
> (6) Any building housing a business that is open to the public.

*Id.* § 3280(c). "Production facility" is not a newly-added term and is already defined in section 3010 of the California Public Resources Code as meaning "any equipment attendant to oil and gas production or injection operations including, but not limited to, tanks, flowlines, headers, gathering lines, wellheads, heater treaters, pumps, valves, compressors, injection equipment, and pipelines that are not under the jurisdiction of the State Fire Marshal pursuant to Section 51010 of the Government Code." *Id.* § 3010.

In drafting and ultimately passing SB 1137, the Legislature made several findings, including that "a growing body of research shows direct health impacts from proximity to oil extraction," "[p]roximity to oil and gas extraction sites pose significant health risks, especially

6

due to increased air pollution," and "studies have shown evidence of harm at distances less than one kilometer, which is approximately 3,200 feet." 2022 Cal. Stat. ch. 365 (S.B. 1137) § 1(a), (c), (d). Notably, in the Senate Rules Committee's Bill Analysis on SB 1137, the authoring state senators discussed the conclusions made by a panel of public health and other experts that CalGEM convened to assist them in the regulatory process. (Doc. No. 9-1 at 8.) Specifically, in responding to questions submitted by CalGEM in 2021, the California Oil and Gas Public Health Rulemaking Scientific Advisory Panel (comprised of thirteen public health and environmental experts) stated that it "concludes with a high level of certainty that there is a causal relationship between close geographic proximity to [oil and gas development] and adverse perinatal and respiratory outcomes," and "concludes with a high level of certainty that concentrations of health-damaging air pollutants, including criteria air pollutants and toxic air contaminants, are more concentrated near [oil and gas development] activities compared to further away."[6] (*Id.* at 57, 64.) Further, the Panel noted that "[e]xisting epidemiologic studies were not designed to test and establish a specific 'safe' buffer distance between [oil and gas development] cites and sensitive receptors, such as homes and schools," but "[n]evertheless, studies consistently demonstrate evidence of harm at distances less than 1km, and some studies also show evidence of harm linked to [oil and gas development] at distances greater than 1km." (*Id.* at 65.)

**C.      Impact of SB 1137 on Oil and Gas Leases on Federal Lands**

　　　　　　1.      Quantity of Acres, Leases, and Wells

Both parties have submitted declarations to provide data regarding the quantity and percentages of acres of federal land in California, of oil and gas leases on BLM-managed land in California, and of acres and leases located within health protection zones. Specifically, with its motion, Plaintiff concurrently filed the declaration of Jeremiah Karuzas, the Deputy State Director for Energy and Minerals of the California State Office, BLM. (Doc. Nos. 4-2.) And Defendants concurrently filed with their opposition the declaration of Lloyd Light, a Geographic

---

[6]  In their response to CalGEM's questions, the Panel explained that their use of the phrase "high level of certainty" is based on the professional judgment of all thirteen Panel members in their assessment of the scientific evidence, and all Panel members agree on the responses as stated. (Doc. No. 9-1 at 54, n.1.)

Information Systems Manager at CalGEM. (Doc. Nos. 9-3.)

According to Mr. Karuzas, there are 47 million acres of federal land in California, and 115,388 acres of that federal land are covered by 616 BLM-managed oil and gas leases. (Doc. No. 4-2 at ¶ 4.) Oil and gas activity is largely located in western Kern County, and over 95% of the BLM-managed leases are under the direction of BLM's Bakersfield ("BKFO") and Central Coast Field Offices ("CCFO").[7] (*Id.* at ¶ 7.) On the leased federal land, BLM manages approximately 12,381 active oil and gas wells, 7,372 of which are producing wells, and 5,009 are idle wells. (*Id.* at ¶ 5.) Based on (unspecified) "calculations performed by BLM," Mr. Karuzas asserts that 202 leases (18,781 acres) of the 616 BLM-managed oil and gas leases (115,388 acres) are impacted by verified health protection zones ("Verified HPZs"), and an additional 16 leases (1,090 acres) are impacted by potential health protection zones ("Potential HPZs", for a total of 218 leases impacted (35% of leases and 17.2% of acres).[8] (*Id.* at ¶ 17.) Of those 218 leases, 79 leases lie entirely within an HPZ. (*Id.* at ¶ 17.) Within the 218 leases, there are approximately 2,047 active wells within HPZs, which represents 16.5% of all active wells on BLM-managed leases in California. (*Id.* at ¶ 18.)

Mr. Light, on the other hand, explains that he used data he obtained from the BLM website's publicly available data hub showing BLM oil and gas leases. (Doc. No. 9-3 at ¶¶ 4–5.)

[7] Mr. Karuzas states that "[n]ew BLM oil and gas leasing in California is currently paused due to a settlement agreement, which arose from previous litigation that challenged BKFO and CCFO Resource Management Plans," but BLM "has begun to undertake the environmental review process that could result in a reinitiation of leasing." (Doc. No. 4-2 at ¶ 8.) Specifically, BLM "is preparing a supplemental environmental impact statement" that "will analyze the impacts of oil and gas leasing" in the planning area, and that statement "could potentially allow BLM to resume oil and gas leasing in the planning area," which "could result in the development of 10 to 40 new oil and gas wells per year on new leases" in the Bakersfield planning area and which "could result in development of up to 37 new oils and gas wells during the next 20 years" in the Central California planning area. (*Id.* at ¶¶ 9–12.)

[8] The terms "Verified HPZ" and "Potential HPZ" (or "Potentially HPZ") are not used in SB 1137 or defined in the statute. Nonetheless, the parties use the term Verified HPZs to mean "areas that have been created from verified sensitive receptors that have been quality control checked by CalGEM," and Potential HPZs to mean "algorithmically created areas that have preliminarily been identified as having a sensitive receptor but have not gone through a formal quality control process to verify the sensitive receptor." (Doc. No. 9-3 at ¶ 4.)

That data hub includes data for "BLM Natl MLRS Oil and Gas Leases" and the "BLM CA Land Status Surface Management Agency." (*Id.* at ¶ 5.) The data from "BLM's Natl MLRS Oil and Gas Leases" indicates there are approximately 9,075 BLM oil and gas leases in California covering 9,680,979 acres.[9] (*Id.* at ¶ 5.) But Mr. Light noted that the data from "BLM Natl MLRS Oil and Gas Leases" appears to cover both active and historic oil and gas leases, so he filtered the data to exclude "closed" leases and only include authorized, interim, and pending (collectively "active") leases, which results in 411 active leases covering 142,311 acres. (*Id.* at ¶ 7.) Overlaying the map of HPZs located on CalGEM's website with the map of the 411 active leases shows that 25,615 acres of the 142,111 acres (18%) are located within a Verified HPZ, and 27,131 acres (19%) are located within either a Verified HPZ or Potential HPZ. (*Id.* at ¶¶ 5, 7.)

　　　　　2.　　　Revenue to the United States from Oil and Gas Leases

In addition to data regarding the number of leases, acres, and wells impacted by SB 1137, Plaintiff also provided information regarding the revenues the U.S. Department of the Interior receives from the BLM oil and gas leases in the declaration of Matthew Warren, BLM's Oil and Gas Program Lead. (Doc. No. 4-3.) Specifically, BLM's oil and gas leasing process generates revenue for the Department of the Interior through the payment of bids (statutory minimum bid of $10 per acre), annual rentals (statutory rates of $3, $5, and $15 per acre for years 1–2, years 3–5, and remaining years) and royalties (statutory minimum of 12.5% of the value of the oil and gas produced). (*Id.* at ¶ 20–23.) Based on revenue data from the Department of the Interior's website, fossil-fuel leasing on federal land in California generated $78,932,714 in revenue to the United States in fiscal year 2024 (October 1, 2023 through September 30, 2024). (*Id.* at ¶ 24.)

According to Mr. Warren, "[f]ederal revenues from oil and gas leasing in California may decline as a direct or indirect result of SB 1137's setback provision, which could deter bidders

---

[9] Mr. Light notes that of the 9,680,979 acres covered by BLM-managed oil and gas leases in California, only 122,831 acres (1.269%) are located within a Verified HPZ, and 1,002,951 acres (10.36%) are located within either a Verified HPZ or Potential HPZ. (Doc. No. 9-3 at ¶ 6.) Further, based on data from the "BLM CA Land Status Surface Management Agency" data hub, of the 15,004,341 total acres of land managed by BLM in California (not just land leased for oil and gas development), 29,683 acres (0.198%) are located within a Verified HPZ, and 1,427,790 acres (9.5%) are located within either a Verified HPZ or Potential HPZ. (*Id.* at ¶¶ 10, 11.)

from competing for Federal leases," and "[t]hese revenue losses could compound over time . . . ." (*Id.* at ¶ 25.) Further, "BLM anticipates that the setback provisions of SB 1137 will create significant regulatory uncertainty for federal lessees and operators," who "may" reduce their participation in federal lease auctions, seek royalty rate reductions, request suspensions of operations and/or production thereby potentially decreasing federal revenues, become unable to diligently explore or develop the federal lease, and prematurely abandoning operations. (*Id.* at ¶¶ 27, 28.) Due to these potential responses by lessees and operators, BLM expects reduced revenue through the loss of lease sales and royalties. (*Id.* at ¶ 29.)

### 3.    Impact of SB 1137 on Lessee Operators

In support of the pending motion, Plaintiff also submitted the declarations of several private operators who lease BLM-managed land and who describe the impact of SB 1137 on their oil and gas business. (Doc. No. 4-4, 4-5, 4-6, 4-7.)

For example, operator Sentinel Peak received approval from BLM in February 2022 for a planned development project on leased land to drill 24 wells, all of which will be located in an HPZ, but the NOI applications the operator submitted to CalGEM in March 2022 have not been approved. (Doc. No. 4-4.) It is not clear from Sentinel Peak's declaration, however, whether the operator provided the SB 1137-related information for the project that CalGEM requested from the operator in 2024. (*See id.*)

Another operator, E&B, submitted plans in 2018 to BLM for a project designed to employ thermal steam techniques in 189 new wells to be drilled over 11 years on their leased land, which currently has 27 producing wells that would need to be plugged and abandoned, and one production facility that would need to be upgraded. (Doc. No. 4-5 at 2.) Less than 3% of the acres on that leased land are outside an HPZ, and only 6 of the 189 proposed wells are outside an HPZ. (*Id.* at 3.) According to the operator, reaching the mineral reserves that are located within the HPZ through horizontal drilling from the 6 wells outside the HPZ "is not an economical recovery

/////

/////

/////

10

method" for the project.[10] (*Id.* at 3–4.) E&B has therefore abandoned the project, has not submitted well permit applications to BLM, and has limited its development on the leased land to operating their existing wells until they reach the end of their useful life (estimated to be another 15 years). (*Id.* at 3–4.) E&B estimates that during the life of its proposed project's production (2029–2040), BLM would have received $6 million a year in royalties. (*Id.* at 5.) E&B also states that "going forward, [it] would not bid on additional federal leases where the majority of the leased minerals are located within an HPZ." (*Id.* at 6.)

Operator HWOC received approval from BLM in December 2024 to drill 14 new wells on leased land, but CalGEM verbally indicated to HWOC that it would not approve NOI applications for those wells because they are all located within an HPZ. (Doc. No. 4-6.) HWOC estimates that over the several decades long life of those 14 wells, it would have paid $5.8 million to BLM in royalties. (*Id.* at 2–3.) HWOC also states that it "does not plan to bid on any federal leases within an HPZ while SB 1137 is in effect." (*Id.* at 3.)

Operator Termo operates 107 wells, one of which is located in an HPZ, and Termo's NOI application for that one well has been held in abeyance by CalGEM. (Doc. No. 4-7 at 2–3.) Termo also represents that it "has not bid on leases located on federal lands within HPZs since the enactment of SB 1137." (*Id.* at 3.)

In addition to those private operators' declarations, Plaintiff submits a declaration from the Director of the Native Oil Producers and Employees of California ("NOPEC") who states that he has been informed by some operators that they have chosen not to pursue otherwise-viable projects due to the uncertainties caused by SB 1137, and some operators have been deterred from bidding on federal leases. (Doc. No. 4-9 at 1–2.)

Though not mentioned in the declarations from Termo and NOPEC, Termo and NOPEC, along with other operators and owners, filed a lawsuit against Defendants in the Los Angeles

---

[10] "Directional or horizontal drilling involves drilling laterally from the wellhead location. Directional or horizontal wells typically start vertically and then gradually increase the angle of drilling up to 90 degrees (horizontal) or greater." (Doc. No. 9-2 at ¶ 9.) "[D]irectional or horizontal drilling are methods where a well outside an HPZ can access resources within an HPZ." (*Id.* at ¶ 10.) According to a District Deputy at CalGEM, "[d]irectional and horizontal wells are currently being used in most oil fields in California to some extent." (*Id.*)

County Superior Court in April 2025, to challenge the validity of SB 1137. (Doc. No. 11 at ¶¶ 21–23); *Native Oil Producers & Emps. of Cal. v. California et al.*, Case No. 25STCP01509, Compl., (L.A. Cnty. Super. Ct. April 23, 2025). In that case, Termo seeks "a declaration from [the] Court that SB 1137 is preempted by federal law insofar as it purports to apply to oil and gas wells and production on lands governed by federal leases" because SB 1137 conflicts with the Mineral Leasing Act of 1920 and the Federal Land Policy Management Act of 1976—the same federal statutes invoked by Plaintiff in this case. (Doc. No. 11-20 at 30–31.) Notably, Plaintiff did not seek to intervene in that case. Further, the plaintiffs in that case did not file a motion for a preliminary injunction or otherwise seek preliminary or provisional relief. (Doc. No. 11 at ¶ 21.) That case is currently scheduled for trial in November 2026. (*Id.*)

Similarly, also in April 2025, another owner of oil and gas producing land brought a lawsuit against Defendants, seeking "a writ of mandamus ordering nonenforcement of SB 1137, compelling issuance of all necessary permits and entitlements for well operations notwithstanding SB 1137, and finding SB 1137 unconstitutional and unenforceable." (Doc. No. 11-19 at 4); *Beard et al. v. California et al.*, Case No. 25STCP01395, Compl., (L.A. Cnty. Super. Ct. April 16, 2025). The plaintiffs in that case likewise did not seek preliminary injunctive relief. (Doc. No. 11 at ¶ 21.) That case is also currently scheduled for trial in November 2026. (*Id.*)

## PROCEDURAL BACKGROUND

Plaintiff United States filed the complaint initiating this action against Defendants on January 14, 2026. (Doc. No. 1.) Plaintiff brings two claims alleging: (1) SB 1137 is preempted by federal law; and (2) SB 1137 is invalid because it violates the intergovernmental immunity doctrine. (*Id.* at 10–14.) Plaintiff seeks declaratory and injunctive relief on each claim, specifically an order declaring that California Public Resources Code section 3281(a)–(b) and associated regulations are invalid "both on their face and as applied to the United States of America, its agencies, its officers, and its lessees," and an order enjoining Defendants from taking actions to enforce those challenged provisions against the United States, its agencies, its officers, and its lessees. (*Id.* at 14.)

On January 16, 2026, Plaintiff filed the pending motion for a preliminary injunction,

which is based on Plaintiff's first claim of federal preemption, not Plaintiff's second claim of intergovernmental immunity.[11] (Doc. No. 4.) Pursuant to a stipulated briefing schedule, Defendants timely filed an opposition to Plaintiff's motion on February 20, 2026, and Plaintiff timely filed a reply thereto on March 6, 2026. (Doc. Nos. 9, 19.)

In addition, on February 20, 2026, Proposed Intervenors filed a motion to intervene as defendants (Doc. No. 10) and a proposed opposition to Plaintiff's motion for a preliminary injunction (Doc. No. 12). On March 2, 2026, the court issued an order informing the parties that the court will consider the Proposed Intervenors' opposition as an amicus brief and directed Plaintiff to address that brief in its reply. (Doc. No. 15.) The court also took the motion to intervene under submission, and that motion will be addressed by the court in a separate order. (*Id.*) Plaintiff did not file a separate reply to Proposed Intervenors' opposition but addresses their arguments in its reply to Defendant's opposition. (Doc. No. 19.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 65, the court has the authority to issue preliminary injunctive relief. An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

A preliminary injunction may issue if a plaintiff establishes that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *See Winter*, 555 U.S. at 20. When the nonmovant is the government, the last two *Winter* factors merge. *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023).

---

[11] Though Plaintiff notes in its reply that its preemption arguments overlap with its arguments as to how SB 1137 violates the intergovernmental immunity doctrine (Doc. No. 19 at 15 n.7), it is clear from Plaintiff's motion that only Plaintiff's preemption claim serves as the basis for seeking preliminary injunctive relief. (*See* Doc. No. 4-1 at 9) ("Because the United States is likely to prevail on the merits of its preemption claim, . . . this Court should preliminarily enjoin the challenged provisions of SB 1137."); (*Id.* at 8) ("The United States is likely to succeed on the merits because federal law preempts the challenged provisions of SB 1137."). Thus, the court does not address Plaintiff's second claim of intergovernmental immunity in this order.

13

The Ninth Circuit has adopted a "sliding-scale approach" where "a stronger showing of one [*Winter*] element may offset a weaker showing of another." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. "[T]he serious questions standard is 'a lesser showing than likelihood of success on the merits.'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)). "Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (citation omitted). Serious questions "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Id.* (citation omitted).

## ANALYSIS

In its motion for a preliminary injunction, Plaintiff asserts that all four *Winter* factors are established because it is likely to succeed on the merits of its federal preemption claim, SB 1137 causes per se irreparable harm to Plaintiff's sovereign interests, and the balance of the equities and public interest weigh heavily in favor of preserving the federal government's constitutional authority. (Doc. No. 4-1 at 21, 29.)

**A.     Plaintiff's Likelihood of Success on the Merits of Federal Preemption Claim**

Plaintiff contends that the challenged provisions of SB 1137 violate the Supremacy Clause and are preempted by federal law, specifically, the Mineral Leasing Act ("MLA") and the Federal Land Policy and Management Act ("FLPMA"), both of which Congress enacted pursuant to their authority under the Property Clause of the U.S. Constitution. (Doc. No. 4-1 at 21.)

The federal preemption doctrine is derived from the Supremacy Clause, which states that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State

14

to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2; *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) ("[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'") (citation omitted). "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 728 (1981).

The Property Clause provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const., Art. IV, § 3 cl. 2. Although the power over federal land entrusted to Congress under the Property Clause is "without limitations," the Property Clause does not exempt federal lands from all state law and regulation. *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580 (1987) (quoting *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976)). "The Property Clause itself does not automatically conflict with all state regulation of federal land." *Granite Rock*, 480 U.S. at 580. "'[T]he State is free to enforce its criminal and civil laws' on federal land so long as those laws do not conflict with federal law." *Granite Rock*, 480 U.S. at 580 (quoting *Kleppe*, 426 U.S. at 543). As the Supreme Court explained in *Kleppe*, "[a]bsent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause." 426 U.S. at 543 (internal citations omitted).

"The Supreme Court has identified 'three different types of preemption'—express, conflict, and field." *Jones v. Google LLC*, 73 F.4th 636, 641 (9th Cir. 2023) (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018)). All three types of preemption "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy*, 584 U.S. at 477.

Here, Plaintiff advances only a conflict preemption argument, not express or field

15

preemption.[12] (Doc. No. 4-1 at 19.) Conflict preemption occurs when a state law "actually conflicts" with federal law. *Granite Rock*, 480 U.S. at 581. An actual conflict between the state law and federal law exists "when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* (internal citations omitted). Thus, "[t]here are two types of conflict preemption: (1) conflicts that prevent or frustrate the accomplishment of a federal objective, and (2) conflicts that make it impossible for private parties to comply with both state and federal law."[13] *Jones*, 73 F.4th at 644 (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000)) (internal quotation marks omitted).

Plaintiff contends that SB 1137 obstructs federal policy, specifically the oil and gas leasing programs authorized and directed by Congress under the MLA and FLPMA, and SB 1137 conflicts with federal land use policy under those statutes because it is an "impermissible land use regulation, not a reasonable environmental regulation." (Doc. No. 4-1 at 8, 21–27.) Before turning to the parties' arguments, the court provides an overview of federal policy under the MLA and FLPMA, as well as an overview of precedential court decisions addressing conflict preemption of state regulations in the context of mineral extractions on federal lands—namely, the Supreme Court's opinion in *Granite Rock* and the Ninth Circuit's decision in *Bohmker v. Oregon*, 903 F.3d 1029, 1040 (9th Cir. 2018).

### 1.   Federal Policy – the MLA and the FLPMA

The Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. §§ 181, *et seq.*, provides for the

---

[12] Express preemption occurs when "a federal statute includes an express preemption provision" that shows Congress intended to preempt state law. *Nat'l R.R. Passenger Corp. v. Su*, 41 F.4th 1147, 1152 (9th Cir. 2022). "Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy*, 584 U.S. at 479.

[13] As discussed further below, Plaintiff's motion advances arguments as to the first type of conflict preemption only. Although Plaintiff asserted at the March 20, 2026 hearing that both types of preemption apply, Plaintiff's motion does not offer any arguments regarding the second type of conflict preemption, nor does Plaintiff point to any evidence to show that it would be "impossible for private parties to comply with both state and federal law." *See Jones*, 73 F.4th at 644.

disposition of "leasable" minerals, including oil and gas, on federal land through a leasing process in which the Secretary of the Interior maintains title to the federal land and establishes lease terms, such as the duration of the lease, acreage limitations, royalty and rental terms, and other terms and conditions. 30 U.S.C. §§ 223–226. The leases issued under the MLA confer on lessees the right to explore for, drill, and produce oil and gas on the leased lands, subject to applicable federal regulations and lease terms. 30 U.S.C. § 226; (Doc. No. 1 at ¶ 20). Under the MLA, each lease must contain certain provisions relating to employment practices, diligence requirements, prevention of undue waste and monopoly, and safeguarding safety and public welfare. 30 U.S.C. § 187; *Ventura Cnty. v. Gulf Oil Corp.*, 601 F.2d 1080, 1085 (9th Cir. 1979), *aff'd*, 445 U.S. 947 (1980). The MLA clarified, however, that "[n]one of such provisions shall be in conflict with the laws of the State in which the leased property is situated." 30 U.S.C. § 187. Further, the MLA provides that "[n]othing in this chapter [Chapter 3A—Leases and Prospecting Permits] shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have, including the right to levy and collect taxes upon improvements, output of mines, or other rights, property, or assets of any lessee of the United States." 30 U.S.C. § 189.

The MLA also authorizes the Secretary "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter." 30 U.S.C. § 189. None of the code sections in Chapter 3A state the purposes of that chapter. Plaintiff points instead to another law passed by Congress "to establish a national mining and minerals policy," the Mining and Minerals Policy Act of 1970 (30 U.S.C.A. § 21a; Pub. L. No. 91-631, December 31, 1970, 84 Stat. 1876), which provides:

> The Congress declares that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs, (3) mining, mineral, and metallurgical research, including the use and recycling of scrap to promote the wise and efficient use of our natural and reclaimable mineral resources, and (4) the study and development of methods for the disposal, control, and reclamation of mineral waste products, and the reclamation of mined land, so as to lessen any adverse impact of mineral extraction and processing upon

17

> the physical environment that may result from mining or mineral activities. . . .
>
> It shall be the responsibility of the Secretary of the Interior to carry out this policy when exercising his authority under such programs as may be authorized by law other than this section.

30 U.S.C. § 21a; (*see* Doc. No. 4-1 at 13) (quoting 30 U.S.C. § 21a).

The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701, *et seq.*, requires the Secretary to "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a). The FLPMA further provides that "[t]he Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by [the Secretary]." *Id.* § 1732. The development criteria for land use plans requires the Secretary to, among other things, "provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans," and "to the extent consistent with the laws governing the administration of the public lands, coordinate . . . with the land use planning and management programs . . . of the States and local governments within which the lands are located." *Id.* § 1712(c)(8), (c)(9). Indeed, the FLPMA provides that "[l]and use plans of the Secretary under this section shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act." *Id.* § 1712(c)(9).

Further, in the FLPMA, Congress declared thirteen policy statements, including that:

> (1) the public lands be retained in Federal ownership, . . . ;
>
> (2) the national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts; . . .
>
> (7) goals and objectives be established by law as guidelines for public land use planning, and that management be on the basis of multiple use and sustained yield unless otherwise specified by law;
>
> (8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and

18

wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use;

(9) the United States receive fair market value of the use of the public lands and their resources unless otherwise provided for by statute;
. . .

(11) regulations and plans for the protection of public land areas of critical environmental concern be promptly developed;

(12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 U.S.C. 21a) as it pertains to the public lands;
. . .

*Id.* § 1701. In the statutory note to § 1701 laying out these policy statements, Congress also included a savings clause, stating "[n]othing in this Act shall be construed as . . . a limitation upon any State criminal statute or upon the police power of the respective States, or as derogating the authority of a local police officer in the performance of his duties, or as depriving any State or political subdivision thereof of any right it may have to exercise civil and criminal jurisdiction on the national resource lands; . . . ." Pub. L. No. 94–579 (S 507), October 21, 1976, 90 Stat. 2743.

2.    Supreme Court's Opinion in *Granite Rock*

In addressing claims that state regulations are preempted by federal laws governing mineral-extraction rights, the Supreme Court has distinguished between state land use regulations and state environmental regulations. *See Cal. Coastal Comm'n v. Granite Rock Co*., 480 U.S. 572, 587 (1987).

In *Granite Rock*, a developer who had obtained federal approval to mine limestone on national forest lands challenged a state law (the California Coastal Act), which required any person undertaking development in the coastal zone, including mining, to secure a permit from the California Coastal Commission. 480 U.S. at 576. The developer did not apply for a permit from the Commission and instead brought a declaratory relief action challenging that law as preempted by federal law and seeking to enjoin the Commission from compelling him to obtain a permit. *Id.* at 577. In that action, the plaintiff developer did not challenge a particular permit's conditions as conflicting with federal law; rather, the plaintiff mounted a broad facial challenge

19

"argu[ing] that any state permit requirement, whatever its conditions, was *per se* pre-empted by federal law" because the permit requirement is "an impermissible state land use regulation." *Id.* at 584, 593. On appeal of the district court's dismissal of the action, the Ninth Circuit reversed and held the law's permit requirement was preempted. *Id.* at 577. Thereafter, the Supreme Court reversed the Court of Appeal's decision that the state law was preempted and remanded the case for further proceedings. *Id.* at 594.

In its analysis, the Supreme Court assumed "for the purposes of [its] discussion and without deciding this issue," that the combination of the two federal land management statutes invoked in that case (the FLPMA and the National Forest Management Act) "pre-empts the extension of state land use plans onto unpatented mining claims in the national forest lands." *Id.* at 585. But that assumption did not end the court's analysis because the challenged state law granted the Commission with both land use and environmental regulatory authority, and the Commission asserted it would use the permit requirement to impose environmental regulations. *Id.* at 576, 585–86. The Supreme Court rejected the plaintiff's preemption argument because no "actual conflict" with the federal land management statutes was demonstrated by the "barren record" of the facial challenge to the permit requirement. *Id.* at 585–89. The Supreme Court analyzed the permit requirement as an environmental regulation and determined the Commission sufficiently identified a possible set of permit conditions it would impose for environmental regulation purposes (e.g., to regulate the quality of coastal waters, erosion, air pollution, and the impact on environmentally sensitive habitat areas)—conditions that are not preempted by federal law. *Id*. The Supreme Court emphasized that its "analysis is not altered by the fact that the Coastal Commission chooses to impose its environmental regulation by means of a permit requirement," and explained that

> [i]f the Federal Government occupied the field of environmental regulation of unpatented mining claims in national forests—concededly not the case—then state environmental regulation of Granite Rock's mining activity would be pre-empted, whether or not the regulation was implemented through a permit requirement. Conversely, if reasonable state environmental regulation is not pre-empted, then the use of a permit requirement to impose the state regulation does not create a conflict with federal law where none previously existed. The permit requirement itself is not talismanic.

*Id.* at 589.

The Supreme Court also recognized that "[t]he line between environmental regulation and land use planning will not always be bright," but "the core activity described by each phrase is undoubtedly different." *Id.* at 587. "Land use planning in essence chooses particular uses for the land." *Id.* Whereas "environmental regulation, at its core, does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits." *Id.*

The Supreme Court emphasized that "Congress has indicated its understanding of land use planning and environmental regulations as distinct activities," in particular through the FLPMA, which requires the Secretary to develop land use plans that provide for compliance with state pollution control laws and that are consistent with state land use plans "to the extent [the Secretary] finds practical." *Id.* at 587 (citing 43 U.S.C. § 1712(c)(8), (c)(9)). The Supreme Court reasoned that,

> Congress clearly envisioned that although environmental regulation and land use planning may hypothetically overlap in some instances, these two types of activity would in most cases be capable of differentiation. Considering the legislative understanding of environmental regulation and land use planning as distinct activities, it would be anomalous to maintain that Congress intended any state environmental regulation of unpatented mining claims in national forests to be *per se* pre-empted as an impermissible exercise of state land use planning. Congress' treatment of environmental regulation and land use planning as generally distinguishable calls for this Court to treat them as distinct, until an actual overlap between the two is demonstrated in a particular case.

480 U.S. at 588.

### 3.    Ninth Circuit's Decision in *Bohmker*

Following *Granite Rock*, the Ninth Circuit in *Bohmker* likewise "assum[ed] without deciding that federal law preempts the extension of state land use plans onto unpatented mining claims on federal lands." *Bohmker v. Oregon*, 903 F.3d 1029, 1031 (9th Cir. 2018).

In *Bohmker*, several gold miners with mining claims on federal lands challenged a state law enacted by Oregon to prohibit the use of motorized mining equipment in rivers and streams containing essential fish habitat, even on federal land, to protect threatened fish populations. *Id.* at

21

1031–32. In passing that law, the Oregon legislature made findings that "recognize both the state's rich tradition of small scale prospecting and mining and its environmental interest in protecting water quality and fish habitat," including recognizing that: "[m]ining that uses motorized equipment in the beds and banks of the rivers of Oregon can pose significant risks to Oregon's natural resources, including fish and other wildlife" and such mining "[b]etween 2007 and 2013, . . . increased significantly, raising concerns about the cumulative environmental impacts." *Id.* at 1032. The plaintiff miners alleged that because their federal mining claims are located in the essential salmonid habitat and they "use a form of motorized mining known as suction dredging to search for and extract gold deposits in rivers and streams," the state law would prevent them from mining on their federal mining claims, thereby interfering with federal mining policy. *Id.* at 1032–33. The plaintiffs argued that the Oregon law was "conflict preempted" by federal mining laws because: the law constitutes a state land use regulation; the law is prohibitory, not regulatory; and the law does not constitute a reasonable state environmental regulation. *Id.* at 1040. The Ninth Circuit rejected those arguments and held that the challenged Oregon law was not preempted because that law "constitutes an environmental regulation, not a state land use planning law," and the law "does not stand as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* at 1031. To the contrary, the federal mining laws invoked by the miners "in the aggregate, reflect Congress' intent to foster a productive mining industry but also its intent to protect the environment," and those federal laws "require miners to comply with state laws, including state environmental laws." *Id.* at 1039 (citation omitted).

The Ninth Circuit drew from the Supreme Court's decision in *Granite Rock*, which "made clear 'that reasonable state environmental regulation is not pre-empted.'" *Id.* at 1040 (quoting *Granite Rock*, 480 U.S. at 587). In determining that the Oregon law was "precisely the kind of reasonable state regulation that the Supreme Court recognized in *Granite Rock*," the Ninth Circuit found that the law "does not choose or mandate land uses, has an express environmental purpose of protecting sensitive fish habitat, is not part of Oregon's land use system[,] and is carefully and reasonably tailored to achieve its environmental purpose without unduly interfering with mining

22

operations." *Bohmker*, 903 at 1040. In doing so, the Ninth Circuit rejected the miners' argument that the Oregon law constitutes a state land use planning law due to its "prohibition" on a particular "use" of the land (motorized mining) within a particular "zone" (essential salmonid habitat), because the Oregon law does not in fact mandate particular uses of the land, it "simply restricts one method of mining." *Id.* at 1041–42. The miners also argued that the Oregon law does not constitute environmental regulation since it does not proscribe limits on environmental damage, such as imposing pollution standards, but the Ninth Circuit rejected that argument as well because standards are not the only form of environmental regulation; "environmental regulation may take many forms." *Id.* at 1042. The Ninth Circuit emphasized that the *Granite Rock* opinion "does not purport to define the entire universe of environmental regulation as consisting solely of limit-prescribing standards." *Id.* Moreover, the court noted that the miners' arguments overlooked the Oregon law's "obvious and important environmental purpose." *Id.* at 1043.

In addition, the Ninth Circuit acknowledged that the Oregon law "will adversely impact the ability of some miners to extract gold deposits from their mining claims," "[b]ut these impacts are the unavoidable consequences of a federal scheme that seeks to foster both the development of valuable mineral resources and proper stewardship and protection of the nation's natural resources." *Id.* at 1040. Further, although the miners did not argue that the Oregon law constitutes a land use regulation "simply because it may render some of their mining claims commercially impracticable," the Ninth Circuit nevertheless emphasized that "the preemption inquiry does not turn on profitability." *Id.* at 1040–41. Indeed, the Ninth Circuit squarely rejected a "commercial impracticability test" as being irreconcilable with *Granite Rock*, because:

> "[v]irtually all forms of . . . regulation of mining claims—for instance, limiting the permissible methods of mining and prospecting in order to reduce incidental environmental damage—will result in increased operating costs," virtually every environmental regulation will render at least some mining claims commercially impracticable, and virtually every environmental regulation would therefore be preempted under a commercial impracticability test.

*Id.* at 1040 (quoting *Clouser v. Espy*, 42 F.3d 1522, 1530 (9th Cir. 1994)).

In addition, the Ninth Circuit was not persuaded by the miners' attempt to distinguish

between regulations that are "prohibitory" and those that are "regulatory" in their "fundamental character," for the purpose of deeming "prohibitory" state environmental regulations to be categorically preempted. 903 F.3d at 1047–48. As an initial matter, the Ninth Circuit found that such a distinction would likely be unworkable, and in any event, regardless of a state regulation's fundamental character, the regulation is not preempted "so long as it does not pose an obstacle to Congressional purposes or make compliance with federal law physically impossible." *Id.* at 1047 (citation omitted). Further, the Ninth Circuit rejected the miners' contention that the Oregon law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress merely because it 'prohibits' a particular method of mining in the portions of rivers and streams containing essential habitat for threatened and endangered salmonids." *Id.* at 1049. The Oregon law "is clearly intended to protect the natural environment by prohibiting the use of particular mining methods or equipment in carefully designated locations" and thus "is not so at odds with Congress's purposes that it is preempted by federal law." *Id.* (citation omitted).

With the precedential decisions of *Granite Rock* and *Bohmker* in mind, the court turns to whether Plaintiff is likely to succeed on the merits of its conflict preemption claim.

                4.        <u>Whether SB 1137 "Actually Conflicts" with the MLA and the FLPMA</u>

To succeed on the merits of its preemption claim, Plaintiff must ultimately establish that SB 1137 actually conflicts with federal law, namely the MLA and the FLMPA. For the reasons discussed below, Plaintiff has not persuaded the court that it is likely to do so.

As a preliminary matter, Plaintiff does not advance any arguments regarding the second type of conflict preemption—"conflicts that make it impossible for private parties to comply with both state and federal law." *Jones*, 73 F.4th at 644 (citation omitted). Thus, the court focuses only on the first type of conflict preemption—"conflicts that prevent or frustrate the accomplishment of a federal objective." *Id.*

Plaintiff argues that SB 1137 prevents or frustrates the accomplishment of federal mining policy, specifically the leasing of federal lands for fossil fuel development as provided under the MLA and FLMPA. (Doc. No. 4-1 at 21.) Given that those federal statutes evince Congress's intent to promote fossil fuel development on federal lands, Plaintiff contends SB 1137

24

contravenes that federal policy by prohibiting the development of fossil fuel resources in HPZs and "is a de facto ban on all new development activities . . . in HPZs." (Doc. No. 4-1 at 22–24.) But this contention is based on several mischaracterizations of SB 1137.

First, SB 1137 does not ban new oil and gas wells on all federal land in California—the restriction on approvals for NOIs applies only in statutorily-defined health protection zones, which, even assuming Plaintiff's proffered calculations are accurate, impacts only 218 leases (35%) and 17.2% of the acres BLM leased for oil and gas development. (Doc. No. 4-2 at ¶ 17.) Moreover, on those impacted leases, Plaintiff approximates there are 2,047 active wells, representing 16.5% of all active wells on leased land. (*Id.* at ¶ 18.) Against its own numbers and percentages, Plaintiff's characterization of SB 1137 as a de facto ban is a considerable stretch. At most, Plaintiff's "de facto ban" characterization would apply to the 79 leases out of 616 (12.8%) that are located entirely within HPZ. (*See id.* at ¶ 17.) Though, even on those 79 leases, operators are not prohibited from continuing to operate existing wells. Further, given the statutory exception for "approvals of notices of intention necessary . . . to comply with a court order finding that denying approval would amount to a taking of property," Cal. Pub. Res. Code § 3281(a)(2), it is doubtful that SB 1137 constitutes a de facto ban on new oil and gas drilling within those 79 leases.

As to existing wells located within HPZs, Plaintiff argues that SB 1137 operates as a de facto ban on current and future maintenance necessary to continue development activities on those wells. (Doc. No. 4-1 at 24.) But there is also a statutory exemption for "approvals of notices of intention necessary . . [t]o prevent or respond to a threat to public health, safety, or the environment," Cal. Pub. Res. Code § 3281(a)(1), and CalGEM has approved approximately 77 permit exceptions for existing wells within an HPZ, primarily to repair damaged casing," including "an exception request to repair a well located on a BLM lease." (Doc. No. 9-2 at ¶ 7.)

Second, Plaintiff's argument rests on inaccurate representations of SB 1137's provisions. For example, Plaintiff asserts that "[e]ven some fossil fuel resources outside of HPZs are undevelopable because operators must place infrastructure within an HPZ to support production outside of HPZs, and Sections 3281(a)–(b) categorically bar such infrastructure where an NOI is

required—which is true for almost all infrastructure." (Doc. No. 4-1 at 16.) In addition, to support its argument that SB 1137 is not an environmental regulation, Plaintiff asserts that "even a pipeline—a 'facility' that produces no emissions—is prohibited within an HPZ." (Doc. No. 19 at 9.) Some of the operators who provided declarations on which Plaintiff relies also appear to believe that SB 1137 precludes production facilities in HPZs. One operator, E&B, states that because of SB 1137, it cannot expand an existing production facility that is located within an HPZ to process the oil and gas produced from another lease that is not located within an HPZ. (Doc. No. 4-5 at 5.) Similarly, the Director of NOPEC states that "attendant production equipment— such as tanks, flowlines, gathering lines, wellheads, pumps, compressors, and pipelines" that are on lands adjacent to wells to service drilling activities and resource collection (i.e., a production facility), are prohibited within a HPZ, "even where the related drilling operations are located outside HPZ boundaries." (Doc. No. 4-9 at 1.) But by the statute's own terms, "[n]o new production facilities shall be constructed or operated in a health protection zone *unless associated with a notice of intention approved* pursuant to subdivision (a) or as determined by the division to be necessary to protect public health and safety." Cal. Pub. Res. Code § 3281(b) (emphasis added). In other words, a new production facility can be constructed and operated within an HPZ if that facility is associated with a NOI that was approved by CalGEM. Indeed, the implementing regulations confirm that new production facilities are not completely banned from HPZs. Rather, construction or operation of a new production facility cannot commence unless CalGEM has verified *at least one* of the following:

> (1) The production facility is outside of a Health Protection Zone.

> (2) The production facility is associated with a notice of intention that was approved by [CalGEM] under Public Resources Code section 3281, subdivision (a).

> (3) [CalGEM] has determined that the production facility is necessary to protect public health and safety.

14 Cal. Code Regs. § 1765.5(b) (emphasis added). Thus, contrary to Plaintiff's characterization of SB 1137, new production facilities are not wholly prohibited from HPZs; new facilities may be constructed or operated if they are associated with NOI-approved existing wells within an HPZ,

26

NOI-approved existing wells outside an HPZ, NOI-approved new wells outside an HPZ, and even NOI-approved wells within an HPZ.

Third, Plaintiff frames SB 1137 as a bar on accessing oil and gas resources within HPZs (Doc. No. 4-1 at 24), even though SB 1137 precludes only the drilling of new wells on the surface of the land; it does not preclude alternative methods of accessing the oil and gas located in an HPZ, such as horizontal or directional drilling methods. Plaintiff acknowledges that these methods exist but contend they "often provide no relief because they are physically impossible, economically infeasible, or both, due to the physical characteristics of the land and oil." (*Id.*) To support that contention, Plaintiff cites to the declarations of operator E&B and operator Termo. (*Id.*) As to the physical impossibility of horizontal and directional drilling, neither declaration supports Plaintiff's contention. The E&B declaration does not assert that horizontal drilling is physically impossible; rather, E&B explains why horizontal wells are a "poor choice" and an inefficient method for accessing minerals in a "reservoir with undulating structural contours" like the reservoir of its proposed project. (Doc. No. 4-5 at ¶¶ 13–17.) The Termo declaration specifically referred to a single proposed well that is located within an HPZ, and in the context of that specific well, Termo declared that the minerals under the surface at that location "cannot be extracted using techniques such as horizontal drilling" because "the geologic formations in the area prevent access to these underground hydrocarbons via directional drilling at a distance." (Doc. No. 4-7 at ¶¶ 8–9.) This conclusory assertion, without supporting evidence, is not sufficient to support Plaintiff's argument regarding physical impossibility. Moreover, countering Plaintiff's unsupported assertion, Defendants point to the declaration of the District Deputy at CalGEM, who states that "[d]irectional and horizonal wells are currently being used in most oil fields in California to some extent," (Doc. No. 9-2 at ¶ 10), clearly suggesting those methods are not physically impossible. Plaintiff's contention that horizontal drilling methods are economically infeasible fares no better. Plaintiff again cites to the declaration of operator E&B, which sought to drill new wells using thermal steam injection techniques and states that "horizontal drilling is not an economical recovery method" for its proposed project because "horizontal wells cannot efficiently achieve the steam patterns necessary for heavy oil recovery," and "the lack of

27

consistent steam sweep across the lateral makes horizontal wells less effective at pushing oil toward producers." (Doc. No. 4-5 at ¶¶ 13–17.) Plaintiff also cites to the declaration of Termo, which has one well in an HPZ on its lease and states that "even if extraction from outside the HPZ were physically possible, it would be economically infeasible, because the high cost of such complex drilling work would not make extractions financially viable for Termo." (Doc. No. 4-7 at ¶¶ 8–9.) While these declarations support Plaintiff's argument, they nonetheless confirm that Plaintiff's argument is grounded in the commercial impracticability theory that the Ninth Circuit rejected in *Bohmker*. *See* 903 F.3d at 1040. Here, as in *Bohmker*, the court recognizes that SB 1137 will "adversely impact the ability of some [lessess] to extract [oil and gas] deposits from their [leased land]," *see id*., and may "result in increased operating costs," *id.* at 1041, but those effects are not a sufficient basis to deem SB 1137 a complete ban on oil and gas development in contravention of federal policy.

Fourth, Plaintiff portrays the federal policy of the MLA and FLPMA through a zoomed-in lens focused on Congress's intent to develop fossil fuels on federal land and establish a multi-use management of public lands in which "it is the policy of the United States that . . . the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals," which includes oil and gas. (Doc. No. 4-1 at 12–13, 22.) But the need for domestic sources of oil and gas is but one of thirteen policy statements—the twelfth statement—declared in the FLPMA. 43 U.S.C. § 1701(a)(12). Other policy statements indicate Congress's intent with regard to environmental concerns, including that:

> the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8). Plaintiff essentially suggests that because "the United States has the right to choose uses for every square inch of its land," (Doc. No. 19 at 6), any state regulation that would interfere with oil and gas extraction to the maximum extent possible on all BLM-leased land necessarily runs afoul of Congress's intent. But as the Ninth Circuit highlighted in *Bohmker*,

28

"federal law does not show that Congress 'viewed mining as the highest and best use of federal land wherever minerals were found.'" 903 F.3d at 1040 (quoting *People v. Rinehart*, 1 Cal. 5th 652, 672 (2016)). The court does not find SB 1137 to conflict with federal policy under the MLA and FLMPA merely because its regulations may result in less than maximum extraction of oil and gas on federal leased land. Plaintiff has not persuaded the court that it is likely to succeed in showing that SB 1137 "prevent[s] or frustrate[s] the accomplishment of a federal objective," *Jones*, 73 F.4th at 644, as required to prevail on this type of preemption claim. To the contrary, given Congress's express intent to manage lands with "multi-use" management plans, and Congress's stated policy goals, including managing public lands "in a manner that will protect the quality of . . . environmental, air . . . values; . . . and that will provide for . . . human occupancy and use," SB 1137 arguably furthers federal objectives rather that preventing or frustrating them.

Fifth and relatedly, Plaintiff argues that SB 1137's categorical prohibition on new fossil fuel development within HPZs functions "as a blanket land-use ban (like a zoning ordinance), not a conditional environmental safeguard." (Doc. No. 4-1 at 25.) Plaintiff argues that because Congress allows specific uses for land (oil and gas drilling) under the MLA and FLPMA, SB 1137 operates as a land-use regulation, rather than a reasonable environmental regulation, and therefore bars or frustrates those specific uses authorized by federal land use policy. (*Id.*) While Plaintiff maintains its position that SB 1137 is a land-use regulation, Plaintiff nevertheless argues that even if SB 1137 were construed as an environmental regulation, SB 1137 would not be "justified" because it does not impose emissions standards and lacks "connection to any substantive environmental benchmarks." (Doc. No. 4-1 at 26.) But this argument fails in large part because it ignores the precedent of *Granite Rock* and *Bohmker*. In *Bohmker*, the Ninth Circuit acknowledged that "environmental regulation may take many forms," including a "prohibition" on the "use" of land in a particular "zone." 903 F.3d at 1041–42. And in *Granite Rock*, the Supreme Court emphasized that the challenged state law constituted an environmental regulation even though the law required "permits" for development within particulars "zones." 480 U.S. at 589.

SB 1137 does not impose emissions standards, but it does limit the environmental and

29

health impacts of emissions from oil and gas development on nearby populations. Therefore, like the Oregon law at issue in *Bohmker*, SB 1137 has a "obvious and important environmental purpose." *See* 903 F.3d at 1043. Indeed, that purpose is reflected by the findings declared by the California Legislature in passing SB 1137. 2022 Cal. Stat. ch. 365 (S.B. 1137) § 1. In particular, the Legislature found that "a growing body of research shows direct health impacts from proximity to oil extraction," "[p]roximity to oil and gas extraction sites pose significant health risks, especially due to increased air pollution," and "studies have shown evidence of harm at distances less than one kilometer, which is approximately 3,200 feet." 2022 Cal. Stat. ch. 365 (S.B. 1137) § 1(a), (c), (d). Moreover, the scientific studies underlying those findings highlighted significant adverse health effects of nearby oil and gas development. Based on those studies, a panel of public health and environmental experts concluded with a high level of certainty that there is a causal relationship between close geographic proximity to oil and gas development and adverse perinatal and respiratory outcomes, and that "health-damaging air pollutants, including [six EPA-regulated] criteria air pollutants and toxic air contaminants, are more concentrated near [oil and gas development] activities compared to further away." (Doc. No. 9-1 at 57; 64.) Importantly, the 3,200 feet (1km) distance was not an arbitrary line drawn by the Legislature, lacking connection to the asserted environmental protection purpose; rather, that distance was also supported by the scientific studies. As the panel stated in its report, "studies consistently demonstrate evidence of harm at distances less than 1km." (Doc. No. 9-1 at 65.) For these reasons, the court is not persuaded by Plaintiff's argument that SB 1137 is a land use regulation, not a reasonable environmental regulation.

In sum, Plaintiff has not met its burden of showing it is likely to establish SB 1137 actually conflicts with federal law, as is required to obtain a preliminary injunction based on its preemption claim. Thus, Plaintiff has not satisfied the first *Winter* factor and its motion for a preliminary injunction will be denied. While the court need not address the remaining *Winter* factors, the court finds it appropriate to also briefly address the parties' arguments on irreparable harm.

/////

30

**B.** **Whether Plaintiff is Likely to Suffer Irreparable Harm**

"A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights[,] a plaintiff demonstrates the lack of need for speedy action." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (citation omitted) (explaining that "in assessing the relative hardship to the parties and the history of their dilemma, we are mindful that for reasons unexplained, [the plaintiff] delayed five years before taking any action"). A plaintiff's "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (finding no irreparable harm established in part because the challenged contractual provisions had been included in the sales contracts for several years). Thus, "[a] delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief," though courts are "loath to withhold relief solely on that ground." *Lydo Enters.*, 745 F.2d at 1213–14. But "[t]he significance of the delay depends on context." *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1006 (9th Cir. 2023) (providing as an example in a trademark infringement case, "in the context of a preliminary injunction, a three-year delay between when the trademark holder learned of the infringement and when it filed suit revealed that any injury that the trademark holder would suffer before trial on the merits would be a relatively short extension of the injury that the trademark holder knowingly suffered for three years before it filed suit"); *see also qilehuikejiyouxiangongsi v. Oralic Supplies, Inc.*, No. 25-cv-9657-PA, 2026 WL 184225, at *3 (C.D. Cal. Jan. 16, 2026) (denying preliminary injunction and emphasizing the movant's "failure to seek injunctive relief until December 2025, years after [the opposing party] began selling the Accused Product and months after this case was filed, severely undercuts [the] claim of irreparable harm").

Further, to obtain a preliminary injunction, Plaintiff must show that the risk of irreparable harm is "likely, not just possible." *All. for the Wild Rockies*, 632 F.3d at 1131. That is, "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis

31

omitted).

Here, Plaintiff has not shown that the risk of irreparable injury is likely nor that the issuance of the requested preliminary injunction would serve to prevent such immediate threatened injury.

First, Plaintiff has not demonstrated a need for speedy action through court intervention. Plaintiff filed this declaratory and injunctive relief action on January 14, 2026—over four years after SB 1137 was enacted. While the implementation of SB 1137 was paused shortly after the law was enacted due to a ballot referendum, the stay of implementation was lifted in June 2024, and the law has been continuously in effect since then—a year and a half before Plaintiff filed its complaint and motion for a preliminary injunction. Notably, Plaintiff's motion for a preliminary injunction is silent about this delay, and it offered no explanation for why preliminary injunctive relief is being sought after all this time has passed. As emphasized in Defendant's opposition and Proposed Intervenors' amicus brief, Plaintiff's assertions of irreparable harm are undercut by their substantial delay in challenging SB 1137 and seeking preliminary injunctive relief. (Doc. Nos. 9 at 24; 12 at 27.) In its reply, Plaintiff downplays its delay as being "insubstantial" (Doc. No. 19 at 19), but none of its explanations justify excusing its lengthy delay in seeking preliminary injunctive relief.

Plaintiff contends, somewhat bizarrely, that it could not have known whether SB 1137 applied to federal lands because SB 1137 and its implementing regulations are "silent as to their application to federal lands." (Doc. No. 19 at 19.) To be sure, the statutory provisions added by SB 1137 did not carve out any exceptions for federal land or leases on federal land nor otherwise distinguish public and private land. Yet Plaintiff argues that the *absence* of such exceptions might nonetheless have meant that the State intended to exempt federal lands from SB 1137's provisions, and therefore, based on the text of the statute, Plaintiff could not have known that SB 1137 applied to federal lands. (*Id.*) Plaintiff implies that it did not learn of the State's intentions to enforce SB 1137 on federal lands until February 20, 2025, when CalGEM made the State's intentions clear at a monthly meeting between CalGEM and members of the California Independent Petroleum Association. (Doc. No. 19 at 19) (citing Doc. No. 4-7 at 1–2.) Plaintiff's

attempted justification for the delay between full implementation in June 2024 and February 2025 is simply that it did not know whether the State intended to apply SB 1137 to federal lands. (Doc. No. 19 at 19.) Even crediting this date and explanation, Plaintiff delayed challenging SB 1137 in court for nearly a year.

Plaintiff further attempts to explain away some of its delay by asserting that "[b]ecause CalGEM refused to act on federal lessees' NOIs, the United States could not know . . . whether SB 1137's setback provisions would apply to federal lands." (*Id.*) But to support this assertion, Plaintiff cites only to the declaration of one operator, Termo, who submitted a NOI application for a single well (out of 107 wells) in May 2024 (while implementation of SB 1137 was stayed), and that application has been held in abeyance by CalGEM. (Doc. No. 19 at 19) (citing Doc. No. 4-7 at 3). Notably though, Termo added that single well to its Idle Well Management Plan in June 2025, suggesting Plaintiff was aware of CalGEM's inaction by June 2025. (Doc. No. 4-7 at 3.) Moreover, as noted above but not mentioned by Termo in its declaration or by Plaintiff in its motion, Termo brought its own lawsuit against Defendants in April 2025, also alleging SB 1137 is preempted by federal law insofar as it purports to apply to federal lands. Termo did not seek preliminary injunctive relief, and the United States did not seek to intervene in that lawsuit. Thus, Plaintiff's assertion—that its delay was justified because it did not realize SB 1137 applied to federal lands until CalGEM failed to act on Termo's NOI application—is not well taken.

Lastly, Plaintiff contends its delay was due in part to the need for Plaintiff to gather information and obtain authorization to sue from multiple federal departments, a process that "was slowed by a six-week lapse in federal appropriations." (Doc. No. 19 at 19.) While the court can appreciate the need to prepare to file a lawsuit and the time it may take for multiple levels of approval to be obtained, the court notes that the complaint in this case is only 14 pages in length with approximately 20 pages of exhibits comprised of the text of SB 1137 and maps, which suggest that this case is not a factually complex, investigation-heavy dispute that would call for extensive pre-filing preparation. (*See* Doc. No. 1.)

For these reasons, the court finds that Plaintiff's substantial delay in filing this action and

seeking preliminary injunctive relief severely undercuts its assertions of irreparable harm.

Second, the purported irreparable harm that Plaintiff describes with regard to the impact of SB 1137 on oil and gas leasing on federal lands is speculative and unlikely to be prevented by the issuance of a preliminary injunction.

Plaintiff relies in large part on the declaration of Mr. Warren, who merely predicts what *might* happen: "[f]ederal revenues from oil and gas leasing in California may decline as a direct or indirect result of SB 1137's setback provision, which could deter bidders from competing for Federal leases," and "[t]hese revenue losses could compound over time . . . ." (Doc. No. 4-3 at ¶ 25.) Mr. Warren's predictions are predicated further on what operators "may" do: "BLM anticipates that the setback provisions of SB 1137 will create significant regulatory uncertainty for federal lessees and operators," who "may" reduce their participation in federal lease auctions, "may" seek royalty rate reductions, "may" request suspensions of operations and/or production thereby potentially decreasing federal revenues, "may" become unable to diligently explore or develop the federal lease, and "may" prematurely abandon operations. (Doc. No. 4-3 at ¶¶ 27, 28.) Such "[s]peculative injury does not constitute irreparable injury." *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).

Critically, BLM is "currently" not leasing federal land in California for oil and gas development due to a settlement agreement reached in (unspecified) litigation that challenged BLM's resource management plans. (Doc. No. 4-2 at ¶ 8.) At the hearing on the motion, Plaintiff was unable to clarify when its own "pause" on issuing new leases began, but Defendants confirmed the pause began in 2016—a decade ago. Moreover, BLM's representations show that leasing is not poised to resume imminently, as it has only "begun" the environmental review process that "could result in reinitiation of leasing" and "could potentially allow BLM to resume oil and gas leasing." (*Id.* at ¶¶ 9–12.) Thus, Plaintiff's contention that SB 1137 is to blame for prospective operators' reluctance to bid on leases and for any decreases in leasing revenue is misleading. If BLM is not currently leasing, then enjoining enforcement of SB 1137 during the pendency of this litigation would serve no purpose in preventing such alleged harm to Plaintiff.

At bottom, Plaintiff's irreparable harm allegation is based on the "uncertainties" caused by

34

SB 1137. For example, Plaintiff asserts that "the uncertainty surrounding potential future HPZ designations discourages current operators with federal leases from making the investments necessary to develop federal fossil fuel resources." (Doc. No. 4-1 at 17.) Plaintiff also asserts that "SB 1137 deters prospective bidders from participating in lease sales, diminishes competition, and reduces the long-term value of federal fossil fuel resources." (*Id.* at 8.) But those uncertainties remain whether or not the court grants a preliminary injunction enjoining enforcement of SB 1137. By definition, a preliminary injunction is in place only while the litigation is pending. Even if a preliminary injunction is issued, that does not guarantee a permanent injunction will follow when the litigation concludes. None of the allegedly harmful effects would be prevented or remedied by a preliminary injunction given that the uncertainties underlying each of them would remain.

Finally, though Plaintiff contends that it satisfies the irreparable harm *Winter* factor because it "suffers per se irreparable harm when states violate its laws," (Doc. No. 19 at 17), the court has already determined Plaintiff has not shown it is likely to succeed on its preemption claim. Consequently, Plaintiff cannot rely on preemption as the basis for its irreparable harm.

Having found Plaintiff has not satisfied the first and second *Winter* factors, the court need not address the remaining factors.

### CONCLUSION

For the reasons explained above, Plaintiff's motion for a preliminary injunction (Doc. No. 4) is DENIED.

IT IS SO ORDERED.

Dated:   **March 30, 2026**

Dena Coggins
United States District Judge