ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BENJAMIN HAYES
Deputy Assistant Attorney General

DUSTIN J. WEISMAN (CO Bar #44818)
JENNIFER R. LAKE (CO Bar #53141)
Trial Attorneys
Natural Resources Section
Energy and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (303) 844-1369
Facsimile: (303) 844-1350
Email: dustin.weisman@usdoj.gov
Email: jennifer.lake2@usdoj.gov

ERIC GRANT
United States Attorney
Eastern District of California

*Attorneys for the United States*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>Defendants. | Case No. 2:26-cv-00107-DC-SCR<br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: November 20, 2026<br>Time: 1:30 p.m.<br>Judge: Hon. Dena M. Coggins<br>Magistrate Judge: Hon. Sean C. Riordan |

**Table of Contents**


INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Federal Regulatory Framework ........ 2

A. Federal Land Policy and Management Act ........ 2

B. Mineral Leasing Act ........ 3

II. California's Regulatory Framework ........ 5

III. SB 1137's Effects on Federal Lands and Leases ........ 7

IV. Procedural Background ........ 8

APPLICABLE LAW ........ 9

STANDARD OF REVIEW ........ 9

ARGUMENT ........ 10

I. The United States is likely to succeed on the merits ........ 10

A. SB 1137 is Preempted Because Congress has Occupied the Field ........ 10

1. Congress has Occupied the Field of Federal Land Use ........ 11

2. Alternatively, SB 1137 is Preempted Because Congress has Occupied the Field of Oil and Gas on Federal Lands ........ 14

B. At Minimum, SB 1137 is Preempted of Conflict Preemption ........ 16

1. SB 1137 Stands as an Obstacle to the Accomplishment and Execution of the Full Purposes and Objectives of Congress ........ 16

2. Federal Lessees Cannot Comply with Both Federal Law and SB 1137 ........ 19

II. The United States is suffering, and will continue to suffer, irreparable harm ........ 21

III. The balance of the equities and the public interest favor injunctive relief ........ 24

CONCLUSION ........ 25

## Table of Authorities

Page(s)

**Cases**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ........ 10

*Arizona v. United States*,
567 U.S. 387 (2012)........ 9, 11, 15

*Barahona-Gomez v. Reno*,
167 F.3d 1228 (9th Cir. 1999) ........ 9

*Bohmker v. Oregon*,
903 F.3d 1029 (9th Cir. 2018) ........ 10, 11, 13, 14, 15, 18, 19

*Brubaker v. Board of County Commissioners,*
652 P.2d 1050 (Colo. 1982)........ 18

*Butte City Water Co. v. Baker*,
196 U.S. 119 (1905)........ 19

*Cal. Coastal Comm'n v. Granite Rock Co.*,
480 U.S. 572 (1987)........ 9, 10, 11, 12, 14, 16

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ........ 23

*Chamber of Com. of U.S. v. Edmonson*,
594 F.3d 742 (10th Cir. 2010) ........ 25

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)........ 9, 19, 20

*Daimler Truck N. Am., LLC v. Cal. Air Res. Bd.*,
No. 25-cv-02255, 2025 U.S. Dist. LEXIS 215580 (E.D. Cal. Oct. 31, 2025)........ 22

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990)........ 15

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992)........ 15

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000)........ 19

*Gibbons v. Ogden,*
22 U.S. 1 (1824)........ 9

*Hancock v. Train*,
426 U.S. 167 (1976)........ 13

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987) ... 16

*Kleppe v. New Mexico*,
426 U.S. 529 (1976) ... 2, 17

*Mut. Pharm. Co. v. Bartlett*,
570 U.S. 472 (2013) ... 20, 21

*Nat'l Fed. of the Blind v. United Airlines, Inc.*,
813 F.3d 718 (9th Cir. 2016) ... 10, 14, 15

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ... 13

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
491 U.S. 350 (1989) ... 22

*Nken v. Holder*,
556 U.S. 418 (2009) ... 24

*Pub. Lands Council v. Babbitt*,
529 U.S. 728 (2000) ... 5

*Rocky Mountain Oil & Gas Ass'n v. Watt*,
696 F.2d 734 (10th Cir. 1982) ... 11

*S.D. Mining Ass'n v. Lawrence Cnty.*,
155 F.3d 1005 (8th Cir. 1998) ... 10, 17, 19

*Silkwood v. Kerr-McGee Corp.*,
464 U.S. 238 (1984) ... 9

*U.S. Philips Corps. v. KBC Bank N.V.*,
590 F.3d 1091 (9th Cir. 2010) ... 25

*United States v. Arizona*,
641 F.3d 339 (9th Cir. 2011) ... 1, 22

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ... 24

*United States v. City & Cnty. of San Francisco*,
310 U.S. 16 (1940) ... 2

*United States v. Gardner*,
107 F.3d 1314 (9th Cir. 1997) ... 11

*United States v. Oakland Cannabis Buyers' Coop.*,
532 U.S. 483 (2001) ... 24

*Ventura Cnty. v. Gulf Oil Corp.*,
601 F.2d 1080 (9th Cir. 1979) ... 5, 9, 15, 17, 18

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000) ........ 22

*Wallis v. Pan Am. Petroleum Corp.*,
384 U.S. 63 (1966) ........ 15

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 10, 21

**Statutes**

16 U.S.C. § 1536(a)(2) ........ 5

30 U.S.C. § 21a ........ 3, 16

30 U.S.C. § 226 ........ 3, 4

30 U.S.C. § 226(a) ........ 2

30 U.S.C. § 226(a)(1) ........ 4

30 U.S.C. § 226(a)-(b) ........ 16

30 U.S.C. § 226(b)(1)(A) ........ 2, 4, 24

30 U.S.C. § 226(e) ........ 4, 20, 21

30 U.S.C. § 226(f) ........ 4

30 U.S.C. § 226(f)-(g) ........ 20

30 U.S.C. § 226(g) ........ 5

30 U.S.C. § 226(p) ........ 20

30 U.S.C. §§ 181-287 ........ 2

42 U.S.C. § 4332 ........ 5

42 U.S.C. § 7506(c) ........ 5

43 U.S.C. § 1701(a)(12) ........ 3

43 U.S.C. § 1701(a)(8) ........ 3

43 U.S.C. § 1732(a) ........ 3, 5

43 U.S.C. §§ 1701-87 ........ 2

CAL. PUB. RES. CODE § 3010 ........ 7

CAL. PUB. RES. CODE § 3106 (West 2026) ........ 5, 6

CAL. PUB. RES. CODE § 3281(a)-(b) ........ 8, 12, 25

CAL. PUB. RES. CODE §§ 3236-3236.6 ........ 7

Pub. L. No. 66-146, 41 Stat. 437 (1920) ........ 3
Pub. L. No. 95-95, 91 Stat. 685 (1977) ........ 13
U.S. CONST. art. IV, § 3, cl. 2 ........ 2
U.S. CONST. art. VI, cl. 2 ........ 9

**Regulations**

43 C.F.R. § 1601.0-5(n) (2026) ........ 2
43 C.F.R. § 3101.12 ........ 4
43 C.F.R. § 3120.12(a) ........ 4
43 C.F.R. § 3120.1-2(a) ........ 2
43 C.F.R. § 3160.0-5 ........ 4
43 C.F.R. § 3162.3-1(c)-(h) ........ 20
43 C.F.R. § 3162.3-1(d)-(f) ........ 20
43 C.F.R. § 3162.3-1(e), (h) ........ 4
43 C.F.R. § 3162.3-1(g) ........ 4
43 C.F.R. § 3162.5-1(a) ........ 5, 20
43 C.F.R. § 3171.12(a) ........ 5
43 C.F.R. §§ 1610.2-1610.3-1 ........ 3
CAL. CODE REGS. tit. 14, § 1714 (West 2026) ........ 5, 6
CAL. CODE REGS. tit. 14, § 1720(b) ........ 7
CAL. CODE REGS. tit. 14, §§ 1765.3, 1765.5(b) ........ 25

**Other Authorities**

1 Am. Law. Zoning § 9:58 (5th ed.), Patricia E. Salkin ........ 12

**List of Attachments**

1. *Governor Newsom Takes Action to Phase Out Oil Extraction in California*, Office of Governor Gavin Newsom, dated Apr. 23, 2021
2. Hearing on the Analysis of SB 1137 before the Assemb. Comm. On Nat. Res., 2021-2022 Reg. Sess. (Cal. Aug. 29, 2022)
3. *Response to CalGEM Questions for the California Oil and Gas Public Health Rulemaking Scientific Advisory Panel*
4. Staff of the S. Rules Comm., Bill Analysis of SB 1137, 2021-2022 Leg. Reg. Sess. (Cal. Aug. 30, 2022)
5. Assembly Floor Analysis of SB 1137, 2021-2022 Leg. Reg. Sess. (Cal. Aug. 30, 2022)
6. CalGEM Website, *California Oil & Gas Permits*, dated June 11, 2026
7. CalGEM Website, *Frequently Asked Questions*, dated June 11, 2026
8. CalGEM Website, *FAQ for Local Government & Planning Bodies on SB 1137*, dated June 11, 2026
9. Declaration of Jeremiah Karuzas, BLM California State Office
10. CalGEM Website, *Pipelines & Facilities*, dated June 11, 2026
11. Declaration of Matthew Warren, BLM Oil and Gas Program Lead
12. Mem. of P. & A. Supporting Defs.' Mot. to Dismiss, *Morgan. v. Ito*, No. 26-cv-00244 (C.D. Cal. Mar. 5, 2026), Dkt. No. 19-1
13. Declaration of Shawn Kerns
14. Declaration of Gary Richardson, E&B Resources
15. Declaration of Ralph Combs, Termo Company

## INTRODUCTION

This is a renewed motion for a preliminary injunction, brought because materially changed circumstances make immediate relief necessary. California Senate Bill 1137 ("SB 1137") is a land-use regulation that intrudes directly upon the federal government's sovereign authority to manage mineral development on federal lands. Congress vested the Bureau of Land Management ("BLM")—not California—with exclusive responsibility for determining whether, where, and under what conditions mineral development may occur on federal lands under the Mineral Leasing Act ("MLA") and the Federal Land Policy and Management Act ("FLPMA"), through land-use planning, leasing, and site-specific permitting. SB 1137 upends that framework by prohibiting drilling and related activities on federal lands where BLM has authorized them, thus negating federal decisions and obstructing congressionally mandated mineral-development processes. The Supremacy Clause forbids such interference. SB 1137 is therefore preempted.

The United States is already suffering irreparable harm, which will continue to compound absent preliminary relief. SB 1137 impairs the United States' sovereign prerogative to manage and control its own lands—harm that is per se irreparable. *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *aff'ed in part and rev'd in part*, *Arizona v. United States*, 567 U.S. 387 (2012). As the United States explained in its prior motion (Dkt. Nos. 4, 19), those harms are acutely felt on existing federal leases, where SB 1137 has disrupted or foreclosed development and caused financial losses from foregone production, royalties, and rental payments.

But the circumstances have significantly worsened since the Court denied the prior motion for preliminary relief on March 31, 2026 (*see* Dkt. No. 25): federal oil and gas leasing in California, paused since November 2022, will resume this December. SB 1137 therefore now threatens additional, imminent, irreparable, and recurring harm by interfering with BLM's ability to comply with and implement the MLA and maximize revenue, which inures to the benefit of the American people, at its planned December 1, 2026, lease sale and upcoming quarterly lease sales. Unless enjoined, SB 1137 will deter bidders, reduce competition and bid amounts, and prevent some parcels from being leased or developed, frustrating the United States' land-use objectives and depriving it of bonus bids, rents, royalties, and other revenues. These harms will arise with the December 1,

2026, sale and compound with each quarterly sale thereafter, as those sales are mandated by the MLA and implementing regulations. 30 U.S.C. § 226(b)(1)(A); 43 C.F.R. § 3120.1-2(a).

The balance of equities and the public interest likewise favor preserving Congress's policy choices and preventing California from obstructing federal land-management decisions. Because changed circumstances introduce an additional, imminent category of irreparable harm—on top of those previously identified—the Court should issue a preliminary injunction.

## BACKGROUND

### I. Federal Regulatory Framework

Under the Constitution's Property Clause, Congress has the exclusive "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST. art. IV, § 3, cl. 2; *accord United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 29 (1940) (Congress's power over federal lands is "without limitation[]"). While a State, "undoubtedly retains jurisdiction over federal lands within its territory," Congress "retains the power to enact legislation respecting those lands pursuant to the Property Clause[,]" which "necessarily overrides conflicting state laws under the Supremacy Clause." *Kleppe v. New Mexico*, 426 U.S. 529, 542-43 (1976). Two statutes enacted under Congress's Property Clause authority codify congressional intent for oil and gas development on federal lands: FLPMA, 43 U.S.C. §§ 1701-87, and the MLA, 30 U.S.C. §§ 181-287.

BLM develops oil and gas resources on public lands through a three-step process. First, pursuant to FLPMA, BLM adopts a Resource Management Plan ("RMP") that assesses the use of the lands for leasing and development, as well as other uses, across a broad geographic area and designates which lands are open to leasing and development. 43 C.F.R. § 1601.0-5(n) (2026). Second, pursuant to the MLA, BLM leases eligible and available lands for oil and gas development. 30 U.S.C. § 226(a). Third, also under the MLA, BLM engages in site-specific permitting—approving Applications for Permit to Drill ("APD") before drilling commences. *Id.* § 226(g).

#### A. Federal Land Policy and Management Act

FLPMA establishes a comprehensive federal framework for the management of public lands, including land use planning decisions about the development of federal mineral resources.

In FLPMA, Congress declared "that it is the policy of the United States that . . . the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals[.]" 43 U.S.C. § 1701(a)(12). The term "minerals" includes oil and gas. 30 U.S.C. § 21a. Congress also established a policy for BLM to manage public lands under principles of multiple use and sustained yield in a manner that protects "scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values[.]" 43 U.S.C. § 1701(a)(8). Thus, Congress assigned federal agencies the responsibility to balance competing interests—including energy development, environmental protection, conservation, recreation, and other land uses—in determining how federal lands should be managed and developed.

Consistent with that framework, FLPMA and its implementing regulations require BLM to coordinate land-use planning with state and local governments and provide opportunities for their involvement during the resource-management planning process. *Id*. § 1712(f); 43 C.F.R. §§ 1610.2-1610.3-1. But while States may participate in the federal planning and review process, Congress vested ultimate authority over the management and use of federal lands in the Secretary of the Interior. 43 U.S.C. § 1732(a).

**B. Mineral Leasing Act**

The MLA provides the framework governing the disposition and development of oil, gas, and other "leasable" minerals on federal lands. Under the MLA, oil and gas deposits are subject to disposition through a federal leasing process. *See* 30 U.S.C. § 226. This federal leasing regime allows the United States to retain title to the land while prescribing, by statute and regulation, the terms under which federal lessees may develop oil and gas resources. Those terms include surface occupancy and use conditions, rental and royalty obligations, drilling requirements, production obligations, reclamation duties, and operational conditions. *See id*.

The MLA codifies a national policy "[t]o promote the mining of . . . oil . . [and] gas . . . on the public domain." Mineral Leasing Act of 1920, Pub. L. No. 66-146, 41 Stat. 437, 437; *see also* 30 U.S.C. § 21a ("[I]t is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in . . . the orderly and economic development of domestic mineral resources . . . ."). Consistent with that policy, Congress directed that federal lands "known

or believed to contain oil or gas deposits *shall* be made available for leasing" when the lands are open to leasing under the applicable RMP. 30 U.S.C. § 226(a)(1) (emphasis added). Congress further required BLM to conduct lease sales "at least quarterly" in each State where eligible lands are available. *Id*. § 226(b)(1)(A); *see also* 43 C.F.R. § 3120.12(a). BLM offers specific parcels for sale, and competitive leases generally must be awarded "to the highest responsible qualified bidder." 30 U.S.C. § 226(b)(1)(A).

Leases issued under the MLA confer the right to explore for, drill, and produce oil and gas from the leased lands, subject to federal statutes, regulations, lease stipulations, and permit requirements. *See* 30 U.S.C. § 226; 43 C.F.R. § 3101.12. Oil and gas leases generally are issued for a primary term of ten years, but they continue "so long . . . as oil or gas is produced in paying quantities." 30 U.S.C. § 226(e). "Paying quantities" means "production from a lease of oil and/or gas of sufficient value to exceed direct operating costs and the cost of lease rentals or minimum royalties." 43 C.F.R. § 3160.0-5. A lease extended by production will expire if production ceases and the lessee fails timely to commence diligent operations. *Id*. § 3107.22. Likewise, where a lease contains a well capable of producing in paying quantities, the lease will expire if the lessee fails to place the lease into production after notice from BLM. *Id*. § 3107.23. These provisions reflect Congress's intent that federal oil and gas leases be actively developed.

This framework also establishes detailed federal control over drilling operations and surface-disturbing activities. *See id*. § 3162.3-1(c)-(f). Before any drilling operations or surface disturbance may occur under the terms of the lease, the operator must submit an APD to BLM. *Id*. § 3162.3-1(c). No drilling or preliminary surface disturbance may begin absent federal approval of the APD. *Id*. Each drilling plan must contain detailed technical and operational information, including the proposed drilling program, drilling locations, geologic information, anticipated hazards, and mitigation measures. *Id*. § 3162.3-1(e). Federal law also requires public notice before BLM may approve APDs. *See* 30 U.S.C. § 226(f); 43 C.F.R. § 3162.3-1(g). Through the APD process, BLM approves whether, where, and how surface occupancy and use, including drilling, may occur on federal leases, including the precise well location and conditions under which drilling may proceed. 43 C.F.R. § 3162.3-1(e), (h).

The MLA provides that the Secretary of the Interior "shall regulate all surface-disturbing activities conducted pursuant to any lease issued under this chapter[.]" 30 U.S.C. § 226(g). In exercising that authority, BLM must consider environmental, public health, and resource-protection concerns as part of the federal decision-making process. *See, e.g.*, 42 U.S.C. § 4332 (National Environmental Policy Act); 42 U.S.C. § 7506(c) (Clean Air Act); 16 U.S.C. § 1536(a)(2) (Endangered Species Act). BLM regulations also require operators to conduct operations "in a manner which protects the mineral resources, other natural resources, and environmental quality[,]" 43 C.F.R. § 3162.5-1(a), and impose operational requirements designed to protect public safety and minimize waste and environmental harm, *see, e.g.*, *id*. § 3171.13(a)(2).

Although state and local governments may participate in federal land-use planning and operational review processes, Congress assigned the decision-making authority to federal agencies. 43 U.S.C. § 1732(a). Federal regulations contemplate consultation and coordination with States concerning oil and gas operations. *See, e.g.*, 43 C.F.R. § 3171.12(a). But those provisions provide States with a consultative role within the federal framework; they do not transfer or delegate final regulatory authority over federal leasing, drilling, production, or surface use to the States. *See Ventura Cnty. v. Gulf Oil Corp.*, 601 F.2d 1080, 1086 (9th Cir. 1979), *aff'd*, 445 U.S. 947 (mem.) (1980); *see also Pub. Lands Council v. Babbitt*, 529 U.S. 728, 741-42 (2000) (recognizing the Secretary's broad discretion to determine "just how, and the extent to which" statutory privileges "shall be safeguarded, in light of the Act's basic purposes").

## II. California's Regulatory Framework

To drill and produce oil or gas on a federal lease in California, an operator must get two approvals: (1) BLM's approval of a federal APD, and (2) the California Geologic Energy Management Division's ("CalGEM") approval of a state Notice of Intention ("NOI").

A CalGEM-approved NOI is required before any drilling or production activities commence. CAL. PUB. RES. CODE § 3106 (West 2026); CAL. CODE REGS. tit. 14, § 1714 (West 2026). CalGEM reviews an NOI for compliance with state health, safety, and environmental requirements, including the California Environmental Quality Act. *See* CAL. PUB. RES. CODE § 3106; CAL. CODE REGS. tit. 14, § 1714. CalGEM may approve the NOI, approve it with conditions, or

deny it. *See* CAL. PUB. RES. CODE § 3106; CAL. CODE REGS. tit. 14, § 1714. Prior to SB 1137, California law imposed no limitation on how close federal oil and gas development could be to other nearby land uses; that started to change in 2021.

In April 2021, Defendant Newsom announced his goal "to phase out oil extraction across the state by no later than 2045." *Governor Newsom Takes Action to Phase Out Oil Extraction in California* at 1, Office of Governor Gavin Newsom (Apr. 23, 2021), attached as Ex. 1. A few months later, the California legislature enacted that agenda: the legislature drafted SB 1137 intending to "ban" new oil and gas development and "phas[e] out existing wells." Hearing on the Analysis of SB 1137 before the Assembly Comm. on Nat. Res. ("Nat. Res. Comm. Analysis") at 5-6, 2021-2022 Reg. Sess. (Cal. Aug. 29, 2022), attached as Ex. 2; *see also Response to CalGEM Questions for the California Oil & Gas Public Health Rulemaking Scientific Advisory Panel* ("CalGEM Questions") at 13, attached as Ex. 3 (discussing the "strategy" to "eliminat[e] new and existing wells and ancillary infrastructure"). And the legislature drafted SB 1137 so that the ban on new drilling and production facilities within "health protection zones" ("HPZs") would act as a "setback" akin to "zoning and local ordinances." Staff of the S. Rules Comm., Bill Analysis of SB 1137 ("S. Rules Comm. Analysis") at 5, 12-13, 2021-2022 Leg. Reg. Sess. (Cal. Aug. 30, 2022), attached as Ex. 4; Assembly Floor Analysis of SB 1137 ("Assembly Floor Analysis") at 3-4, 2021-2022 Leg. Reg. Sess. (Cal. Aug. 27, 2022), attached as Ex. 5.

The California legislature passed SB 1137 and Defendant Newsom signed it into law in September 2022. Initial implementation began on January 1, 2023, but was suspended on February 3, 2023, after an industry-led referendum qualified for the ballot. Implementation resumed on June 28, 2024, after the referendum was withdrawn.

SB 1137 added Sections 3280 through 3291 to the California Public Resources Code. The United States challenges two core provisions (i.e., the "setback provisions"). First, Section 3281(a) directs that CalGEM "shall not approve" any NOI under Section 3203 within an HPZ, with rare exceptions—such as to address an imminent threat to health, safety, or the environment; to comply with a court order finding that denial would constitute a taking or otherwise require approval; or to plug and abandon a well. An approved NOI is required for drilling, deepening, redrilling, or

reworking a well, drilling a sidetrack, and for operations that permanently alter the well casing.[1] CalGEM Website, *Frequently Asked Questions* at 3-4, attached as Ex. 7. Second, Section 3281(b) prohibits construction or operation of "new production facilities" in HPZs unless associated with an approved NOI under subdivision (a) or deemed necessary by CalGEM to protect health and safety.

The statute defines "production facility" to include not only wells, but also virtually any equipment attendant to oil and gas production, such as tanks, flowlines, gathering lines, wellheads, pumps, compressors, and pipelines not regulated by the State Fire Marshal. CAL. PUB. RES. CODE § 3010. Section 3280(b) defines an HPZ as "the area within 3,200 feet of a sensitive receptor," while Section 3280(c) defines "sensitive receptor" to include residences, schools, community centers, healthcare facilities, live-in housing, and businesses open to the public.

CalGEM issued guidance explaining that noncompliance with SB 1137 or its implementing regulations may result in civil and criminal enforcement. *See* CalGEM Website, *FAQ for Local Government & Planning Bodies on SB 1137* at 2, attached as Ex. 8. Violations constitute misdemeanors. CAL. PUB. RES. CODE §§ 3236-3236.6. SB 1137 contains no exemption for operations on federal lands or under federal leases. *See id*. § 3281(a).

**III. SB 1137's Effects on Federal Lands and Leases**

SB 1137's effects on federal lands are substantial and wide-ranging. The United States holds title to approximately 47 million acres of mineral estate in California, and BLM administers over 600 oil and gas leases on federal lands in California, covering more than 100,000 acres. Karuzas Decl. ¶ 4, attached as Ex. 9. Over one-third of those leases are partially or fully within HPZs, with about 79 leases entirely within HPZs. *Id.* ¶ 22. That number will grow, because any lease can

---

[1] A "[n]ew drill" is to "[d]rill a new well hole in the earth"; to "deepen" is to "[d]rill to extend the depth of a well"; to "[r]ework" is any operation after drilling that involves deepening, redrilling, plugging, or permanently altering in any manner the casing of a well or its function; drilling a "[s]idetrack" means to "[c]ement a portion of the original well path and extend a new path from the uncemented portion"; a "well casing" is a steel pipe installed within a drilled wellbore. CalGEM Website, *California Oil & Gas Permits* at 2, attached as Ex. 6; CAL. CODE REGS. tit. 14, § 1720(b). This brief uses "drilling" as shorthand for all operations requiring an NOI.

be swept into an HPZ whenever a new "sensitive receptor" is established, and leases that are partially covered by HPZs can quickly become completely covered. *Id*. ¶¶ 21, 27.

SB 1137 bars drilling and new production facilities within state-defined HPZs even if a lessee holds a valid federal lease and a BLM-approved APD. CAL. PUB. RES. CODE § 3281(a)-(b). A lease entirely within an HPZ cannot be developed from within the leased land. For a lease lying partially within an HPZ, SB 1137 makes the HPZ-covered portion off-limits, which can render the uncovered portion undevelopable due to legal, physical, or economic constraints. *See id*; *see also* CalGEM Website, *Pipelines & Facilities* at 1-2, attached as Ex. 10.

The financial consequences are significant. In fiscal year ("FY") 2025, oil and gas development on federal lands in California generated about $63 million in revenue for the United States, which BLM expects will decline due to SB 1137. Warren Decl. ¶¶ 24-25, 28-29, attached as Ex. 11. Indeed, since SB 1137 was passed in September 2022, federal oil and gas revenue in California has plummeted each year: $98M (FY2022), $90M (FY2023), $78M (FY2024), and $63M (FY2025). *Id*. ¶ 28 & n.2. SB 1137 reduces royalty payments through halted production, *id*. ¶¶ 29-32, and BLM has received lease suspension requests from lessees that will further reduce federal revenue, *see* Karuzas Decl. ¶ 30. Meanwhile, federal lease sales in other states are generating record participation and revenue for the United States. *See* Warren Decl. ¶ 26 & n.1 ("BLM has collected approximately $5.1 billion from lease sales" in 2026 alone). The harm compounds over time: expanding HPZ boundaries reduce projected royalties on leases already issued, and the risk of expanding HPZ boundaries will depress future bids because potential lessees must discount for the likelihood that some or even all the acreage they are vying to lease will become undevelopable.

The result is that federal leases awarded through competitive bidding and governed by detailed federal regulations—and the approved APDs authorizing drilling on those leases—are effectively vetoed and rendered inoperable by SB 1137, depriving the United States of the use of its lands for the purposes Congress intended. *See* Karuzas Decl. ¶¶ 27-31; Warren Decl. ¶ 34.

### IV. Procedural Background

The United States filed its Complaint (Dkt. No. 1) on January 14, 2026, and moved for a preliminary injunction two days later (Dkt. No. 4). Following oral argument on March 20, 2026,

the Court denied the motion on March 31, 2026. Dkt. No. 25. In its ruling, the Court held that the United States had not carried its burden to show a likelihood of success on the merits or irreparable harm and therefore did not reach the remaining *Winter* factors. *Id*. at 30, 35. In its irreparable-harm analysis, the Court found it "critical[]" that federal oil and gas leasing was then paused, reasoning that this pause meant "enjoining enforcement of SB 1137 during the pendency of this litigation would serve no purpose in preventing such alleged harm to Plaintiff." *Id*. at 34. The Court also concluded that "[n]one of the allegedly harmful effects [of SB 1137] would be prevented or remedied by a preliminary injunction." *Id*. at 35.

## APPLICABLE LAW

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. State laws that "interfere with, or are contrary to the laws of Congress, made in pursuance of the [C]onstitution . . . must yield to it." *Gibbons v. Ogden,* 22 U.S. 1, 82 (1824).

Federal law can preempt state law through express, field, or conflict preemption. *Arizona v. United States*, 567 U.S. 387, 398-400 (2012). "If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984). When addressing field preemption based on FLPMA, the Supreme Court has distinguished between a State's land use regulations and its environmental regulations. *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 587-88 (1987). But even environmental regulations may be preempted if they conflict with federal law. This can occur when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the full purposes and objectives of Congress. *See id.* at 581; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000); *Ventura Cnty.*, 601 F.2d at 1084-86.

## STANDARD OF REVIEW

A preliminary injunction preserves the status quo of the parties and prevents irreparable loss before judgment can issue. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1234 (9th Cir. 1999),

*supplemented*, 236 F.3d 1115 (9th Cir. 2001). A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[2]

## ARGUMENT

### I. The United States is likely to succeed on the merits.

The Constitution "gives Congress plenary power over" federal lands, preempting any state law that "conflicts with the operation or objectives of federal law, or when Congress 'evidences an intent to occupy a given field.'" *Granite Rock*, 480 U.S. at 593 (citation omitted). States may not "prohibit a lawful use of the sovereign's land that the superior sovereign itself permits and encourages." *S.D. Mining Ass'n v. Lawrence Cnty.*, 155 F.3d 1005, 1011 (8th Cir. 1998). "To do so offends both the Property Clause and the Supremacy Clause of the federal Constitution." *Id.* SB 1137 is preempted because its "true purpose" is to "prohibit" or "ban" a particular land use, "constitute land use planning" and are preempted, *Bohmker v. Oregon*, 903 F.3d 1029, 1040 (9th Cir. 2018) (citation omitted), and because it stands as an obstacle to the full purposes and objectives of Congress under FLPMA and the MLA.

#### A. SB 1137 is Preempted Because Congress has Occupied the Field.

Congress has occupied the field that SB 1137 attempts to regulate. Congress preempts a field when "federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Nat'l Fed. of the Blind v. United Airlines, Inc.*, 813 F.3d 718, 733 (9th Cir. 2016) (citation omitted). "If Congress evidences an intent to occupy a given field, *any* state law falling within that field is pre-empted." *Granite Rock*, 480 U.S. at 581 (emphasis added) (citation omitted).

---

[2] The Ninth Circuit alternatively says that injunctive relief is appropriate where the plaintiff can show "serious questions" going to the merits and a balance of hardships that "tips sharply" towards the plaintiff. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citation omitted). If these two standards differ, the United States satisfies both.

**1. Congress has Occupied the Field of Federal Land Use.**

Congress occupied the field of federal land-use management. The Supreme Court assumed without deciding that the combination of FLPMA and the National Forest Management Act ("NFMA") field preempts state land-use plans involving mining on federal lands. *See Granite Rock*, 480 U.S. at 585; *Bohmker*, 903 F.3d at 1040. The reasoning of that assumption should extend to all state land-use laws that attempt to regulate federal land use. When there is "a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant," state law is preempted. *Arizona*, 567 U.S. at 399 (citation modified). That principle applies with force to federal land-use management, wherein Congress exercised plenary Property Clause authority to establish a pervasive federal framework for determining the uses of federal lands, leaving no room for States to impose their own land-use restrictions. *United States v. Gardner*, 107 F.3d 1314, 1318 (9th Cir. 1997) ("[T]he United States can administer its federal lands any way it chooses . . . ."); *Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 739 (10th Cir. 1982) ("FLPMA contains comprehensive inventorying and land use planning provisions . . . ."); *see also supra* Background I.

The Supreme Court in *Granite Rock* explained how this Court should differentiate land-use laws from environmental regulations:

> Land use planning in essence chooses particular uses for the land; environmental regulation, at its core, does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits. Congress has indicated its understanding of land use planning and environmental regulation as distinct activities.

*Granite Rock*, 480 U.S. at 587.

Ultimately, the Court in *Granite Rock* did not find that the state statute in question was field preempted. It found instead that the statute was not intended to prohibit mining, based in part on the state agency's consistent representations to that effect. *See id.* at 586-87. Unlike the state policy at issue in *Granite Rock*, however, SB 1137 is no mere environmental regulation that addresses *how* activities may occur on land. SB 1137's structure, text, drafting history, and real-

world operation all confirm that it is a land-use prohibition that determines *whether* certain activities may occur on federal lands. It is therefore preempted by FLPMA and the MLA.

SB 1137's structure alone reveals its character as a land-use restriction. The law's setback provisions impose a categorical, location-based prohibition on new drilling and production facilities within HPZs. *See* CAL. PUB. RES. CODE § 3281(a)-(b). The law does not set emissions limits, prescribe pollution controls, govern operational practices, or impose any environmental performance standard. *See id*. A new well or production facility within an HPZ is forbidden regardless of its environmental impact. That complete absence of any substantive environmental benchmark is one factor suggesting a land-use regulation. *See Granite Rock*, 480 U.S. at 587. SB 1137 does not become an environmental regulation simply because the State codified it in the Oil and Gas Conservation Code rather than in its land-use planning statutes. The question is whether the law "chooses particular uses for the land[,]" not where the legislature codified it. *Id*.

The drafting history confirms what SB 1137's structure makes plain. The California legislature made no secret of SB 1137's purpose and operation. Legislative analyses repeatedly described the 3,200-foot HPZ buffer as a "setback" akin to "zoning and local ordinances." S. Rules Comm. Analysis at 5, 12-13; Assembly Floor Analysis at 3-4. The same analyses characterized SB 1137 as a "ban" on new drilling, with NOIs to drill "categorically denied," with narrow exceptions. Nat. Res. Comm. Analysis at 5-6. And the legislature specifically intended for SB 1137 to "ban" new oil and gas development and "phas[e] out existing wells" by imposing a "ban on rework permits." *Id.* The word "setback" is itself a term of art drawn directly from zoning law: a setback is "[t]he minimum amount of space required between a lot line and a building line . . . [t]ypically contained in zoning ordinances or deed restrictions," *Setback*, Black's Law Dictionary (12th ed. 2024), and the authority to prescribe setbacks "is normally exercised as part of the zoning power," Patricia E. Salkin, 1 Am. Law. Zoning § 9:58 (5th ed. 2026). Under *Granite Rock*, this is a land-use prohibition, not an environmental regulation.

Nor does SB 1137 qualify as merely an environmental regulation because banning drilling and production facilities in HPZs purportedly has the incidental effect of eliminating associated pollution. Banning a land use to eliminate its potential effects is the very definition of land-use

regulation. *Cf. Hancock v. Train*, 426 U.S. 167, 180-81 (1976), *superseded by a statute on other grounds*, Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 Stat. 685. As CalGEM's own scientific advisory panel recognized, the "strategy" underlying SB 1137 is the "elimination of new and existing wells and ancillary infrastructure" because the "[e]limination" of oil and gas development "[e]liminates the source of nearly all environmental stressors." CalGEM Questions at 13-14. A law designed to eliminate a use of land, rather than to govern how that use is conducted, is a land-use restriction by any measure.

California's litigation posture in related proceedings provides confirmation that SB 1137 is a land-use regulation. In defending against a takings challenge brought by private landowners in the Central District of California, California argued that SB 1137 constitutes a legitimate exercise of the State's land-use authority—the same regulatory power that *Granite Rock* assumed cannot be extended to federal lands. *See* Mem. of P. & A. Supporting Defs.' Mot. to Dismiss 10, *Morgan v. Ito*, No. 26-cv-00244 (C.D. Cal. Mar. 5, 2026), Dkt. No. 19-1, attached as Ex. 12 ("[C]ourts routinely uphold land-use regulations that destroy or adversely affect recognized real property interests by prohibiting particular contemplated uses of land." (citation modified)). Having characterized SB 1137 as a land-use regulation in one forum, California cannot recharacterize it as a mere environmental regulation here. *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001) (judicial estoppel prevents a party from asserting a position "clearly inconsistent" with an earlier position on which the party prevailed (citation omitted)).

*Bohmker* further confirms why SB 1137 is a land-use regulation, crediting Oregon's law as a bona fide environmental measure regulating *how* in-stream mining occurs, not *whether* it may occur at all. 903 F.3d at 1040-45. SB 1137 does the opposite, banning drilling and production facilities in HPZs categorically, with no environmental performance standard, regardless of emissions, mitigation, or site-specific impact. And California had other tools available if it truly wanted to protect public health rather than ban oil and gas operations; it could have used emissions limits, operational standards, or a reverse setback. A reverse setback would condition the siting of new sensitive receptors on maintaining distance from existing oil and gas operations, protecting the same health interests without disturbing development that the federal government had authorized.

But California used none of these tools, instead prohibiting outright the underlying federal land use itself, thus confirming that SB 1137 was designed as a land-use regulation, not an environmental regulation.

*Bohmker* also held that commercial impracticability is not an appropriate test for distinguishing between permissible environmental regulation and impermissible land-use planning under *Granite Rock*. 903 F.3d at 1039-41. But the United States' argument here does not rest on that theory. SB 1137 is an impermissible land-use regulation, not because compliance is costly, but because it was designed, structured, and operates to prohibit drilling new wells and production facilities within HPZs; all of which serve California's explicit goal of phasing out oil and gas production in the State.

In sum, SB 1137 is a land-use ban. SB 1137 does not complement the federal regimen; it instead displaces federal authority. It is structured and operates as a zoning ordinance, its text imposes no environmental standards, its drafting history describes it as a ban on new oil and gas development and an instrument to phase out existing development, and its real-world effect is the categorical exclusion of federally authorized drilling and production facilities in HPZs on federal lands that the Federal Government has designated for that use under FLPMA and the MLA. Because SB 1137 "chooses particular uses for the land" rather than governing how activities may occur, it is a preempted land-use restriction. 480 U.S. at 587.

**2. Alternatively, SB 1137 is Preempted Because Congress has Occupied the Field of Oil and Gas on Federal Lands.**

Even if this Court does not adopt *Granite Rock*'s and *Bohmker's* assumption that Congress has preempted the field of land-use laws on federal lands, this Court should still agree that at least Congress has preempted state oil and gas laws on federal lands by enacting FLPMA and the MLA. *Ventura County* controls, and SB 1137 is preempted.

"The essential field preemption inquiry is whether the density and detail of federal regulation merits the inference that any state regulation within the same field will necessarily interfere with the federal regulatory scheme." *Nat'l Fed. of the Blind*, 813 F.3d at 734. The field must be defined with specificity. *Id.* at 735. In this case, the field is oil and gas production on federal lands.

In "survey[ing] the scope" of the statutory framework in this field, *id.* at 734-35, the MLA and FLPMA form a comprehensive framework that leaves no space for state laws.

Controlling precedent already holds that Congress has enacted a comprehensive scheme regarding oil and gas development on federal lands. *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 69 (1966) ("In providing for development of public domain lands containing minerals, the [Mineral Leasing] Act *comprehensively* regulates various aspects of the process." (emphasis added)). *Ventura County* is especially instructive: the Ninth Circuit there emphasized the MLA's "*extensive* regulation of oil exploration and drilling," underscoring the degree of federal control relevant to field preemption analysis. *Ventura Cnty.*, 601 F.2d at 1083 (emphasis added). Courts must look at both the legislature's purpose for a statute *and* the statute's effect when defining a field. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105-06 (1992); *English v. Gen. Elec. Co.*, 496 U.S. 72, 84 (1990). Both inquiries point in the same direction here: the MLA and FLPMA occupy the field of oil and gas land-use on federal lands. That conclusion is dispositive of this case, because "[w]here Congress occupies an entire field . . . even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401.

Although *Ventura County* ultimately resolved the preemption question before it on obstacle-preemption grounds (601 F.2d at 1084-86), its description of the MLA's comprehensiveness compels finding field preemption here. Indeed, the Ninth Circuit reaffirmed *Ventura County's* characterization of the MLA in *Bohmker*, noting that, unlike activities under the Mining Law, drilling operations under the MLA were subject to "detailed [federal] supervision" and an "extensive federal scheme reflecting concern for the local environment." 903 F.3d at 1050 (alteration in original) (quoting *Ventura Cnty.*, 601 F.2d at 1084). *Bohmker* also recognized that "*Granite Rock* assumed without deciding that 'the combination of the NFMA and the FLPMA pre-empts the extension of state land use plans onto unpatented mining claims in national forest lands[,]'" which led the Ninth Circuit to "make the same assumption" in *Bohmker*. *Id.* at 1040 (citation omitted). Taken together, these statements confirm that if FLPMA's planning regime—standing alone or paired with NFMA—was assumed to foreclose state land-use authority on federal mining claims,

then the MLA's even more detailed and comprehensive system of federal control necessarily precludes California from imposing its own land-use prohibitions on federal oil and gas leases.

### B. At Minimum, SB 1137 is Preempted of Conflict Preemption.

Even if there were no field preemption here, SB 1137's setback provisions are nevertheless conflict-preempted, on two independent grounds. First, they stand as an obstacle to the accomplishment of the full purposes and objectives of Congress as reflected in FLPMA and the MLA. Second, they make it impossible for federal lessees and operators to comply with their federal obligations while also adhering to state law.

#### 1. SB 1137 Stands as an Obstacle to the Accomplishment and Execution of the Full Purposes and Objectives of Congress.

SB 1137 "stands as an obstacle to the accomplishment [and execution] of the *full* purposes and objectives of Congress," *Granite Rock*, 480 U.S. at 581 (emphasis added) (citation omitted), as set forth in FLPMA and the MLA. *See supra* Background I, III. States can enforce their laws on federal land only "so long as those laws do not conflict with federal law." *Granite Rock*, 480 U.S. at 580. A "state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). Here, those methods include BLM's selection of parcels for development and its authorization of where and how drilling will occur to achieve federally mandated development of those resources.

Congress did not merely permit mineral development on federal lands; Congress *mandated* it, *see* 30 U.S.C. § 226(a)-(b), and charged the Secretary with carrying out that mandate through a three-stage regulatory process, *see id*. § 21a. At the RMP stage, the Secretary's designee, BLM, determines through its land-use planning process that certain federal lands within California are open and suitable for oil and gas leasing and development. At the leasing stage, BLM leases those lands in exchange for bonus bids, rental payments, and royalties, subject to terms requiring that the oil and gas resources on those lands be diligently developed. And at the APD stage, BLM authorizes lessees to drill specific wells in specific locations on those leased federal lands.

The California Legislature designed SB 1137 to function as exactly the kind of obstacle preemption is meant to prevent: a "ban" on new oil and gas development that also "phas[es] out

existing wells" by imposing a "ban on rework permits." Nat. Res. Comm. Analysis, at 5-6. SB 1137 overrides BLM's land-use planning decisions by declaring all federal lands within HPZs off-limits to new drilling and production facilities. Next, SB 1137 overrides federal leasing decisions, thus frustrating their financial and operational terms, despite those decisions reflecting BLM's determination that the leased lands—including portions within HPZs—should be developed. Finally, at the most granular level, SB 1137 vetoes individual federal drilling decisions, by determining that a lessee may not drill in the location where BLM has authorized that lessee to drill. The result is that a BLM-approved APD for a well within an HPZ is worthless. California has substituted its own judgment for BLM's judgment concerning drilling and production operations—the core activity that federal law authorizes and promotes. Courts applying obstacle preemption to federal mineral development statutes have found such laws preempted. *See, e.g.*, *S.D. Mining Ass'n*, 155 F.3d at 1011 ("A [State] cannot prohibit a lawful use of the sovereign's land that the superior sovereign itself permits and encourages.").

The obstacles imposed by SB 1137 are significant. Over 200 federal leases in California—roughly one-third of all federal leases in the State—fall within HPZs, and that number is expected to grow as additional HPZs are designated. Karuzas Decl. ¶¶ 21-22, 27. SB 1137 thwarts development of these leases because the law makes swathes of land off limits to drilling and production facilities that BLM has authorized and encouraged. And for the leases entirely within HPZs, the federal decision to lease those lands for development is nullified. *See id.* ¶ 30; Warren Decl. ¶ 34; *see also Kleppe*, 426 U.S. at 543 (States may not "place the public domain of the United States completely at the mercy of state legislation" (citation omitted)).

*Ventura County* is again instructive. The court held that the county could not require operators on federal leases to obtain local zoning permits as a condition of drilling, because doing so would allow it to "prohibit that use, either temporarily or permanently, in an attempt to substitute its judgment for that of Congress." *Ventura Cnty.*, 601 F.2d at 1084. The county pressed its police powers and environmental interests, but the court rejected them: "Although we recognize that federal incursions upon the historic police power of the states are not to be found without good cause, we must affirm because . . . the local ordinances stand as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress." *Id.* at 1086 (citation modified). The court was equally clear that local interests are not left unprotected—they are addressed through the federal process itself—but that "the ultimate lessee will be responsible to a single master rather than conflicting authority." *Id.*

The parallels to this case are clear. The local permitting scheme in *Ventura County* allowed the county to veto individual drilling decisions on federal leases by withholding zoning approval. SB 1137 operates the same way—and goes further. California does not merely condition drilling on state approval; it categorically prohibits new drilling and production facilities on every federal lease in an HPZ without regard to BLM's judgment that those lands are open and suitable for leasing and development. If a county-level zoning veto over a few individual wells was enough to trigger preemption in *Ventura County*, then California's statewide ban affecting one-third of all federal leases is preempted all the more.

That principle is reinforced by *Brubaker v. Board of County Commissioners*, 652 P.2d 1050, 1056-57 (Colo. 1982), where the Colorado Supreme Court struck down a county's attempt to use zoning to block federally authorized drilling. The court held that prohibiting a single drilling project because it conflicted with the county's planning goals "reflects an attempt by the County to substitute its judgment for that of Congress concerning the appropriate use of these lands[,]" and thus posed an impermissible obstacle to federal objectives. *Id*. The court emphasized that the county was not merely supplementing federal requirements but exercising a "veto power" over federally authorized activities. *Id*. Although *Brubaker* arose under the Mining Law, its reasoning applies with greater force here because Congress's objectives for oil and gas development under the MLA are far more clearly defined, its directives more explicit, and its operational requirements more specific. *See Bohmker,* 903 F.3d at 1050; *see also supra* Background I. If a county zoning veto over a single drilling project under the Mining Law was enough to trigger preemption in *Brubaker*, then California's ban on new drilling and production facilities under the MLA affecting one-third of federal leases in the State cannot survive scrutiny.

*Bohmker* does not save SB 1137; it confirms why obstacle preemption applies here. *Bohmker* was a Mining Law case, and the Ninth Circuit declined to treat *Ventura County* as

controlling for that very reason. *See* 903 F.3d at 1050. Because *Bohmker* itself refused to apply *Ventura County* based on the difference between the Mining Law and the MLA, it is equally appropriate here to recognize that *Bohmker* sheds limited light on obstacle preemption under the MLA—a statute with far more explicit purposes and objectives, clearer development directives, and more specific federal requirements. *See id.*; *supra* Background I. The contrast in litigation posture reinforces the distinction: whereas the United States appeared as amicus in *Bohmker* to confirm Oregon's rule aligned with federal law, 903 F.3d at 1045, here the United States is the plaintiff asserting that SB 1137 obstructs federal objectives under the MLA and FLPMA. Thus, *Bohmker* adds nothing to California's defense here and only reinforces that SB 1137 must be measured against the MLA's purposes and objectives, both of which SB 1137 plainly obstructs.

Even apart from its categorical ban on new drilling and production facilities, SB 1137 obstructs federal objectives by increasing the cost of operating existing wells. Obstacle preemption does not require a complete prohibition; interference with a subset of federally authorized activity suffices. *See Crosby*, 530 U.S. at 379-80; *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881-82 (2000). SB 1137 thus frustrates federal objectives both by banning new drilling and production facilities and by increasing operating costs so that some existing wells may become uneconomical and forced out of operation. Thus, the State is doing precisely what the Eighth Circuit condemned in *South Dakota Mining Association*: "prohibit[ing] a lawful use of the sovereign's land that the superior sovereign itself permits and encourages." 155 F.3d at 1011.

In sum, SB 1137 obstructs the federal mineral development scheme Congress established in FLPMA and the MLA in multiple ways: overriding BLM's resource management determinations, nullifying federal leasing decisions, and vetoing individual drilling authorizations. State legislation "must be *entirely* consistent with the Federal laws, otherwise it is of no effect." *Butte City Water Co. v. Baker*, 196 U.S. 119, 125 (1905) (emphasis added). Because SB 1137 is not consistent with FLPMA, the MLA, and implementing federal regulations, it is preempted.

**2. Federal Lessees Cannot Comply with Both Federal Law and SB 1137.**

Even beyond obstacle preemption, SB 1137's setback provisions make it impossible for federal leaseholders to comply with federal commands and obligations. State law is preempted

where it is impossible to comply with both federal and state requirements. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013); *Crosby*, 530 U.S. at 372-73.

For one thing, when BLM approves an APD for a well within an HPZ, the Federal Government has made a site-specific determination that drilling at that location is authorized and appropriate. Karuzas Decl. ¶¶ 29-30; Warren Decl. ¶¶ 18, 20-23, 34; *see also* 30 U.S.C. § 226(f)-(g); 43 C.F.R. § 3162.3-1(c)-(h). An approved APD is not a mere generalized grant of permission to drill on a lease; it is an authorization that specifies the exact location of the well and access roads, the proposed drilling method and program, bottom-hole location, anticipated hazards, waste handling, anticipated production facilities, reclamation, and required mitigation measures. Warren Decl. ¶¶ 21-23; Karuzas Decl. ¶ 29; 43 C.F.R. § 3162.3-1(d)-(f). In approving an APD, BLM conducts a detailed technical and environmental review and identifies conditions of approval tailored to the specific site and operation. *See* Karuzas Decl. ¶¶ 6, 25; Warren Decl. ¶¶ 18, 20-23, 34; 30 U.S.C. § 226(p); 43 C.F.R. § 3162.5-1(a). The APD approval thus reflects a considered federal judgment made at the level of a specific well, at a specific surface location, using a specific drilling method, that the proposed operations may lawfully proceed. It is impossible for an operator to simultaneously comply with the federal authorization that approves and encourages drilling at a specific location and the state prohibition that forbids it.

For another thing, compliance with both federal law and SB 1137 is impossible because federal law *obligates* lessees to diligently develop their leases and produce oil and gas in "paying quantities," while SB 1137 prohibits the very operations necessary to satisfy those obligations on leases within HPZs. Warren Decl., Attach. 2 at. 3-4 (The "Lease Terms" state that the "Lessee must exercise reasonable diligence in developing and producing" oil and gas and that "this lease will be subject to cancellation unless or until the leasehold contains a well capable of production of oil or gas in paying quantities"). These are not meaningless terms that lessees may waive; they are congressionally prescribed conditions that define the continued existence of the lease. *See* 30 U.S.C. § 226(e). This reflects Congress's unambiguous judgment that federal lessees must actively develop and produce their leases, not simply hold them indefinitely. SB 1137 makes it impossible for lessees with leases within HPZs to satisfy those federal obligations. By prohibiting

new wells, new production facilities, and reworking activities within HPZs, SB 1137 prevents lessees from drilling the wells and constructing the facilities necessary to initiate or maintain production. Karuzas Decl. ¶¶ 27-28; *see also* Nat. Res. Comm. Analysis at 5 ("Because oil wells generally have a limited productive lifespan prior to the need for reworking, a ban on rework permits will serve to start phasing out existing wells . . . ."); *see* CalGEM Website, *Pipelines & Facilities* at 1-2.

A lessee that cannot drill new wells, install new production facilities, or engage in reworking activities within an HPZ cannot bring new production online or maintain production levels necessary to satisfy the "paying quantities" requirement in 30 U.S.C. § 226(e). Karuzas Decl. ¶ 30; Kerns Decl. ¶¶ 7-9, attached as Ex. 13; Richardson Decl. ¶¶ 21-26, attached as Ex. 14; *see* CalGEM Website, *Pipelines & Facilities* at 1-2. Even where some limited production may technically continue on portions of leases with land outside of HPZs, the prohibition on new wells and new production facilities within HPZs can reduce production to levels that may fall below the "paying quantities" threshold, rendering the lease uneconomical and triggering its expiration under federal law. Karuzas Decl. ¶ 30; Kerns Decl. ¶¶ 7-9; Richardson Decl. ¶¶ 21-26; *see* 30 U.S.C. § 226(e). The result is that federal lessees within HPZs face an impossible choice: comply with SB 1137 and forfeit their federal leases for failure to produce in paying quantities, or comply with their federal obligations and violate state law. *See*, *e.g.*, Richardson Decl. ¶¶ 3-20; *see also* Combs Decl. ¶¶ 6-12, attached as Ex. 15. That is precisely the conflict that impossibility preemption precludes. *See Bartlett*, 570 U.S. at 480.

Lessees suffer loss due to their inability to obey federal commands. Lessees pay money to the United States in their bonus bids, followed by rental payments. So when BLM cancels their lease for failure to produce, lessees are not merely losing an opportunity of gain; they suffer loss analogous to a penalty. Because performing actions that will foreclose these penalties are impossible, SB 1137 is preempted under impossibility principles.

## II. The United States is suffering, and will continue to suffer, irreparable harm.

A plaintiff must show that, without preliminary relief, the challenged conduct is likely to cause irreparable harm. *Winter*, 555 U.S. at 22. The United States maintains that it satisfied this

requirement in its prior motion, but the Court disagreed, concluding that an injunction would serve no purpose because federal oil and gas leasing in California was paused and because the Court believed that none of SB 1137's alleged harms would be prevented or remedied by preliminary relief. *See* Dkt. No. 25 at 34-35. Since then, the factual landscape has materially changed: the federal leasing pause on which the Court's analysis relied has been lifted, the next lease sale is scheduled for December 2026, and 19 of the parcels slated to be offered in that lease sale are entirely or partially within HPZs. *See* Karuzas Decl., Exhibit 1 at 2. Moreover, there is now more evidence that SB 1137 is actively harming current and prospective leases and that a preliminary injunction would prevent those harms. Accordingly, preliminary injunctive relief is necessary to halt ongoing and irreparable injuries to the United States' sovereign and financial interests, injuries that will continue to worsen absent an injunction.

SB 1137 also inflicts ongoing injury to the United States' sovereign interests in managing federal lands, implementing national energy policy, enforcing federal law, and preventing the usurpation of federal authority. By obstructing fossil fuel development authorized under federal law, SB 1137 directly interferes with the federal government's ability to carry out the purposes and objectives of Congress, including productive use of federal lands and the promotion of domestic energy production. A complaint "asserts an injury to the United States" if it alleges an "injury to [U.S.] sovereignty arising from violation of its laws." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).

Consequently, courts routinely hold that the United States suffers per se irreparable harm when states violate its laws. *See, e.g.*, *Arizona*, 641 F.3d at 366 (finding irreparable harm to the United States based on preempted Arizona immigration law); *Daimler Truck N. Am., LLC v. Cal. Air Res. Bd.*, No. 25-cv-02255, 2025 U.S. Dist. LEXIS 215580, at *54-55 (E.D. Cal. Oct. 31, 2025) (finding "per se irreparable harm in the absence of an injunction barring enforcement of" an agreement that conflicted with federal law); *see also New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989) (irreparable injury may be established "by a showing that the challenged state statute is 'flagrantly and patently violative of'" federal law (citation omitted)).

Unless enjoined, SB 1137 will continue to obstruct Congress's policies embodied in the MLA and FLPMA and impair BLM's ability to administer federal lands and advance national energy objectives. Lands that BLM has specifically selected and leased for mineral development will remain undeveloped or be underdeveloped. Karuzas Decl. ¶¶ 27, 30; Warren Decl. ¶¶ 32, 34; Kerns Decl. ¶¶ 7-9; Richardson Decl. ¶¶ 19-26; Combs Decl. ¶¶ 7-13. Drilling and production that BLM has approved and encouraged within HPZs will remain effectively vetoed by California. *See*, *e.g.*, Richardson Decl. ¶¶ 19-26; Combs Decl. ¶¶ 7, 10. And the United States' ability to lease its lands for future oil and gas development at the December 1, 2026, lease sale and at future lease sales will be frustrated. Karuzas Decl. ¶ 31; Warren Decl. ¶¶ 29-36; Kerns Decl. ¶¶ 11-12; Richardson Decl. ¶¶ 32-33; Combs Decl. ¶¶ 14-17. These ongoing intrusions into the federal government's management of its lands impair the United States's sovereign authority and constitute ongoing irreparable harm.

Separate from its sovereign injuries, the United States will suffer substantial lost revenue from both existing and future federal leases. For existing leases, SB 1137 will reduce or eliminate production, resulting in lost royalty payments and, in some cases, the loss of leases that can no longer be economically developed. *See* Karuzas Decl. ¶¶ 27, 30; Warren Decl. ¶¶ 32, 34-35; Kerns Decl. ¶¶ 7-9, 12-13; Richardson Decl. ¶¶ 19-26; Combs Decl. ¶¶ 8-14. For lands that otherwise would be offered for lease, SB 1137 will deter potential bidders and/or reduce the amounts they are willing to bid, resulting in lost bonus bids, rental payments, and royalties from federal resources that otherwise would have been leased and developed. Karuzas Decl. ¶ 31; Warren Decl. ¶¶ 29-34; Kerns Decl. ¶¶ 11-12; Richardson Decl. ¶¶ 32-33; Combs Decl. ¶¶ 15-17. Those losses are unlikely ever to be recovered if SB 1137 is not enjoined soon because lessees are progressively and permanently ending operations, abandoning planned projects, and redirecting capital to investments elsewhere, making it unlikely that the lost production and associated federal revenues will be recaptured even if SB 1137 is later permanently enjoined. *See* Richardson Decl. ¶¶ 19-30; Combs Decl. ¶¶ 8-16; *see also California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (economic harm is an irreparable injury if aggrieved party "will not be able to recover monetary damages").

Lastly, a preliminary injunction would provide meaningful relief. It would temporarily resolve the intergovernmental conflict over control of federal lands and allow FLPMA and MLA objectives to be carried out by enabling lessees to resume development activities and to bid with confidence on federal leases. Kerns Decl. ¶ 16; Richardson Decl. ¶¶ 31-32; Combs Decl. ¶ 11. For these reasons, the United States has demonstrated imminent and irreparable harm.

**III. The balance of the equities and the public interest favor injunctive relief.**

The balance of the hardships suffered by parties and the public interest favor granting the United States' request to enjoin SB 1137's setback provisions. This action seeks to protect the interests of the United States as a whole, so the burdens that will result without injunctive relief are directly tied to the public benefits that will be protected if this Court issues the requested injunction. *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009) (balance of equities and public interest "merge when the Government is the opposing party" because harm to the Government is harm to the public interest). This is especially true here because this lawsuit seeks to vindicate the supremacy of federal law. *United States v. California*, 921 F.3d 865, 893-94 (9th Cir. 2019) (recounting the Ninth Circuit's longstanding "recognition that preventing a violation of the Supremacy Clause serves the public interest").

The public interest will be served by the issuance of an injunction. To start, preliminary relief will preserve the United States' authority to manage its lands and prevent California from overriding national energy policy. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496-98 (2001) (when weighing the public interest, courts of equity must respect Congress's policy choices as set forth in a statute). A preliminary injunction would help keep lessees and operators solvent—ensuring they can continue bidding on and developing leases—which would support energy production, lower prices, protect jobs, and maintain a stable domestic oil supply. *See* Richardson Decl. ¶¶ 12, 31-32 (preliminary relief would enable E&B Resources to resume development of 189 wells); *see* Combs Decl. ¶¶ 15-18. A preliminary injunction would also ensure that the December 2026 lease sale, as well as subsequent quarterly federal lease sales conducted pursuant to the MLA's mandate, can proceed without SB 1137's restrictions distorting the bidding process or deterring development. *See* Karuzas Decl. ¶ 31; Warren Decl. ¶¶ 29-35; Kerns Decl.

¶¶ 11-12; Richardson Decl. ¶¶ 32-33; Combs Decl. ¶¶ 15-17; 30 U.S.C. § 226(b)(1)(A). It would thereby reduce SB 1137's negative effects on national energy markets, Warren Decl. ¶ 34, and it would ensure that the public benefits from lease bonuses, royalty payments, and other income that the federal government derives from oil and gas development.

By contrast, a preliminary injunction will not meaningfully burden California. SB 1137 only recently went into effect and is not fully implemented, so an injunction in this context would have the effect of merely preserving the recent status quo. *U.S. Philips Corps. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010) ("[T]he very purpose of a preliminary injunction . . . is to preserve the status quo and the rights of the parties until a final judgment issues in the cause."). If this Court ultimately concludes that SB 1137 does not offend the Supremacy Clause, California would then be able to implement and enforce SB 1137 without having suffered any substantial burden. But given that this litigation implicates the management and control of federal lands—in which, by any plausible account, the federal interest is paramount—any burden on California from a preliminary injunction would be modest. Indeed, California has no legitimate interest in the enforcement of a law that violates the Supremacy Clause. *Chamber of Com. of U.S. v. Edmonson*, 594 F.3d 742, 771 (10th Cir. 2010) ("Oklahoma does not have an interest in enforcing a law that is likely constitutionally infirm.").

**CONCLUSION**

SB 1137 is field-preempted, or at minimum conflict-preempted. It inflicts immediate and irreparable harm by obstructing federally authorized mineral development, undermining BLM's land-use planning and leasing decisions—including the upcoming December 2026 lease sale—and infringing on the Federal Government's sovereign authority to manage its lands and thereby derive revenue. The United States is likely to succeed on the merits, and the balance of equities and public interest strongly favor preventing unlawful state interference with Congress's directives. The Court should grant the motion and preliminarily enjoin enforcement of SB 1137's setback restrictions (CAL. PUB. RES. CODE § 3281(a)-(b)) and related regulations (*e.g.*, CAL. CODE REGS. tit. 14, §§ 1765.3, 1765.5(b)) as applied to federal lands.

DATED: October 16, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BENJAMIN HAYES
Deputy Assistant Attorney General

*<u>/s/ Dustin J. Weisman</u>*
DUSTIN J. WEISMAN (CO Bar #44818)
JENNIFER R. LAKE (CO Bar #53141)
Trial Attorneys
Natural Resources Section
Energy and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (303) 844-1369
Email: dustin.weisman@usdoj.gov
Email: jennifer.lake.2@usdoj.gov

ERIC GRANT
United States Attorney
Eastern District of California

*Attorneys for the United States*